**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **CRYSTAL VASCONCELLOS** | § | |
| | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **Civil Action No. 06-00484-T-LDA** |
| **v.** | § | |
| | § | |
| **PIER 1 IMPORTS (U.S.), INC., AND** | § | |
| **CINDY BALDWIN** | § | |

**PIER 1 IMPORTS (U.S.), INC.'S STATEMENT OF UNDISPUTED FACTS**

COMES NOW, Pier 1 Imports (U.S.), Inc. ("Pier 1"), Defendant in the above-styled litigation, and files its Statement of Undisputed Facts in Support of its Motion for Summary Judgment on all claims of Crystal Vasconcellos ("Plaintiff" or "Vasconcellos") and in support thereof would respectfully show the Court as follows:

**UNDISPUTED STATEMENT OF MATERIAL FACTS**

1. Vasconcellos was employed as a Store Manager at Pier 1's retail store located in Newport, Rhode Island.[1] (App. 4:6-13; App. 85-93).

2. Vasconcellos was at all relevant times an at-will employee. (App. 47:23-25; App. 85-93). As an at-will employee both Vasconcellos and Pier 1 could terminate their employment relationship at any time and for any reason not prohibited by law.

3. Cindy Baldwin was hired as a Regional Manager in November of 2004. (App. 66:10-17).

4. In December 2004, Vasconcellos learned that her new Regional Manager would be Cindy Baldwin. (App. 5:19-23; App. 85-93).

---

[1] To avoid genuine issues of material fact, Pier 1 relies almost exclusively on the deposition testimony of Vasconcellos as support for this Statement of Undisputed Facts.

5. Pier 1 Regional Managers oversee approximately 10-15 Pier 1 retail stores. Vasconcellos first met Baldwin in January 2005. (App. 6:3-4; App. 94-99; App. 85-93).

6. In February 2005, Vasconcellos experienced a break-up with her boyfriend. (App. 16:3-23; App. 85-93).

7. She was so upset by this breakup that Baldwin noticed Vasconcellos was upset and asked her why she was upset. Vasconcellos informed Baldwin that she was going through a tough break-up; Vasconcellos was so upset over the break-up that she left the store for the day. (App. 16:19-23; App. 85-93).

8. On February 18, 2005, Vasconcellos was given a Written Corrective Action. (App. 94-99; App. 85-93)

9. A Written Corrective Action is a written counseling advising an associate that her performance is deficient in some respect and encouraging improved performance. The Written Corrective Action described a several areas where Vasconcellos' store was performing in a substandard manner related to inventory irregularities connected with incomplete or inaccurate paperwork; discounts on damaged merchandise; and failure to follow company shipping policies. (App. 94-99; App. 85-93).

10. These issues were identified during a company internal audit of Vasconcellos's store on February 10, 2005. (App. 94-99; App. 85-93).

11. This was the second internal audit where many of these deficiencies had been identified in Vasconcellos's store. (App. 94-99)

12. In March of 2005 Baldwin (and others) spent a significant amount of time at the Newport store because Pier 1 was preparing for a divisional meeting and the Newport store was the model store for the walk-thru portion of the meeting. (App. 69-70).

13. In April of 2005, Baldwin was living in Newport, Rhode Island near the Pier 1 store. (App. 69-70).

14. In April of 2005, after the divisional meeting in March, Baldwin presented the Store Managers that she supervised with their annual performance review. (App. 69-70)

15. At all times prior to April 19, 2005, Vasconcellos concedes that Baldwin treated her professionally and as business acquaintances. (App. 7:1-5).

16. On April 19, 2005, Baldwin and Vasconcellos met to go over Vasconcellos' annual performance review. (App. 13:6-25; App. 85-93).

17. The review rated Vasconcellos overall performance a "Good" with several areas where Vasconcellos was rated as "Needs Development." (App. 54:12-16; App. 61-63).

18. Vasconcellos was rated as needing development in training her staff, taking more ownership of her store, listening to her team, and providing clear and timely direction to her team. (App. 61-62).

