**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **CRYSTAL VASCONCELLOS**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**PIER 1 IMPORTS (U.S.), INC., AND CINDY BALDWIN** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Civil Action No. 06-00484-T-LDA** |

**PIER 1 IMPORTS (U.S.), INC.'S APPENDIX TO STATEMENT OF UNDISPUTED FACTS**

Robert P. Brooks (#3721)
Jaime J. LaPorte (#6668)
Adler Pollock & Sheehan, P.C.
One Citizens Plaza, 8th Floor
Providence, Rhode Island 02903-1345
Telephone: (401) 274-7200
Telefax: (401) 751-0604
rbrooks@apslaw.com
jlaporte@apslaw.com
Dated: February 11, 2008

-And-

Russell D. Cawyer *(Admitted Pro Hac Vice)*
State Bar No. 00793482
Carrie A. Brantley *(Admitted Pro Hac Vice)*
State Bar No. 24036256
Kelly Hart & Hallman LLP
2500 Texas Commerce Tower
201 Main Street
Fort Worth, Texas 76102
Telephone: (817) 332-2500
Telefax: (817) 878-9280
russell.cawyer@khh.com
carrie.brantley@khh.com

**ATTORNEYS FOR DEFENDANT PIER 1 IMPORTS (U.S.), INC.**

*444079_1.doc*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

Crystal Vasconcellos :
:
vs. : C.A. NO.: 2006-4016
:
Pier 1 Imports (U.S.), Inc.,:
And Cindy Baldwin :

DEPOSITION OF CRYSTAL VASCONCELLOS, the Plaintiff in the above-entitled matter, on behalf of the Defendants, before Elizabeth Greeley, Notary Public, in and for the State of Rhode Island, at the Law Office of Bruce Gladstein, 750 East Avenue, Pawtucket, Rhode Island, on September 6, 2007 at 9:30 a.m.

PRESENT:

FOR THE PLAINTIFF........LAW OFFICE OF BRUCE GLADSTEIN
BY: BRUCE GLADSTEIN, ESQUIRE

FOR THE DEFENDANTS.......KELLY HART & HALLMAN
BY: RUSSELL CAWYER, ESQUIRE

ALLIED COURT REPORTERS
115 PHENIX AVENUE
CRANSTON, RI 02920
401-946-5500

# I N D E X


| WITNESS | PAGE |
|---|---|
| CRYSTAL VASCONCELLOS | |
| EXAMINATION BY MR. CAWYER.................... | 4 |


## DEFENDANTS' EXHIBITS FOR I.D.


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 1 | W-2 FORM (1 PG).................. | 42 |
| 2 | W-2 FORM (1 PG).................. | 43 |
| 3 | WAGE DOCUMENT (1 PG)............ | 51 |
| 4 | HANDWRITTEN STATEMENT (3 PGS)... | 86 |
| 5 | QUESTIONNAIRE (4 PGS)........... | 105 |
| 6 | DISCRIMINATION CHARGE (1 PG).... | 109 |
| 7 | INTERROGATORIES (6 PGS)......... | 111 |
| 8 | SUMMONS (6 PGS).................. | 123 |
| 9 | APPLICATION (2 PGS).............. | 123 |
| 10 | WAGE DOCUMENT (1 PG)............ | 125 |
| 11 | WAGE DOCUMENT (1 PG)............ | 125 |
| 12 | GOVERNMENT DOCUMENT (1 PGE)..... | 126 |
| 13 | CHECK (1 PG)..................... | 129 |
| 14 | CHECK (1 PG)..................... | 129 |
| 15 | CHECK (1 PG)..................... | 129 |
| 16 | LETTER (1 PG).................... | 130 |
| 17 | RESUME (2 PGS)................... | 131 |
| 18 | NOTICE TO SUE (1 PG)............ | 132 |
| 19 | RESUME (1 PG).................... | 132 |
| 20 | NOTICE TO SUE (2 PGS)........... | 133 |
| 21 | INTERROGATORIES (4 PGS)......... | 133 |
| 22 | WORKSHEET (1 PG)................ | 146 |
| 23 | EMPLOYMENT APPLICATION (5 PGS).. | 150 |
| 24 | JOB DESCRIPTION (3 PGS)......... | 151 |




