anything?
A. That was it.
Q. So what did you do next?
A. I clocked back in at that point. I started gathering my furniture together and seeing what I had in my stockroom and what I had on the floor that would be eligible to go to this sidewalk sale that they were having in Seekonk.
Q. When you finished those tasks, what did you do?
A. Cindy called me back and told me to hold off on actually renting the truck and we would deal with the merchandise -- they may not need it. We would deal with it tomorrow, if she needed my product.
Q. Was there anything else said on this second conversation between you and Ms. Baldwin, other than her telling you to hold off on the truck?
A. Yes.
Q. What did you do when you finished your second conversation with Ms. Baldwin on April 29?
A. I left for the day.
Q. You never went back to the bank to get ones?
A. No, it was too late.
Q. You didn't instruct any of your managers or associates to get ones at the bank?
A. It was too late.

Q. At no time from 4:30 when you clocked back in until 5:30 when you left did you ask anybody to go get change or ask anybody to get change when you left?

A. It was too late, no.

Q. I appreciate that. At no time when you got back in the store at 4:30 until 5:30 did you ask anyone to go to the bank to get change for the weekend?

A. No.

Q. On April 29, 2005 did you have any conversations with any of your employees about the phone call with Cindy that they had?

A. No.

Q. So you didn't ask Jody after you went back in the store what Cindy had said?

A. No. She told me she didn't talk to Cindy.

Q. You didn't talk to any other associates on April 29, 2005 to find out what Cindy first said when she called?

A. No.

Q. Did you talk to Theresa?

A. No.

Q. When was the next time you recall there being any discussion about the reason for your leaving on April 29, 2005; when was the next time?

A. When Cindy came into the store on the 4th.

Q. May 4?
A. May 4.
Q. It's fair to say that on April 29, 2005 at 4:15 when you first left the Pier 1 store it was your intent to go home for the day, correct?
A. Yes.
Q. You did not have an intent at that moment to go to the bank, right?
A. No.
Q. Only after you got to your car and your assistant manager, Jody, called you and said Cindy was looking for you did you go back to the store and decide you were going to go to the bank?
A. Yes.
Q. At any time during that April 29, 2005 phone call with Cindy Baldwin, either of the conversations you had with her that day, did you ever tell her that it was your intention to leave for the day?
A. No.
Q. Did you tell her, Ms. Baldwin, at any time during the two conversations you had with her on April 29, 2005 that you hadn't been feeling well that day?
A. No.
Q. At any time on April 29, 2005 in either of the conversations had you with Ms. Baldwin, did you ever

tell her that you had been vomiting on that day?

A. No.

Q. Is it accurate to say that during none of the conversations had you with Cindy Baldwin on April 29, 2005 did your pregnancy come up in any way?

A. That's accurate.

Q. Had you been vomiting on April 29, 2005?

A. I wasn't feeling well. Yes, I had vomited.

Q. At the store?

A. Yes, in the bathroom.

Q. Did anybody see you?

A. No.

Q. Did you tell anybody?

A. No. I said that I wasn't feeling well.

Q. You didn't tell anybody that you had been vomiting?

A. I don't think so.

Q. You're sure you threw up on April 29, 2005 in the store?

A. Yes.

Q. Between April 29, 2005 and May 4, 2005, did you have any conversations with any of the employees that worked in your Pier 1 store about the conversations that you had with Cindy Baldwin and your leaving early on April 29, 2005?

Baldwin had come to your store?

A. I'm not, I found out either Saturday or Sunday that Cindy was in the store. I'm not sure if it was Theresa who told me.

Q. So you don't even remember who told you, right?

A. No.

Q. That's not right?

A. No, that is right.

Q. I guess it's fair to say that other than saying Cindy came by the store, you don't recall what they told you?

A. What was said to me, my store was very small, was that Cindy was in the store after you left. I don't know what she was doing.

Q. That's all you knew, right?

A. Yes.

Q. The only reason you knew that Cindy came by the store was based on what someone else told you?

A. Yes.

Q. You don't have any personal knowledge that Cindy Baldwin came to the store, correct?

A. Before I asked Jody, no.

Q. Even after you asked Jody, you didn't have any personal knowledge that Ms. Baldwin came to your store, because you learned it from what someone else

told you, right?

