had lied to the manager's supervisor?
A. I can't answer that question.
Q. You don't have an opinion?
A. I think that the interview was conducted, and that's it.
Q. You can't identify anything else that you think Pier 1 should have done in its investigation of you and the allegation that you had been dishonest with your regional manager when you told her you had gone to the bank?
A. I can't identify anything else that they should have done.
Q. Yes?
A. In the investigation, I can't think of anything right now.
Q. Can you identify any store manager that lied to their regional manager that wasn't terminated?
A. Not that I know of.
MR. CAWYER: Bruce, don't be pointing at stuff to your client.
MR. GLADSTEIN: I'm not pointing.
MR. CAWYER: The record will reflect your tilting the interrogatory, finger and --
MR. GLADSTEIN: My thumb is on a blank space, and my other thumb is on a blank space. Unless

tone and didn't call your store as often, can you identify any facts that lead you to believe that Pier 1's stated reason for your termination of employment was untrue?

MR. GLADSTEIN: Just for the record, I'm not telling her how to testify. Don't worry about what he considers facts. Worry about what you consider facts.

A. Okay. Yes, I believe that -- I'm sorry. Once more, rephrase the question so I can --

Q. Sure. Other than the fact that you believe Ms. Baldwin's tone and frequency with which she called your store changed after you told her that you were pregnant, can you identify any facts that lead you to believe that Pier 1's stated reason for your termination of employment was untrue?

A. Yes.

Q. What?

A. That I feel that she treated me differently. She acted different towards me. Those are facts to me.

Q. Anything else, other than your subjective belief that she treated you differently, that leads you to believe that Pier 1's stated reason for its termination of your employment is untrue?

A. I don't think so.
Q. So nothing else?
A. I don't believe that their reason for terminating me is correct.
Q. Right. My question is simple. Other than your subjective belief, do you have any facts that lead you to believe that Pier 1's stated reason is untrue?
A. I guess not.
Q. Okay. What was your last rate of pay with Pier 1?
A. It was $39,000 per year plus change, I'm not sure, with the ability to bonus.
Q. Did you actually participate in any benefit plans with Pier 1?
A. Yes.
Q. Which ones?
A. Medical.
Q. What was the amount of your premium per month?
A. I don't remember. They just deducted it out of the check.
Q. Were you given an opportunity to participate in Cobra?
A. Yes. It was too expensive.
Q. Do you remember how much it was?
A. $900 a month.

Q. Handing you the document we now marked as Defendants' Exhibit 30, does that appear to be a true and correct copy of a written corrective action that you were presented with and signed on November 21, 2003?
A. Yes.
Q. Did you express any written disagreement with the performance deficiencies that are reflected in Defendants' 30?
A. No.
(DEFENDANTS' EXHIBIT 31 MARKED FOR ID)
Q. Handing you a document we marked as Defendants' Exhibit 31, does that appear to be a true and correct copy of a store manager performance review that you were given on April 19, 2005 by Cindy Baldwin?
A. Yes.
Q. Ms. Vasconcellos, do you understand that if Pier 1 prevails in this lawsuit that you may be responsible for the court costs that are incurred in defending the lawsuit?
A. No.
Q. You didn't understand that if Pier 1 ultimately prevails from this lawsuit that you might be responsible for paying certain costs, like copies of deposition transcripts, witness fees for witnesses

C-E-R-T-I-F-I-C-A-T-E

I, ELIZABETH GREELEY, a Notary Public, do hereby certify that I am expressly approved as a person qualified and authorized to take depositions pursuant to Rules of Civil Procedure of the Superior Court; especially, but without restriction thereto, under Rule 30 of said Rules; that the witness was sworn by me; that the transcript contains a true record of the proceedings.

Reading and signing of the transcript was requested by the deponent or any parties involved upon completion of the deposition.

IN WITNESS WHEREOF, I have hereunto set my hand this 11th day of September, 2007.

ELIZABETH GREELEY, NOTARY PUBLIC
CERTIFIED COURT REPORTER
MY COMMISSION EXPIRES: 04/07/2010

DEFENDANT'S EXHIBIT 4

Exhibit D

On Friday the 29th of April I wasn't feeling well and decided to leave a little early. Before I reached my car my assistant manager called my cell phone and informed me that Cindy would like me to call her back. I came back into the store grabbed some money to exchange ~~[illegible]~~ for 1's at the bank. I ran over there, came back and returned Cindy's phone call. I felt uncomfortable communicating to Cindy that I was experiencing morning sickness and wanted to leave early. When she questioned me about where I was I let her know I had went to the bank. I did not mention that my intent had been to leave the store.