19. To assist Vasconcellos in improving her performance in the deficient areas identified in the recent retail audit, Baldwin also advised Vasconcellos that she wanted her to partake in all the shipments coming into the store. (App. 13:6-25; App. 14:1).

20. Vasconcellos told Baldwin that she had no problem being present for every truck day during the week but that she would have limitations when it comes to the heavy furniture. (App. 14:2-6).

21. Baldwin asked Vasconcellos why and Vasconcellos told her that she was pregnant. (App. 68:5-11).

22. While Vasconcellos told Baldwin she had lifting limitations, she did not in fact have any written work restrictions; had not even seen a doctor for her current pregnancy, and had never been given written lifting restrictions for her earlier pregnancy. (App. 5:3-8).

23. Vasconcellos further told Baldwin that she was due in December and that her assistant manager was capable of running the store in her absence. (App. 17:11-25).

24. Baldwin told Vasconcellos that they would deal with the running of the store during her anticipated absence when the time came for Vasconcellos to take a leave of absence. (App. 17:11-25).

25. Baldwin asked her how she felt about the pregnancy. (App. 15:8-13; App. 85-93).

26. Vasconcellos explained that she was happy with the pregnancy, that the father was not the same person she had broken up with in February, and that the pregnancy was "a good thing." (App. 15:8-13, 21-25; App. 16:1-5; App. 85-93).

27. When Vasconcellos's assistant manager and co-workers asked her the same question, she did not believe the associate to be "put off" by the news and instead thought those employees were happy for her. (App. 11:14-25; App. 12:1-15).

28. Vasconcellos admits that Baldwin never said anything negative about her pregnancy, her alleged work restrictions, or that she would need to take a leave of absence after the birth of her child during the April 19, 2005 meeting. (App. 18:3-24; App. 45:11-18; App. 85-93).

29. On April 26, 2005, Vasconcellos emailed Baldwin to inform her that she was working at the Dartmouth Store because her car needed work done. (App. 83; App. 67:3-8, 23-25; App. 85-93).

30. Pier 1 store managers are required to contact their regional managers if they are not going to be in their assigned store when scheduled. (App. 94-99)

31. Upon receiving the email, Baldwin told Vasconcellos that working out of another store seemed to be more of a personal decision rather than a business decision because it was important that Vasconcellos work at her assigned store. (App. 83; App. 94-99)

32. Baldwin also told Vasconcellos that there were other options if she need time off to take care of personal matters such as vacation time. (App. 83; App. 94-99).

33. Pier 1 Managers have unlimited sick time. (App. 94-99)

34. On April 29, 2005, Vasconcellos was scheduled to work from 9:00 a.m. to 5:30 p.m. (App. 20:7-8; App. 85-93).

35. During the day, Vasconcellos claims that she was not feeling well and at 4:15 p.m. decided to leave early. (App. 20:9-25; App. 85-93).

36. Prior to leaving, Vasconcellos covered the responsibilities she wanted completed during the remainder of the day with her assistant manager, Jody Graham ("Graham"), and then gathered her personal belongings; clocked out from work; told Graham good-bye and exited the store intending to go home. (App. 20:12-25; App. 21:1-6, 18-25).

37. Shortly thereafter, Baldwin called the store for Vasconcellos. Baldwin was told that Vasconcellos was gone for the day. (App. 24:20-25; App. 25:23-25; App. 26:1-4).

38. The assistant manager then called Vasconcellos's cell phone to advise her that the Regional Manager, called looking for Vasconcellos. (App. 22:9-22; App. 85-93).

39. Vasconcellos asked the assistant manager if Baldwin wanted anything in particular and the assistant manager said she did not know because she did not take the call. (App. 22:23-25; App. 23:1-11; App. 85-93).

40. Vasconcellos returned to the store. She did not, however, immediately return Baldwin's call. (App. 23:16-25; App. 24:1-8; App. 85-93).

41. Instead, she decided that she would get some money and go to the bank next door to get change for the weekend. (App. 23:16-25; App. 24:1-8).

42. Vasconcellos obtained the cash she wanted to have changed to smaller bills from the store safe and then walked next door to the bank. (App. 23:16-25; App. 24:1-8; App. 85-93).