b36f074d-227c-4159-8771-ab897762197a

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 25 | CORRECTIVE ACTION (2 PGS)....... | 155 |
| 26 | VERBAL COUNSELING (2 PGS)....... | 157 |
| 27 | VERBAL COUNSELING (1 PG)........ | 158 |
| 28 | VERBAL COUNSELING (1 PG)........ | 158 |
| 29 | VERBAL COUNSELING (1 PG)........ | 159 |
| 30 | CORRECTIVE ACTION (1 PG)........ | 159 |
| 31 | PERFORMANCE REVIEW (3 PGS)...... | 160 |

continuously until you became a store manager?
A. Correct.
Q. Were you always an associate manager at the North Dartmouth store?
A. Yes.
Q. When you were a store manager, what store did you manage?
A. Newport, Rhode Island.
Q. You always managed that particular store?
A. Yes.
Q. Never managed any other Pier 1 store as a store manager?
A. No.
Q. Who was your health care provider with your first pregnancy?
A. Pilgrim Health.
Q. Where is Pilgrim Health located?
A. I don't know.
Q. What state?
A. Massachusetts.
Q. What city?
A. I don't know.
Q. Do you remember who your health care provider was?
A. Dr. Donley.

Q. Anyone else?
A. Not through the pregnancy.
Q. During your first pregnancy with your son Dalton, did Dr. Donley ever give you any work restrictions?
A. No.
Q. Did Dr. Donley ever give you any physical restrictions of any kind?
A. No.
Q. When did Cindy Baldwin first become your supervisor?
A. I don't know the date of her employment. I met her, I was told about her in December of 2004. I believe she started around then.
Q. Who told you about Cindy Baldwin in December 2004?
A. I believe it was Susan Dubois.
Q. Who is Ms. Dubois?
A. The district divisional manager.
Q. What did Ms. Dubois tell you about Cindy Baldwin in December 2004?
A. She addressed my region on a conference call that our new regional manager's name was Cindy Baldwin.
Q. Did she tell you anything else about Ms. Baldwin in this first conference call that was directed to the

region?
A. I don't recall.
Q. When did you first meet Cindy Baldwin?
A. January of 2005.
Q. I want to ask you a series of questions, but I want to limit my time period from January 2005 to April 18, 2005 before you were given your last performance review as a store manager. Do you understand what time frame I'm talking about?
A. Yes.
Q. During that time frame, how did Ms. Baldwin treat you?
A. She was personable. She was very friendly. She seemed very open.
Q. What do you mean by "she seemed very open"?
A. She had a lot of knowledge and answered all our questions, all my questions.
Q. You mean work-related questions?
A. Work-related questions.
Q. Do you mean anything else by open when you say she was open?
A. No.
Q. What do you mean by "she was personable"?
A. She was very friendly, always smiling, always conversational.

Q. Did she seem interested in you?
A. Yes.
Q. During that time period, did she always treat you professionally?
A. Yes.
Q. How often did Ms. Baldwin come to your store from January 2005 through April 18, 2005?
A. Often. She lived a few streets over from my store.
Q. How many times per month, on average?
A. Oh, I saw her sometimes two times a week. Sometimes less.
Q. There were some workweeks you might see her as often as two times a week and other times where you might not see her at all in a week?
A. Yes.
Q. How many times did she come by unannounced during the time frame from January 2005 through April 18, 2005?
A. I don't really recall any.
Q. You don't recall her ever coming by unannounced?
A. No.
Q. How often did she call your store from January 2005 to April 18, 2005?
A. Mostly every day.

Q. So it's your testimony under oath that Cindy Baldwin called you mostly every day?
A. Most of the time, yes. There were lapses where that did not happen.
Q. What was the longest period of time where Ms. Baldwin didn't call your store from January 2005 to April 18, 2005?
A. Maybe four days.
Q. How often did that happen where it might be as many as four days that went by between the time you talked with Ms. Baldwin on the telephone?
A. I can't say.
Q. How come?
A. I don't remember.
Q. Did you ever keep a diary?
A. No.
Q. Ever keep a journal?
A. Not ongoing.
Q. When have you kept a journal?
A. When I was 17.
Q. You haven't kept a journal since you were 17?
A. Only on the happenings with my older son.
Q. What do you mean?
A. With his meetings with his father.
Q. Tell me what types of things you would keep in

Q. How did you learn you were pregnant?
A. I took a test.
Q. A test that you buy at a drugstore?
A. Yes.
Q. Do you know how long you had been pregnant as of early April 2005 when you learned you were pregnant?
A. No.
Q. Did you later learn?
A. Yes.
Q. When was that?
A. I learned the exact time on May 8.
Q. What was the exact time?
A. Best I can recall, I was about five to six weeks pregnant now. She said it was in between. It's never an exact.
Q. So in about early February 2005 you were first pregnant?
A. No. Late March.
Q. Late March?
A. I became pregnant.
Q. I can't do math in my head either. So you first became pregnant in late March 2005. You learned you were pregnant in early April 2005, and your doctor gave you the date of conception on May 8, 2005; is that accurate?