A. Yes.

Q. You didn't see Cindy Baldwin in your store on April 29, 2005, right?

A. No.

Q. No, that's right?

A. That is right.

Q. The only thing Jody told you was that Cindy Baldwin came to the store and pulled up some time cards?

A. Yes.

Q. Did she say anything else?

A. She asked what time I was scheduled for that day, the 29th.

Q. Jody asked you that?

A. Cindy asked Jody that.

Q. That's what Jody told you Cindy asked her?

A. Yes, Jody told me.

Q. What else, if anything?

A. That she was there for a couple of hours. Pretty much it.

Q. Other than telling you that Cindy Baldwin looked at time cards, did Jody tell you anything else that Cindy did while she was in your store for the alleged two, two and-a-half hours?

asked her the question.
Q. You said Ms. Baldwin asked you why would your associate tell me you had gone for the day; is that accurate; she asked you that question?
A. Yes.
Q. Your response was, "I don't know, because I had just run to the bank"?
A. Not because I had just run to the bank. That's not my exact words.
Q. What were your exact words?
A. I said, I said, "I don't know." She questioned me again. I said, "I ran to the bank." That's when she pulled out -- I didn't say that I only ran to the bank.
Q. When you left, when you left at 4:15, you hadn't gone to the bank, had you?
A. No.
Q. You hadn't intended on going to the bank, had you?
A. Not at that point.
Q. Were you intending to mislead Ms. Baldwin when you told her that you had gone to the bank and didn't disclose that you had been intending to leave for the day?
A. That wasn't my intention.

Q. What was your intention?
A. To find out what she wanted me to do.
Q. But on May 4, 2005 she's asking you some questions about your actions on April 29, right?
A. Right.
Q. The only thing you volunteer is, "No, I was going to the bank"?
A. Right.
Q. You never volunteered that it was your intent to leave for the day until after she asked you why your associate didn't know you were going to the bank?
A. Are you asking me to confirm, or are you asking me a question?
Q. Well, let me ask it a different way. Her next question to you was why didn't your associate know you had gone to the bank, correct?
A. I believe so.
Q. You said, "I don't tell my associates everything that I do," right?
A. Right.
Q. But again, that response, that was misleading, too, wasn't it? When you left at 4:15, you had told your associate what you were doing, you were leaving for the day?
A. I told Jody, my assistant manager, I was

Q. You're not sure?

A. No.

Q. Do you know if it had been before you decided to take the ones to the bank?

A. It was before, I don't recall if there was an afternoon deposit.

Q. Isn't the routine practice of your Pier 1 store to make two store deposits per day?

A. It wasn't always.

Q. Well, it was always your routine practice to make a second deposit on a Friday afternoon when, as you say, the bank was going to be closed on a Saturday, wasn't it?

A. No.

Q. So is it your testimony today that nobody made an afternoon deposit on April 29?

A. I said I don't recall an afternoon deposit. The day we had, we only had $300 in.

Q. During this May 4, 2005 meeting with Ms. Baldwin, were you asked to write any statement out?

A. Yes.

Q. Tell me exactly what Ms. Baldwin asked you to do.

A. She said, "Write a statement on how you think the conversation went today or what you think the conversation was about today."

Q. Did she give you any other instruction?
A. No.
Q. Did she tell you what to write?
A. Not at that point, part.
Q. She didn't tell you to leave out anything, did she?
A. No.
Q. What was your intent when you were writing that handwritten statement on May 4, 2005?
A. To tell my, convey what I thought happened.
Q. You would have included in that statement anything you thought was important, wouldn't you?
A. I would assume so.
Q. You didn't intentionally leave out anything, did you?
A. No.
Q. At any time during the conversation with Ms. Baldwin on May 4, 2005, did you make any apology to her?
A. I believe so.
Q. What did you apologize for?
A. I apologized for not telling her my original intention, because I knew she felt like that was, I was supposed to tell her that.
Q. Did you get the impression when you met with

Ms. Baldwin on May 4, 2005 that you thought she thought you had been dishonest with her?