On Wednesday May 4th Cindy arrived at ~~$~~ my store and asked to speak about the conversation that ~~[illegible]~~ took place the previous Friday. She asked me questions about my communication with my assistant manager and asked me to pull up my time cards for the month of April. Cindy questioned what my intention was for that Friday evening and I explained I was going to the bank. With more

questions I hesitantly let her know my true intention was to leave for the day. I also explained that I felt extremely uncomfortable in this situation believing that there would be no 2-way or sympathy or accomodation to the pregnancy. I apologized for not being direct. Cindy then claimed she had spoken to my staff and they had said I was "always late." We began to look over my time cards. There are many adjustments. I admit I do forget to punch in a lot. She questioned the precise times of my 'in' times always coinciding with my scheduled times, since my 'staff' says I'm always late. I explained that I am definitely not late most of the time. If I am it has been discussed with the assistants on shift and usually does not exceed 15 minutes. Cindy questioned the time cards not reflecting those times. I also explained that if I'm early and forget to punch in I don't enter that time, I enter the time I'm scheduled for, my thoughts being... I'm salary I don't need to punch in the fifteen minutes I arrived before my shift

I also would like to state that I do not recall being late any of the punches in April. I would also like to state that I often drive to pick up transfers and do not punch in for them unless it is a far distance. I've also brought paperwork home to complete without adding it to clocked time. We also discussed breaks and the ability to take them, scheduling, and the schedule in the S drive coinciding with the worked shift.

* I had told Cindy that I did let Jody, my assistant manager, know I would be at the bank. I did not inform Jody I was leaving for the bank. I said goodbye to her, and I was clocked out for the day.

Crystal R Vasconcellos

*Confidential / Salary*

# Written Corrective Action

Pier 1 imports

NOTE: When using the online version of this form, you must first save it to your hard drive or a network drive. Instructions

| | | |
|---|---|---|
| Associate's Last Name: Vasconcellos | First: Crystal | Date: 2.18.2005 |
| Job Title: Store Manager | | Associate Identification Number: 185872 |
| Store #: 589 | Store Location: Newport, RI | Date of Hire: 09/17/2001 |

Has Associate Previously Received Corrective Action for Same Reason?

☐ Yes ☒ No

List Prior Corrective Action Taken:

Date ____ Verbal ☐ Written ☐
Date ____ Verbal ☐ Written ☐
Date ____ Verbal ☐ Written ☐

Briefly Describe Substandard Performance Including Dates/Times as Appropriate:

Your store was audited on 2.10.2005, by your Zone Asset Protection Manager and your Regional Manager. (See attached audit.) Following are items that are not consistently being done according to Pier 1's standards.

**Backroom & Office:**

1. The amount you claim on your manifest for damage is not the same as the amount you tag the damaged item on the sales floor. It is against company policy to claim 50% on your manifest, and tag the same merchandise on the sales floor at a 25-30% discount. It is your responsibility to initial the damage percent claimed. You are providing associates with higher damage discounts than regular customers. These violations are unacceptable, and must be remedied immediately.
2. Your monthly billing summary continues to have errors. It is your responsibility to review it, and ensure accuracy. This was discussed with your during an audit on March 12, 2004.
3. DETAIL CHECK IN FURNITURE. THIS WAS NOTATED ON MY PRIOR AUDIT OF 9/17/03 AND KB'S OF 3/12/04.
4. You have not keyed inventory adjustment logs on a weekly basis, as required by the company. This was also discussed with you during prior audits on 09/17/03 and 03/12/04.
5. You are checking in dropships to receivers, not packing slips. This was discussed with you during an audit on 09/17/03.
6. You are not handling inter-store transfers appropriately. Inter-store transfers must be detail checked in, the quantity of merchandise must be circled, and you must sign and date the transfer. This was discussed with you during a prior audit on 09/17/03.

**Asset Protection:**

1. You have not taken deposits to the bank on a daily basis, and you have not maintained an accurate deposit log. Validated deposit slips have not been picked up twice a week. You are not using the deposit bags in numerical order.
2. You must keep Quick Credit Applications in the safe, and mail weekly. This is for the protection of all of our customers who are applying for Quick Credits.

**Communication:**

1. You have not reviewed the bank deposit log during every shift. Errors are not being caught by Crystal's validation. It is your responsibility to ensure that your management team is reviewing the deposit log, and that it is accurate. This was discussed with you during a prior audit on 09/17/03.