43. Vasconcellos never entered the bank or obtained the change because she was not feeling well and the bank was busy. (App. 24:14-21).

44. Instead, she decided to get change later and returned to the Pier 1 store to return Baldwin's call. (App. 24:14-21; App. 85-93).

45. Upon returning to the Pier 1 store, Vasconcellos returned Baldwin's call. (App. 25:7-12; App. 85-93).

46. Baldwin told Vasconcellos that her associate told her she had left for the day. (App. 25:14-15; App. 85-93).

47. Vasconcellos's responded, "I ran over to the bank." (App. 25:14-16; App. 85-93).

48. Baldwin responded "Oh." (App. 25:14-16; App. 85-93).

49. The two then discussed certain activities that needed to be handled for a scheduled sidewalk sale at Pier 1's Seekonk store. (App. 25:16-24; App. 85-93).

50. Vasconcellos's pregnancy was never mentioned during this call nor did Vasconcellos tell Baldwin that she was sick, feeling ill, or that she had vomited that day. (App. 28:20-25; App. 29:1-17; App. 85-93).

51. After the call, Vasconcellos clocked back in and completed the tasks she and Baldwin discussed. (App. 26:3-8; App. 85-93).

52. Vasconcellos clocked out at 5:30 p.m. and left for the day. (App. 26:18-20; App. 27:1-4; App. 85-93).

53. Vasconcellos never returned to the bank to obtain the change the store supposedly needed for the weekend nor did she ask any other Pier 1 manager or employee to obtain the change. (App. 26:21-25; App. 27:1-8; App. 85-93).

54. Because this was not the first time Plaintiff was not where she was supposed to be, on April 29, 2005, Baldwin stopped by the Newport Store on her way home to see why Plaintiff had left. (App. 74:12-24; App. 94-99).

55. Baldwin reviewed Vasconcellos's time card to see whether it reflected that she had merely stepped over to the bank or had clocked out for the day. (App. 76:3-25; App. 77:1-4; App. 78:1-10).

56. Making bank deposits is working time and Pier 1 associates do not clock out when taking deposits to the bank. (App. 24:22-25; App. 25:1-3; App. 85-93)

57. Baldwin also asked Graham whether Vasconcellos had told her she was going to the bank when she left on April 29, 2005. (App. 94-99).

58. Graham advised Baldwin that when Vasconcellos originally left she told Graham that she was leaving for the day. (App. 75:13-24; App. 84).

59. Vasconcellos did not tell Graham she was going to the bank. (App. 75:13-24; App. 84; App. 85-93).

60. Believing that Vasconcellos had been dishonest in her explanation that she had been at the bank when Baldwin originally called, Baldwin concluded she needed to investigate this potential integrity issue further. (App. 94-99).

61. On May 4, 2005, Baldwin visited Vasconcellos's store to follow-up on Vasconcellos's report that she had been at the bank when Baldwin initially called the store looking for her. (App.79:25; App. 80:1, 21-25; App. 81:1-10).

62. During the interview, Vasconcellos falsely told Baldwin that she had informed Graham she was merely going to the bank when she had in fact left for the day. (App. 36:14-20).

63. Vasconcellos admitted repeatedly that the statements she made to Baldwin during this interview that she told her subordinate she was going to the bank were inaccurate. (App. 36:21-25; App. 41:2-14).

64. Vasconcellos even apologized for not telling Baldwin that her original intent had been to leave for the day. (App. 35:17-20).

65. As part of her investigation Baldwin asked Vasconcellos to write out a statement on how she thought the conversation went. (App. 34:22-25).

66. In her statement, Vasconcellos injected her pregnancy into the investigation by volunteering that she reason she was not direct with Baldwin about here whereabouts on April 29, 2005 was because she had been experiencing morning sickness. (App. 56; App. 100-01).

67. Vasconcellos concedes that she was free to write anything she wanted in the statement and was not told to exclude anything. (App. 35:1-7).

68. In her handwritten statement, Vasconcellos again repeated that she had not been truthful with Baldwin when she told Baldwin she let her assistant manger know she would be at the bank. (App. 38:4-15; App. 58).