A. She didn't give me a date of conception.
Q. Well, she gave you a date you were first pregnant, a range, right?
A. A range, yes.
Q. Other than that, what I said was correct?
A. Yes.
Q. Was this a planned pregnancy?
A. No.
Q. When did you first start telling people you were pregnant?
A. The day I found out.
Q. Who did you tell?
A. My friends.
Q. Who are your three closest friends?
A. Jen Xavier, Jen Corey, C-O-R-E-Y, and John, obviously.
Q. Where does Jen Xavier live?
A. Fall River, Massachusetts.
Q. Do you have her address?
A. 116 Renney, R-E-N-N-E-Y, I believe, Street.
Q. What's Ms. Xavier's phone number?
A. 508-674-4711.
Q. What about Jen Corey, what is her address and telephone number?
A. She just moved. I don't know her exact

address. She's in Middleboro, Massachusetts. Her phone number I have to get out of my phone. I don't remember.

Q. Do you have your phone with you today?

A. Yes. 774-263-8437.

Q. When did you first start telling any employee of Pier 1 that you were pregnant?

A. Two weeks after I found out, about the same time I told Cindy.

Q. What employees at Pier 1 did you tell you were pregnant before your employment ended in May of 2005?

A. My assistant managers, Theresa Butala, B-U-T-A-L-A, Rachel Brown, Jody Graham.

Q. What was Theresa Butala's position with Pier 1 in April and May 2005?

A. Assistant manager.

Q. What about Rachel Brown?

A. Assistant manager.

Q. Jody Graham?

A. Assistant manager.

Q. Did you tell any of your sales associates?

A. I don't recall directly.

Q. What was Ms. Butala's reaction when you told her you were pregnant?

A. "Oh, my God. Are you happy? I can't wait to

throw a baby shower."
Q. These were all positive reactions that you observed?
A. Yes.
Q. Is that accurate?
A. Yes.
Q. Did she wish you congratulations?
A. Theresa, yes.
Q. What was Rachel Brown's reaction?
A. I don't remember exact wording, but congratulations.
Q. Fair to say it wasn't a negative reaction?
A. Yes.
Q. What about Jody Graham?
A. Same.
Q. Tell me about the first time you told Cindy Baldwin you were pregnant.
A. It was during my review.
Q. When was that?
A. April 19.
Q. I'm going to ask you some questions about the conversation you had with Ms. Baldwin.
A. Sure.
Q. I would like you, to the best of your ability, to tell me the exact words that were used, not

paraphrase, don't fill in the blanks, but tell me the exact words that were used so I can get a fair understanding of what was said to you and what was said to Ms. Baldwin.

A. Okay.

Q. Tell me what you recall about the April 19, 2005 meeting where you went over your performance review with Ms. Baldwin and you told her you were pregnant.

A. In that, do you want me to tell you about when we went over the review or go right into what I said to her?

Q. Let's start at the beginning of the meeting and walk me through everything you can recall.

A. Okay. We spoke about the performance review, what she analyzed my performance with, a good she gave me. We talked about what successes my store had in the past few months as well as the prior year. After we talked about the successes, we talked about, we began speaking about the opportunities, and one of the opportunities in my store was the stockroom. My stockroom was very small. Shipment often was processed in a messy way, because we could not categorize it. So we started talking about how to fix that problem and different strategies we could use. Cindy requested that I partake in all the shipments

coming into the store, which was just doing a truck.
Q. What did you say in response?
A. I said that I had no problem being present at every truck, on every truck day during the week, but I will have limitations when it comes to the heavy furniture.
Q. What did she say, if anything, in response?
A. She asked why.
Q. What did you say?
A. I told her that I was pregnant.
Q. What did she say?
A. "Oh, is that a good thing?" I'm trying to think of her exact words for you. At that point I believe she just said okay, oh, okay.
Q. What did you say in response, if anything?
A. I went into conversation about how I was very happy about this and it was a good thing.
Q. So you volunteered to Ms. Baldwin that you were happy about the pregnancy and it was a good thing?
A. I'm having a problem with -- you said you wanted exact words. I'm having a problem with exact words for you.
Q. I just want to know the best of your recollection. I don't want to hear something new for the first time at trial. To the best of your ability,

tell me the exact words that people used.