A. At the beginning.

Q. At any time during the May 4, 2005 interview?

A. After several questions, yes.

Q. So it was your impression that you thought Ms. Baldwin thought you lied to her?

A. Yes.

Q. What was it exactly you apologized for?

A. That she felt -- I don't remember my exact apology to her. I said I'm sorry if she felt that I was dishonest with her. It wasn't my intention to be dishonest with her.

Q. Did you tell Cindy that you had told Jody, your assistant manager, that you would be at the bank?

A. In quick response, yes.

Q. So during this May 4, 2005 interview, you did tell Ms. Baldwin that you told Jody you would be at the bank, correct?

A. Yes.

Q. But in actuality you had never told Jody that you had been at the bank, correct?

A. Correct.

Q. That was inaccurate, right?

A. Yes.

(DEFENDANTS' EXHIBIT 4 MARKED FOR ID)

Q. I'm going to hand you a document I've marked as Defendants' Exhibit 4. Is Defendants' Exhibit 4 a true and correct copy of the statement that you wrote out on May 4, 2005 at Ms. Baldwin's request?

A. Yes.

Q. Again, this is the statement where she asks you to document what had occurred on Friday, April 29 through May 4, 2005, correct?

A. Yes.

Q. This was the statement where she didn't tell you to leave anything out, right?

A. Right.

Q. She didn't tell you that you needed to be sure you included anything, correct?

A. No.

Q. What's inaccurate about that?

A. After I had written it to this point, she faxed it into human resources and then asked me to include this last part.

Q. Is there anything in this last part --

MR. GLADSTEIN: Just for the record, when she said this part, it was everything up to the asterisk on Page --

Q. When you say this part, you included at LR, or at

Cindy's request, was the portion that is next to the asterisk on Bates label 600030?

A. Correct.

Q. Is there anything about what you added and wrote in the asterisk that is inaccurate?

A. No.

Q. So you had, in fact, told Cindy that you had told your assistant manager that you had been at the bank, right?

A. Yes.

Q. You had not, in fact, told your assistant manager that you had been at the bank, right?

A. Correct.

Q. So that was inaccurate?

A. It was inaccurate.

Q. You wrote out Defendants' Exhibit 4, did you intend to write it out truthfully?

A. Yes.

Q. Accurately?

A. Yes.

Q. Would you have expected a manager like Cindy Baldwin to rely on the information you included in Defendants' Exhibit 4 in making her decisions about your employment?

A. I wouldn't assume anything.

Q. How long had you been a manager for Pier 1 as of May 2005?

A. Store manager or associate manager?

Q. How long have you been a manager?

A. For Pier 1, the whole time I worked there.

Q. Four years?

A. Almost.

Q. Have you ever had any opportunities to formally or informally investigate allegations of employee misconduct?

THE WITNESS: My own associates?

MR. CAWYER: Any associate.

A. Yes.

Q. When you were investigating allegations of associate misconduct, what did you do to investigate those allegations?

A. I spoke to other associates and questioned them.

Q. So you interviewed relevant witnesses, right?

A. Yes.

Q. You interviewed the person who was accused of misconduct, right?

A. Yes.

Q. Did you review any documents?

A. The rules and regulations that pertain to

that investigation, I'm assuming.
Q. You mean the Pier 1 policies?
A. Yes.
Q. Anything else that you would do when you were investigating allegations of associate misconduct?
A. I never had to review an extreme misconduct.
Q. You mean extreme misconduct like lying?
A. No. That's not what I meant.
Q. What did you mean?
A. Stealing.
Q. Do you think lying is an extreme misconduct?
A. It depends on the situation.
Q. What does it depend on? When is lying okay?
A. When the intention wasn't to lie, but somebody takes it as a lie.
Q. You mean like when you tell your manager that you told your assistant manager you were going to the bank when, in fact, you didn't tell your assistant manager you were going to the bank?
A. It wasn't a specific yes or no. It wasn't a specific, direct question.
Q. But it was inaccurate nonetheless?
A. Sure.
Q. Do you equate misconduct of lying as similar to stealing?