Crystal, many of the above-mentioned items have been discussed with you during previous audits. It is your responsibility to ensure that you are following asset protection guidelines in relation to the back room and Office, and communication with your management team. It is your responsibility to ensure the accuracy and integrity of company assets and customer information. Your performance is not meeting standards in the area of asset protection.

Expectations:

Clearly and concisely state your expectations of the associate. Use the links in the References box below to access policies and resources online. You may refer to them in your statement of expectations, and in many cases you can copy and paste directly from the policy or resource.

DEFENDANT'S EXHIBIT 25 Vasconcellos 9-6-07

I am here to support you and help you to succeed. However, the final accountability for your performance and success rest with you. You must meet the above mentioned levels of performance immediately and be able to maintain those levels going forward. Failure to do so will result in further corrective action, up to and including the termination of your employment.
My expectation is that you immediately correct all infractions found on the audit and that you adhere to all policies in order to meet Pier 1's standards. It is the minimum expectation of myself & Pier 1 that you follow company policies, and that you uphold these policies in your store. You must immediately secure andprotect all company and customer assets, and ensure that your team does the same. You must ensure that all damage discounts are applied consistent with the Damage Discount POlicy. You must comply with policies relating to bank deposits, and hold your management team accountable for doing the same.

## REFERENCES

**Job Descriptions**

- Sales Associate
- Stockroom Coordinator
- Assistant Manager
- Manager in Training
- Sales Manager
- Senior Assistant Store Manager
- Store Manager

**Policies**

- Code of Conduct
- EEO Policy
- Anti-Harassment
- Open Door Policy
- Absence, Tardiness & Leaving Early
- Work Hours, Overtime & Time Sheets
- Work Attire
- Asset Protection
- Associate Discount
- Bank Deposits

**Resources**

- Store Associate Handbook
- People Management Manual
- Policies & Procedures Manual
- AP Quick Reference

**Search**

If you can't find what you need in the links above, click here, then type a keyword into the Search box.

**Failure to meet and sustain the expectations set forth in this corrective action may result in further corrective action up to and including termination of your employment.**

Sign below to indicate that you have read this corrective action.

[signature] 2/18/05
Associate Signature Date

Cynthia Baldwin 2.18.05
Supervisor Signature Date

Cynthia Baldwin
Print Supervisor Name

# Store Manager
## Performance Review

| | | | |
|---|---|---|---|
| **Name:**<br>Crystal Vasconcellos | **Social Security #:**<br>031603639 | **Region/Zone:**<br>9412/9410 | **Store#:**<br>0589 |
| **Hire Date:**<br>10/01 | **Time in Position:**<br>3 years | **Regional Manager Conducting Review:**<br>Cindy Baldwin | |
| **Last Review Rating:** gd | **Last Review Date:**<br>2/04 | **Job Title:**<br>Store Manager | **Review Period**<br>**From:** 2/04<br>**To:** 2/05 |

| Competency | OT | VG | GD | ND | UN |
|---|---|---|---|---|---|
| **Results Orientation:** Sales and profit focused. Focuses on achieving company goals and objectives. Stretches self and others to achieve higher levels of performance and productivity. | ☐ | ☐ | ☒ | ☐ | ☐ |
| **Customer Focus:** Gets customers engaged and willing to buy. Dedicated to meeting and exceeding the expectations of customers. Gets first hand customer information and uses it to improve the business. Holds everyone accountable for seeking out, identifying and meeting customer needs. | ☐ | ☐ | ☒ | ☐ | ☐ |
| **Decision Making:** Utilizes a mixture of analysis, wisdom, experience and judgment to make quality decisions in a timely manner, even under tight deadlines and pressure. Effectively plans and prioritizes. Most solutions and suggestions turn out to be correct and accurate when evaluated over time. | ☐ | ☐ | ☒ | ☐ | ☐ |
| **People Development:** Effectively staffs. Holds regular performance feedback and development discussions with associates. Challenges and stretches people. Holds people accountable for achieving company goals and expectations. Ensures that succession planning goals are met. | ☐ | ☐ | ☐ | ☒ | ☐ |
| **Building Relationships:** Relates well to others. Builds constructive, effective relationships and teams. Uses diplomacy and tact and can diffuse high-tension situations. Leaves others wanting to work with him/her again. | ☐ | ☐ | ☒ | ☐ | ☐ |
| **Business Skills/Knowledge:** Has the functional and technical skills and knowledge to perform the job at a high level of accomplishment. Is adaptable and able to learn new skills. | ☐ | ☐ | ☒ | ☐ | ☐ |
| **Communication:** Provides timely information and clear direction to enable people to do their jobs effectively. Keeps people informed so that they feel part of the organization. Attentively and actively listens to others. | ☐ | ☐ | ☐ | ☒ | ☐ |