69. Vasconcellos' written statement further demonstrated her intent to mislead Baldwin when she wrote: "Cindy questioned what my intention was for that Friday evening and I explained I was going to the bank. With more questions I hesitantly let her know my true intention was to leave for the day." (App. 56-57; App. 85-93).

70. In her written statement, Vasconcellos again confirmed that the reason she left for the day was because she had been experiencing morning sickness. (App. 56-57).

71. Vasconcellos admitted in her deposition that her true intention at the time Baldwin called looking for her was to go home for the day and not to go to the bank. (App. 32: 18-20; App. 28:3-9).

72. Following Baldwin's meeting with Vasconcellos, she next partnered with her Divisional Director and Human Resources department. (App. 94-99)

73. On May 5, 2005, Baldwin advised Vasconcellos that her employment was being discontinued due to dishonesty. (App. 42:4-23; App. 85-93).

74. Vasconcellos concedes that the only reason ever provided to her for her termination of employment was dishonesty. (App. 43:15-18).

75. Vasconcellos concedes that she is unaware of any company policy Pier 1 failed to follow in investigating her misconduct or in terminating her employment. (App. 46:17-20; App. 39:1-25; App. 40:1-25; App. 50:18-22).

76. Vasconcellos cannot identify anything else Pier 1 should have done in investigating her misconduct before making its decision regarding her employment. (App. 51:6-15).

77. No Pier 1 employee ever made any negative or derogatory remarks about Vasconcellos's pregnancy; the possibility she might need to take a future leave of absence for her pregnancy; or that she might eventually have work restrictions resulting from her pregnancy. (App. 18:3-24).

78. Vasconcellos can identify no non-pregnant Pier 1 store manager who the company believed lied to her Regional Manager and was permitted to remain employed. (App. 51:16-18).

79. There is no evidence of any similarly-situated non-pregnant store managers who were treated more favorably than was Vasconcellos. (App. 46:21-25; App. 47:1-3; App. 49:10-16, 21-23).

80. Vasconcellos admits that she is unaware of any facts that lead her to believe that Baldwin did not have a sincere belief that Plaintiff had lied to her. (App. 46:17-20).

81. Vasconcellos concedes that it became readily apparent to her during the March 4, 2005, interview with Baldwin that Baldwin believed Plaintiff had not been honest with her. (App. 35:25; App. 36:1-8).

82. Vasconcellos admits that the only evidence she has that Pier 1's proffered non-discriminatory reason for its actions is untrue is her own subjective belief. (App. 52:22-25; App. 53:1-8)

Respectfully submitted,

/s/ Robert P. Brooks

Robert P. Brooks (#3721)
Jaime J. LaPorte (#6668)
Adler Pollock & Sheehan, P.C.
One Citizens Plaza, 8th Floor
Providence, Rhode Island 02903-1345
Telephone: (401) 274-7200
Telefax: (401) 751-0604
rbrooks@apslaw.com
jlaporte@apslaw.com
Dated: February 11, 2008

-And-

Russell D. Cawyer *(Admitted Pro Hac Vice)*
State Bar No. 00793482
Carrie A. Brantley *(Admitted Pro Hac Vice)*
State Bar No. 24036256
Kelly Hart & Hallman LLP
2500 Texas Commerce Tower
201 Main Street
Fort Worth, Texas 76102
Telephone: (817) 332-2500
Telefax: (817) 878-9280
russell.cawyer@khh.com
carrie.brantley@khh.com

**ATTORNEYS FOR DEFENDANT PIER 1 IMPORTS (U.S.), INC.**

**CERTIFICATE OF SERVICE**

To: Bruce P. Gladstein, Esq.
750 East Ave.
Pawtucket, RI 02860

I hereby certify that I filed Pier 1 Imports (U.S.), Inc.'s Statement of Undisputed Facts through the ECF system on the 11th day of February, 2008, and that notice will be sent electronically to the above-named counsel who is a registered participant identified on the Mailing Information for Case No. 07-484T-LDA.

/s/ Robert P. Brooks

*444077_1.doc*