A. She asked me how I felt about it. Almost like she was unsure if I was happy.

Q. Did she ask you whether you were okay with it, or how did you feel about it, how did you feel?

A. About it. She did not ask me how I was feeling at the time.

Q. She asked you how do you feel about it, and what response, if anything, did you make?

A. I said, "It's a good thing." I said, "Don't worry. It's a good thing." I talked, it was myself talking for a good couple of minutes about, that I was happy.

Q. What else did Ms. Baldwin say, if anything, after you described how you were happy and this pregnancy was a good thing?

A. She said, "Can I ask you a personal question?"

Q. What did you say, if anything?

A. I said okay.

Q. What happened next?

A. She said, "I know in February you were just going through a break-up." That was her posed question. She said it with a -- I went into how it wasn't the same person and how this was a good thing

and how long I've known this person. I was very, I wanted to convey to her that I was happy about this.

Q. Had you gone through a bad break-up in February 2005?

A. Yes.

Q. With whom?

A. It wasn't, let me say, not a bad break-up. It was a short-term break-up that for a week I was upset about it.

Q. Who was it you were broken up with?

A. His name was Jason.

Q. What was his last name?

A. I don't remember right now.

Q. How long did you date Jason?

A. Three months, two months.

Q. So in February, for a week period of time when you were broken up, you were upset about that?

A. Yes.

Q. You had shared that with Cindy Baldwin, hadn't you?

A. She noticed I was upset in February. She asked me why. I said, "I'm just going through a break-up," and I went home.

Q. Did you appreciate the fact that Ms. Baldwin was concerned about you?

A. No.

Q. You would have preferred her to be unconcerned about you?

A. No, not necessarily.

Q. After you say that Ms. Baldwin asked you about going through the break-up in February, what did you say your response was, if anything?

A. I said that I was happy now, and I started describing my relationship now is a good thing, justifying myself, honest.

Q. What else, if anything, was said during this conversation between you and Ms. Baldwin after you explained that you were in a happy relationship now?

A. I told her when I was due.

Q. Tell me exactly what you told her.

A. I said I'd be due around Christmas. December 17 was my due date. I let her know that that shouldn't be a problem because Theresa, my assistant manager, was comfortable handling the store in my absence. I'd make sure that she would be completely set up and everything.

Q. What else, if anything, was said?

A. She said, "We'll deal with that then."

Q. Anything else?

A. Not that I recall, other than, in the body of

the conversation talking about the review, like I said before.

Q. Is it accurate to say at no time during this April 19, 2005 conversation you had with Cindy Baldwin did she ever make any negative statements about your pregnancy?

A. Yes.

Q. Is it accurate to say that during the April 19, 2005 conversation that Ms. Baldwin never said anything negative about the fact that you need to take time off because of your pregnancy?

A. Yes.

Q. Is it also accurate to say that Ms. Baldwin never said anything negative to you about your pregnancy, correct?

A. Yes.

Q. Ms. Baldwin never said anything negative to you about the fact that you need to take time off for your pregnancy, correct?

A. Yes.

Q. Ms. Baldwin never said anything negative to you about any work limitations that might be imposed upon you during the tenure of your pregnancy, correct?

A. Correct.

Q. After the April 19 conversation with Ms. Baldwin

Q. You wouldn't characterize your relationship with Ms. Baldwin at any time as being friends, right?

A. No.

Q. That's not right?

A. No, we were not friends.

Q. Business acquaintances?

A. Yes.

Q. Do you recall April 29, 2005?

A. No. April 29, yes, I'm sorry.

Q. If you didn't recall it, I guess we could all go home.

A. I'm sorry. The day, I was thinking May when you said that.

Q. What time did you get to work on April 29, 2005?

A. 9 a.m.

Q. Who worked with you on April 29, 2005?

A. I don't remember my associate during the day, but I believe Theresa worked in the morning. I don't remember the morning. I believe Theresa opened at seven.

Q. Who else did you work with during the course of the day?

A. Jody came in at three. Two more associates, Heather and Kris, they were both fairly new; Kris being very new. There was another associate on,

another person with me during the day earlier. I'm not sure which associate.