A. On April 29, no.
Q. At some other point did you tell Ms. Baldwin that you told your assistant manager, Jody, that you had gone to the bank?
A. On May 4 she asked me what the procedure was before I left. I said I usually tell my assistant managers. She goes, "So you told Jody?" I said yes.
Q. When you said yes, you referred to telling Jody that you had gone to the bank on April 29, 2005, correct?
A. Yes.
Q. In fact, you had not told Jody on April 29, 2005 that you had gone to the bank?
A. No, and I did amend that with her.
Q. Where did you amend it?
A. I had told her afterwards that no, I don't remember telling her, in fact, that I went to the bank, and then I wrote that.
Q. Show me on Defendants' Exhibit 4 where you wrote that you were mistaken about telling Jody that you had gone to the bank?
A. I didn't write that I was mistaken. That was part of the conversation.
Q. So nowhere on Defendants' Exhibit 4 did you correct the inaccurate statement you made to

Ms. Baldwin that you had told Jody, your assistant manager, that you had gone to the bank, correct?

A. Correct.

Q. So on May 4, 2005 you left for the day and Ms. Baldwin told you that they didn't have a decision, she'd talk to you tomorrow, correct?

A. Yes.

Q. When was the next time you talked with Ms. Baldwin?

A. The next morning.

Q. What time?

A. When I first got to my store, 8:40 in the morning.

Q. She was already there?

A. Yes.

Q. Tell me what happened.

A. I walked into my store. I went into my office and began morning paperwork. I completed most of my morning paperwork and left my office for the sales floor. She asked if she could speak with me. So I went in the office. So I went back to the office and we sat down. She said, "The company has decided to separate your employment due to dishonesty."

Q. This was in your office?

A. In my office.

Q. Was your door opened or closed?
A. Closed.
Q. What else did she say, if anything?
A. I asked her if that was in the handbook. She replied yes, under the code of conduct, under integrity.
Q. Anything else?
A. She asked me if I was okay. I said fine, and I left.
Q. Was anything else said?
A. Nothing.
Q. So what was the reason she gave you for your separation of employment?
A. Dishonesty.
Q. Now, has anyone from Pier 1 ever given you any reason, other than dishonesty, for the reason that you were separated?
A. No.
Q. You ever file any complaint with Pier 1 with Ms. Baldwin or her treatment of you?
A. Other than this, the complaint that I filed with human resources?
Q. Other than your lawsuit and other than your charge of discrimination, did you ever file any complaint with Pier 1, human resource department or

any department of Pier 1 about Ms. Baldwin or her treatment of you?

A. No.

Q. Do you attend church regularly?

A. No.

Q. Have you ever?

A. When I was young.

Q. In your handwritten statement you wrote on, I believe, Page 1, "I felt uncomfortable communicating to Cindy that I was experiencing morning sickness and wanted to leave early." Do you see where you wrote that?

A. Yes.

Q. Why did you feel uncomfortable communicating that to Ms. Baldwin?

A. It was my impression that she was put off by outside, by anything to do not with the business.

Q. What do you mean? I don't understand.

A. She had made it clear to me, or my impression, in the review by her mannerisms that she was put off by what I had told her.

Q. Okay. Tell me what she did that formed your impression that she was put off by you.

A. The tone in her voice, also the questions that she asked as far as --

goes, "Are you okay with it," that's a little bit different and it's a put-off tone.

Q. Because she asked you in a hesitant manner?

A. It was just hesitant, in my view.

Q. What else was it, if it wasn't hesitant?

A. It was put off. That's the way I can describe it.

Q. You can't describe it any better than that?

A. A synonym for put off, she wasn't happy by it.

Q. She never told you she wasn't happy about your pregnancy, did she?

A. I didn't say that.

Q. But she never said that, did she?

A. She never did.

Q. Did anybody else ever tell you that Ms. Baldwin had made any negative statements about your pregnancy?

A. No.

Q. Did you have any other conversation with Ms. Baldwin after May 5, 2005?

A. No.

Q. Did you have any other conversations with any current or former Pier 1 employee after May 5, 2005?

A. I called looking for my employee file, and I spoke with somebody in human resources.

wanted?