Pier 1 imports

DEFENDANT'S EXHIBIT 31 Vasconcellos 8-6-07

| Overall Performance Rating | OT | VG | GD | ND | UN |
|---|---|---|---|---|---|
| Your performance rating best summarizes how you have performed over this review period. | ☐ | ☐ | ☒ | ☐ | ☐ |

**Comments:**

Crystal, overall your performance for the year was good, even though you did not achieve positive sales results. You were adaptable throughout the year, responding to changes in leadership, company direction and expectations. You were flexible and supportive to the region, especially in assisting Seekonk in the absence of a store manager. You are quick to say yes and help out another store in need, regardless of what is on your plate. You take your role in your peer group very seriously and want to be viewed as a resource to your peers. You enjoy connecting to your peers in the region and gathering information from them, whether it is ideas, best practices, etc . . .You had many challenges during the back half of the year, and you found yourself struggling during a difficult Holiday and business climate. You have embraced all feedback and rallied yourself and your team to improve.

People Development:

You would benefit greatly from focusing on developing your people by providing regular performance feedback and development discussions. You have not successfully trained and developed your management team in their roles. You need to hold yourself and your team accountable for achieving company goals and expectations, (i.e. your monthly audits, dialy cleaning, etc. . .).By taking more ownership and intitiative of your store, you will begin to get the buy in you need from your team.

Communication:

You would also benefit from providing timely information and clear direction to your team. This will enable your team to do their jobs more effectively. By using the communication skills that you learned at the meeting, you will improve your skills and enhance your teams self esteem. You will grow by "actively" listening to your team, peers, etc. You have struggle with really listenting to others and not tuning out, if you don't agree or aren't onboard. You need to be open to new ideas, thoughts and opinions to assist you in moving yourself and your store forward in 2006.

Pier 1 imports

**Goals:**

This performance review has been reviewed and discussed with me:

Crystal Vasconcellos | CRYSTAL VASCONCELLOS / MNGR | 4/19/05
Signature | Print Name/Title | Date

C. Baldwin | C. Baldwin / RM | 4.19.05
Prepared by (Signature) | Print Name/Title | Date

Approved by (Signature) | Print Name/Title | Date

Pier 1 imports

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

Crystal Vasconcellos :
:
VS. : C.A. NO.: 2006-4016
:
Pier 1 Imports (U.S.), Inc.,:
And Cindy Baldwin :

DEPOSITION OF CYNTHIA BALDWIN BARKER, a Defendant in the above-entitled matter, on behalf of the Plaintiff Defendants, before Elizabeth Greeley, Notary Public, in and for the State of Rhode Island, at the offices of Adler, Pollock and Sheehan, Citizens Plaza, Providence, Rhode Island, on January 4, 2008 at 9:30 a.m.

PRESENT:

FOR THE PLAINTIFF........LAW OFFICE OF BRUCE GLADSTEIN
BY: BRUCE GLADSTEIN, ESQUIRE

FOR THE DEFENDANTS.......KELLY HART & HALLMAN
BY: RUSSELL CAWYER, ESQUIRE
2500 TEXAS COMMERCE TOWER
201 MAIN STREET
FORT WORTH, TX 76102
-AND-
ADLER POLLOCK & SHEEHAN
BY: JAIME LAPORTE, ESQUIRE