Q. The only people you can remember by name are Theresa, Jody, Heather and Kris?

A. Yes. Rachel might have been on in the morning as well. Again, I'm not sure.

Q. When were you scheduled to work April 29, 2005?

A. 9 to 5:30.

Q. When did you decide to leave for the day on April 29, 2005?

A. I believe it was around 4:15.

Q. So around 4:15 p.m. you decided you were going to leave for the day?

A. Yes.

Q. Did you clock out?

A. Yes.

Q. Did you talk to anyone to tell them you were leaving for the day?

A. I told, I said good-bye to Jody.

Q. Tell me exactly what you told Jody before you left.

A. I told her that I hadn't been feeling well and that I was going to leave. We had actually gone over the responsibilities for the night.

Q. So you went over the responsibilities of the

night with Jody?

A. Yes.

Q. That was because you were leaving at 4:15 for the day and wouldn't be back to go over those responsibilities with Jody, correct?

A. Yes.

Q. You told Jody, "I haven't been feeling well and I'm going to leave," correct?

A. I don't know if that's an exact statement, but yes.

Q. What was the exact thing you said to Jody, if you can recall?

A. In our conversation about the responsibilities for the night, I informed her that I wasn't feeling well. After I, after our conversation ended, I told her that I was going to take off, and good-bye.

Q. When you left the store at 4:15, what did you have in your possession?

A. I had a bag of items to bring to the Dartmouth store.

Q. Anything else?

A. No.

Q. Didn't have a purse?

A. My purse.

Q. Sunglasses?

A. Probably a water bottle, sunglasses.

Q. What was in the bag of items you had to take to the other Pier 1 store?

A. I don't remember which items. Usually it's glassware or something small.

Q. It was all product to sell?

A. Yes.

Q. You left the store at 4:15; what did you do?

A. I walked through the parking lot to get to my car.

Q. Did you get in your car?

A. No.

Q. What happened?

A. My cell phone rang.

Q. What did you do?

A. Answered it.

Q. Who was it?

A. Jody.

Q. Tell me, what did Jody say?

A. Jody said, "Cindy just called and she was looking for you."

Q. Did she say anything else?

A. She said she didn't take the phone call, because I asked her if she wanted something specific.

She said she didn't take the phone call, one of the associates did.

Q. Did she tell you which associate took the call?

A. She did not.

Q. Cindy called you -- sorry, Jody called you and said Cindy called looking for you?

A. Yes.

Q. You asked did she want something specific. Jody said she didn't know, because she didn't take the call?

A. Yes.

Q. Was anything else said between you and Jody during this phone conversation?

A. Not that I recall, no.

Q. What did you do next?

A. I went back into the store and I remembered that it was Friday and the banks weren't open the next day. So I wanted to get some ones. We had some in the safe, but it's always good to have more to get ready for a weekend. I walked into the store. I went to the safe which is on the sales floor. I grabbed some money, walked out the other door and went to go to the bank.

Q. Walked out the front door or the back door?

A. The front door.

Q. To get to the bank, did you walk or drive?
A. Walked.
Q. What bank did Pier 1 use in April 2005?
A. Citizens Bank.
Q. How far was it located from the Pier 1 store?
A. About two seconds. It was the next building.
Q. They're next door to each other?
A. Yes.
Q. So when you would make the routine bank deposits, you would normally walk, correct?
A. Yes.
Q. So you went to the Citizens Bank, and what did you do?
A. I didn't end up going in, because it was too busy. So I figured -- I was feeling very nauseous. I figured I'd just go back and call Cindy and try again afterwards.
Q. Did you actually make it into the store?
A. Back into the store, yes.
Q. Did you actually make it into the bank?
A. No.
Q. When you were a store manager, did you do bank deposits?
A. Yes, all the assistants.
Q. That is working time, isn't it?

A. Yes.
Q. People don't clock out for bank runs, do they?
A. No.
Q. So you went to the bank; you never made it inside the door?
A. No.
Q. You saw it was busy and you turned around and went back to the Pier 1 store?
A. Yes.
Q. What did you do next?
A. I went into my office and called Cindy's cell.
Q. Tell me about the phone conversation with Cindy.
A. I called her and she said, "Oh, your associate said you left for the day." I said, "I ran over to the bank." She goes oh. Then she started telling me what she wanted me to do for the rest of the day. She gave me a list of things to do, including gathering furniture, damaged clearance, to rent a truck, to load the truck with all the damaged and clearance merchandise and to get ready to bring it to the Seekonk store. She said she'd be calling me back to, after I've done, pulled together all my furniture, to see if that would go through.
Q. What else was said during this conversation, if