A. Correct.

Q. Can you identify any facts that lead you to believe that Ms. Baldwin didn't have a sincere belief that you had lied to her?

A. Other than my impressions?

Q. Right. Can you identify any facts, facts that you're aware of that lead you to believe that Ms. Baldwin didn't have a sincere belief that you lied to her?

A. She called the store less. She was less personable to me on the phone. She made unannounced visits. Her tone was completely different with me.

MR. CAWYER: Object as non-responsive. Move to strike.

MR. GLADSTEIN: Objection.

Q. My question was, can you identify any facts that lead you to believe that Ms. Baldwin did not have a sincere belief that you had lied to her?

A. No.

Q. Can you identify any Pier 1 store manager whom their supervisor believed had lied to them that wasn't terminated?

A. Not a specific incident.

Q. Not an incident and not a store manager, correct?

A. No.
Q. That's not correct?
A. Correct.
Q. When you were a store manager at the Pier 1 Imports store in Newport, did you have a copy of the Pier 1 store associate handbook?
A. Yes.
Q. You always had access to the handbook, correct?
A. Yes.
Q. As a store manager, one of the things you're required to do is make sure the policies of the handbook are being complied with in your store, correct?
A. Correct.
Q. Do you know what at-will employment means?
A. Yes.
Q. What does it mean?
A. At-will employer has the will to hire and fire at will.
Q. And the employee has the right to resign whenever she likes, correct?
A. Correct.
Q. During your, the entirety of your employ with Pier 1, you were an at-will employee, weren't you?
A. I believe so.

what you remember Theresa telling you.
A. Okay. That's what it was.
Q. You certainly didn't overhear Ms. Baldwin ever saying anything like that?
A. No, I did not.
Q. You never heard Ms. Baldwin mocking your answers?
A. I did not.
Q. I want to now turn your attention to your response to interrogatory number 12 which is on Page 4 of Defendants' Exhibit 7. Take a moment, read your answer to yourself and let me know when you're finished.
A. Okay.
Q. I want to ask you about the second to the last sentence, your response to interrogatory 12. Do you see where you wrote, "Company protocol was a three-strike policy on any one offense, unless it was stealing. Even then I have received cases where thieves were given more time out of respect and opportunity than I was." Do you see that?
A. Yes.
Q. Pier 1 doesn't have any progressive discipline policy that you're aware of, does it?
A. The one that I was introduced to and followed myself in my own store was introduced to me by my

was caught stealing and was given more opportunities than you were given?

A. More opportunities, my statement meant that they were given longer times to steal more than I was given to -- I don't know how to finish that -- to even be there.

Q. What do you mean?

A. There had been suspected thieves that they knew stole and let resign before they terminated them.

Q. Tell me every associate that you're aware of that was stealing from the company that was allowed to continue to work after the company knew they were stealing?

A. I cannot give you any names.

Q. You can't name one, can you?

A. No.

Q. That's not correct?

A. I can't give you a name that the company knew for a long time that somebody was stealing and they didn't do anything about it, no.

Q. Can you identify any employee that was caught stealing that wasn't terminated?

A. No, I cannot.

Q. Well, when you wrote, "I have seen cases where thieves were given more time, respect and opportunity

A. When she worked there in 2001, 2002. I'm not sure. We weren't close.
Q. Did you participate in that investigation in any way?
A. No.
Q. Is it fair to say you have no personal knowledge about the circumstances regarding Jule, this manager, and anything she might or might not have done?
A. I do not have any personal on-hand knowledge.
Q. As far as you know, Jule was caught stealing and was terminated?
A. As far as I know.
Q. Can you identify any written policy or written procedure of Pier 1 that it failed to follow with respect to its investigation of you for lying and your termination of employment?
A. Can you repeat that?
Q. Can you identify any written policy or procedure of Pier 1 that you believe the company violated in either its investigation of you or its termination of your employment?
A. I don't know of any Pier 1 policy.
Q. Thank you. Now, we talked a little bit about investigations. What do you think Pier 1 should have done in investigating an allegation that its manager