ALSO PRESENT: SUSAN DUBOIS

ALLIED COURT REPORTERS
115 PHENIX AVENUE
CRANSTON, RI 02920
401-946-5500

# I N D E X

| WITNESS | PAGE |
|---|---|
| CYNTHIA BALDWIN BARKER | |
| EXAMINATION BY MR. GLADSTEIN.................. | 3 |

## PLAINTIFF'S EXHIBITS FOR I.D.

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 1 | HANDBOOK CHECKLIST (1 PG)........ | 14 |
| 2 | HANDBOOK (8 PGS)................. | 31 |
| 3 | CORRECTIVE ACTION (2 PGS)........ | 45 |
| 4 | CORRECTIVE ACTION (2 PGS)........ | 45 |
| 5 | CORRECTIVE ACTION (2 PGS)........ | 45 |
| 6 | EMPLOYEE LIST (1 PG)............. | 46 |
| 7 | STORE LIST (1 PG)................ | 50 |
| 8 | E-MAIL (1 PG).................... | 53 |
| 9 | PERFORMANCE REVIEW (3 PGS)....... | 59 |
| 10 | STATEMENT (1 PG)................. | 80 |
| 11 | E-MAIL W/ NOTES (1 PG)........... | 90 |
| 12 | STAEMENT (3 PGS)................. | 100 |
| 13 | E-MAIL (2 PGS)................... | 119 |
| 14 | TIME CARDS (2 PGS)............... | 129 |

A. Just that, the date and the time and where it was, what time she was coming and what time I was coming, basically. That was it.

Q. Where you would have coffee?

A. I didn't know if we would have lunch or not, but we didn't.

Q. Did you discuss any of the facts of what had occurred between Crystal and Pier One with Ms. Dubois?

A. No.

Q. Now, are you still with Pier One?

A. Yes.

Q. When were you hired by them?

A. In November of '04.

Q. What position were you hired for?

A. Regional manager.

Q. Is that the same position you hold today?

A. Yes.

Q. Where did you work before Pier One?

A. Origins.

Q. What is Origins?

A. It's a natural cosmetic company.

Q. How long did you work there for?

A. One year.

Q. Why did you leave Origins?

A. I didn't want to travel as much as I had

Q. Well, were you supposed to document any verbal counselling documentation?

A. No. It was an e-mail, and it was a note in her file. I verbally told her that she could not do that again. She just decided to go to another store one day, not her own store for personal reasons. I told her that was not acceptable and that she could not do that again.

Q. You told her that via an e-mail?

A. No, verbally we discussed it.

Q. Was that when she went to the Dartmouth store?

A. Yes.

Q. You stated that she didn't notify you that she was going there?

A. Yes.

Q. How did you find out she was going to the Dartmouth store?

A. She e-mailed me after she had been there.

Q. Did you e-mail her back?

A. Yes, and I asked her to give me a call, and we discussed it.

(PLAINTIFF'S EXHIBIT 8 MARKED FOR ID)

Q. Giving you what has been marked as Plaintiff's 8, is this the e-mail that you were speaking about?

A. Yes.

A. At the end of the conversation.
Q. Was it just, "Oh, by the way, I'm pregnant," or was it in response to something that you said?
A. It wasn't either.
Q. Well, didn't she tell you she was pregnant after you told her that she needed to supervise -- didn't she tell you that she was pregnant after you told her that she needed to participate in the unloading of trucks?
A. I told her that she needed to supervise them and yes, that's when she told me.
Q. Okay. When she said that you were pregnant, what was your reaction?
A. She didn't tell me I was pregnant.
Q. I'm sorry. When she told you she was pregnant, what was your reaction?
A. I asked her if she was happy about that, and she told me that she was. That it was a different man, the father was a different man than she had a bad breakup with the month before. I told her, I said, "Congratulations."
Q. Did you ask her who the father was?
A. No.
Q. Did you ask her about the bad breakup she had?
A. No.

Q. Not one?
A. No.
Q. Did Crystal say anything to you regarding her ability to perform the duties of store manager during a pregnancy?
A. No.
Q. Did Crystal tell you her due date?
A. No.
Q. Did you ask Crystal when she was due?
A. No.
Q. Did you ever ask Crystal when she was due?
A. No.
Q. You had no concern about when she would be out of the store for giving birth?
A. We didn't discuss it, no.
Q. That was never a concern of yours, as to when Crystal would be out of the store due to the birth of her child?
A. No.
Q. Now, after that conversation -- strike that. After you had your review with Crystal, did you call the Newport store more often, less often, or the same up to the point of April 29?
A. The same.
Q. Up to, after the review on April 19, did you go

to the store or visit the store more often, the same or less up to April 29?

A. Probably less.

Q. Was there a reason why you went less?

A. I had been there quite often preparing the store for that big walk-through in the month of March, daily, in fact. Then I had to do all my other regional reviews, my store manager reviews. So I had to go to each of the other 13 stores.

Q. Up to the April 29 date -- strike that. Between the review of April 19 and up to the April 29 date of 2005, were you still concerned regarding Crystal's performance that you spoke about earlier?

A. I don't know what you mean by concerned.

Q. Well, you said there were issues regarding Crystal's performance that occurred with the February 18 written notice. You said you discussed it at her review?

A. Yes.

Q. Did you still have a concern regarding Crystal's, did you still have the same concern regarding Crystal's performance between the April 19 review and the April 29 date?

A. Yes.

Q. Now, let's go back to the e-mail from Crystal to

yourself and yourself back that was dated April 26. I believe that's Exhibit 8; is that correct?
A. Yes.
Q. This was after you were told that Crystal was pregnant; is that correct?
A. Yes.
Q. Did you state to Crystal that she needed to take the day she went to the Dartmouth store as a sick day?
A. No.
Q. Did you state to Crystal that she needed to take the day she went to the Dartmouth store as a vacation day?
A. No.
Q. Those could have been options, also, correct?
A. Yes.
Q. Now, I asked you earlier about the S drive; did you ever find out whether it was current or correct?
A. I believe that she told me it was not, and she fixed it.
Q. Okay. So now let's go to April 29. Do you remember that day?
A. Yes.
Q. Tell me, as best as you can, the events of that day starting from when you first went to work.
A. Okay. I went to the Seekonk location and

spent the day preparing that store and the team on a truckload sale that we were having there the next day.

Q. Keep on going.

A. Okay. In doing so, I needed to call around to other stores to get product for the truckload sale the next day. I called several stores and had one of the stores rent a U-Haul and called the Newport, one of the stores, to see if they could get together some product for the truckload sale.

Q. Do you remember what time you called the Newport store?

A. Not exactly. I think it was after 4:00.

Q. When was the sale?

A. The next day.

Q. Was there a reason why you called the Newport store so late in the day, if you needed the merchandise for the next day?

A. We had just gotten that notice. We found out and had very short, short notice to get it together.

Q. So you called the Newport store?

A. Yes.

Q. Continue.

A. I called and asked for Crystal. The store assistant manager, Jody, I spoke with, told me she had gone home for the day. I then, I said to her that I

thought she was on until 5:30. She said that she didn't know. That she had gone home for the day. I said okay. I didn't ask Jody to do anything. I just hung up with her.

Q. Let me stop you for a second. After you stated to Jody that you thought Crystal was on duty until 5:30, what was Jody's response?

A. She said she didn't know, but that she had gone home for the day. She didn't know what she was scheduled. She said, "I don't know. She's gone home for the day." So I then called another store, and when I was, after I finished that conversation, Crystal called me back.

Q. Do you remember what store that was?

A. It was either Westerly or Garden City. We were trying to share a truck, to fill up a truck with furniture from the stores.

Q. Do you know how long after you called the Newport store Crystal called you back?

A. Very short time.

Q. What do you mean by a very short time?

A. Within a matter of minutes. It wasn't very long.

Q. Five minutes, ten minutes, fifteen minutes?

A. Probably less than that.

don't know exactly, but I don't think that it was.
Q. Anything else during that conversation that the two of you spoke about?
A. No.
Q. Did you speak with Crystal again that day?
A. No.
Q. Between those two conversations with Crystal, did you speak with anybody at the store?
A. No.
Q. At the Newport store?
A. No.
Q. After your conversation with Crystal, did you speak with anybody at the Newport store?
A. Yes.
Q. Who did you speak with?
A. I spoke with Jody.
Q. Was that on the phone or in person?
A. In person.
Q. Did you go to the store?
A. Yes.
Q. Do you know what time you arrived at the store?
A. I believe it was after 6:00. It was probably, I'm not sure exactly, but I know it was after 6:00.
Q. Could it have been after seven?

Q. I'm just trying to take this one step at a time. I thought your testimony was that you said to Jody, "Crystal said something that was opposite of what you said"; is that correct?

A. I don't think that I said opposite, no.

Q. Different?

THE WITNESS: I'm not sure. Is that something you can read back to me? I don't know what I said.

MR. GLADSTEIN: Okay.

MR. CAWYER: Just tell him what you said. Walk through the conversation.

A. Okay. I asked her to come in the back. I asked her to tell me what had happened. She got very uncomfortable. She said, "I'm uncomfortable with this." I said, "Why?" She said, "I feel like I'm going to get someone in trouble." I said, "Jody, I need you to understand, you need to be honest and tell me what had happened. You're responsible for yourself. You're not responsible for someone else."

Q. Okay. Go ahead.

A. She then told me that Crystal had told her, she had her sunglasses on her face and she waved good-bye and said, "I'm going home for the day."

Q. Did you ever say to Jody that Crystal told you