ask if you could print, ask if Jody could print something for you in the back room?

A. Like I said earlier, it was around, it was after 6:00. I'm not sure if it's exactly 6:30.

Q. I'm not worried about the time. Did you ask Jody if she could print something?

A. I asked Jody to come to the office. I don't recall if I ever asked Jody to print something.

Q. Did you ask Jody to come to the office?

A. Yes.

Q. Did you ask her to print something?

A. No.

Q. What did you print?

A. Her time cards, her hourly, her time card.

Q. For that day, or for what time period?

A. Yes, for that day. It's actually done weekly, so for the week.

Q. Was there a reason why you had Crystal, was there a reason why you needed a printout of Crystal's time card?

A. Yes.

Q. What was the reason?

A. Because I was trying to determine what had happened that day when I called and Jody told me she had gone for the day and then she called back and said

she was at the bank. I was trying to figure out and get to the truth and find out what was happening. I wanted to see what she had worked that day and what was on her time card.

Q. Did you have a concern regarding Crystal's time card, other than for that one day?

A. Once I started printing them, yes.

Q. Okay. Let's keep on reading. "Once back there, she told me that what I had told her on the phone initially was very different than what Crystal had said." Is that an accurate statement?

A. I'm not, I'm not sure. This is what Jody's interpretation was. I don't know.

Q. "And told me lying was not tolerated at Pier One"; is that a correct statement?

A. I don't remember saying that exactly.

Q. She then writes, "I was unsure of what Crystal had told Cindy, although at this point I was aware she had probably been less than honest about leaving for the day, and now I was in a very difficult position." Did she say that to you?

A. She told me that she was -- no, she didn't say to me exactly those words.

Q. What did she say?

A. She told me she was uncomfortable, and she

Q. You print out Crystal's time card?
A. Yes.
Q. Someone prints out Crystal's time card, either you or Jody; either way, you have Crystal's time card in your hand?
A. Yes.
Q. Is this for the week?
A. Yes.
Q. Did you print anything other than for the week?
A. No.
Q. What happens next? Again, I still want to remain on the 29th.
A. I believe at that point I called Susan, my supervisor, and told her that Crystal had, I believe Crystal had lied to me.
Q. Why did you believe Crystal had lied to you?
A. Because when I called the store, Jody had told me she had gone for the day. When she called me back, she said she had gone to the bank and she was off the clock. She had punched out, and she wasn't on the clock. When I got there and when I spoke with Jody, how uncomfortable she was and the conversation, she said that Crystal had never told her she had gone to the bank.
Q. So you spoke with Susan and made an opinion about

A. Hyannis.
MR. GLADSTEIN: Okay. Thank you.
(BRIEF RECESS)
Q. Other than that e-mail that I showed you on May 2, did you have any other conversations or writings, discussions, memos, e-mails with anybody else up to the time that you spoke with Crystal on May 4?
A. I don't remember, but I don't believe so.
Q. Now, is there a reason why did you not speak to Crystal until May 4?
A. No, there was no reason. I don't know what her schedule was off the top of my head, and I was in my office on Monday. My guess is she might have been off on Tuesday and went there on Wednesday.
Q. You didn't call her over the weekend?
A. No, I don't believe I did, no.
Q. Tell me what happens on May 4.
A. I went to the Newport store to talk to Crystal.
Q. Let me stop you for one second. Before you went to the store, had you spoken with Crystal on the phone?
A. No, I don't believe so.
Q. You go to the Newport store on May 4?

A. Yes.
Q. Do you remember what time?
A. In the morning, first thing in the morning.
Q. Okay.
A. I asked Crystal to talk to her in the office. We sat down in the office. I asked her to kind of walk me through or explain to me what had happened on Friday afternoon. She did. She told me the same thing that she had told me Friday on the phone.
Q. Before you said, before you asked her to explain what happened, did you say to her that you spoke to Jody and the two statements do not jibe together; did you say that to Crystal?
A. No, I don't believe that I did.
Q. Did you say anything to Crystal about, that you don't like people who lie before you asked her to give her statement?
A. No. I had said something similar to that when I first met her. I didn't, when I asked her for her statement.
Q. Did you at any point say anything to Crystal similar to what you said to Jody about the two statements not being accurate or being different than the other?
A. Yes.

Q. When did you say that?
A. When she was talking to me, telling me, when she repeated what she had said to me on Friday. I told her that I was having a hard time with what she was saying, because it did not match what her team had told me. I was trying not to, I was trying to have her explain it to me and be honest with me. When I said that to her, she then apologized and said that she did not tell Jody that she went to the bank. She had lied. She apologized and never had told her that.
Q. Okay. Now, at some point you asked her to write out a statement; is that correct?
A. Yes.
Q. Do you remember at what point you asked her to write out a statement?
A. Yes.
Q. When was that?
A. At the end of our conversation.
Q. Did you ever ask Crystal to write out a statement after the first story that she told you or first reason that she gave you on what occurred on April 29, 2005? Do you understand my question?
A. No.
Q. You're saying, I believe you testified that Crystal gave you two versions of what occurred on

C-E-R-T-I-F-I-C-A-T-E

I, ELIZABETH GREELEY, a Notary Public, do hereby certify that I am expressly approved as a person qualified and authorized to take depositions pursuant to Rules of Civil Procedure of the Superior Court; especially, but without restriction thereto, under Rule 30 of said Rules; that the witness was sworn by me; that the transcript contains a true record of the proceedings.

Reading and signing of the transcript was requested by the deponent involved upon completion of the deposition.

IN WITNESS WHEREOF, I have hereunto set my hand this 17th day of January, 2008.

Elizabeth Greeley Notary Public

ELIZABETH GREELEY, NOTARY PUBLIC
CERTIFIED COURT REPORTER
MY COMMISSION EXPIRES: 04/07/2010

**Trotter (Field), Michele F.**

| | |
|---|---|
| **From:** | Baldwin, Cynthia M |
| **Sent:** | Wednesday, May 04, 2005 10:36 AM |
| **To:** | Dubois, Susan H |
| **Cc:** | Trotter (Field), Michele F. |
| **Subject:** | FW: today |

Here you go . . .

Cindy Baldwin
Providence Regional Manager

-----Original Message-----
**From:** Baldwin, Cynthia M
**Sent:** Tuesday, April 26, 2005 11:15 AM
**To:** Store #0589
**Subject:** RE: today

Hi Crystal,

I have to admit you have thrown me for a loop with this one . . . I am not quite clear on the benefit of this from a business perspective.
I am also concerned with your schedule this week on the (S) drive . . . is it current or correct?
Please call me in #486 when you get this.

thanks,
Cindy Baldwin
Providence Regional Manager

-----Original Message-----
**From:** Store #0589
**Sent:** Tuesday, April 26, 2005 10:25 AM
**To:** Baldwin, Cynthia M
**Subject:** today

Hi Cindy-

I just wanted to let you know that I am in the Dartmouth store today. My car needed to be fixed, so I got a ride here and will be working in the office to complete some paper work, take the conference call, and whatever Michelle wants help with for being a gracious host.

Thanks,
Crystal

PLAINTIFF'S EXHIBIT 8 BARKER 1-4-08 [initials]

My recollection of the shift occurring on Friday April 30 is as follows:

At approximately 3:30 Crystal called me into the office to give change of shift details and items to focus on during the evening. She answered a call at 4pm and I returned to the floor. Crystal came from the back room at approximately 4:15 with her coat, sunglasses and items to transfer to the Dartmouth store and said good-bye leaving through the doors facing the parking lot. My assumption was that she had left for the evening.

Cindy called within 5 minutes and an associate transferred the call to me. When asked if Crystal was gone for the day I replied that I thought so. Cindy asked about her schedule for the day and mentioned that Crystal was on the schedule until 5:30, I replied that I did not know about Crystals' work schedule. I called Crystal on her cell phone, let her know Cindy would like a return call and she replied that she would be right back in. She was in the store within 1 minute and phoned Cindy from the backroom. I asked if everything was ok and she replied yes. Cindy came to the Newport store around 6:30pm and asked if I could print something for her in the back room. Once back there, she told me that what I had told her on the phone initially was very different than what Crystal had said and told me that lying was not tolerated at Pier I. I was unsure of what Crystal had told Cindy although at this point I was aware she had probably been less then honest about leaving for the day and now I was in a very difficult position. I became flustered and upset that I was being placed in a situation between my store manager and the regional manager. I told Cindy that I had not lied and that it was my impression was that Crystal had left for the day and she returned only because Cindy had called.

Cindy called the following morning to thank me for addressing the situation honestly even though it had been difficult. She asked the conversation remain confidential.

The following Monday I stopped by the store and was asked by Crystal what I had talked to Cindy about during the visit on Friday. I said Cindy spent some time in the office, walked the floor and questioned some furniture placement.

I spoke with Crystal again Wednesday evening and she told me she had been honest with Cindy. She told me she respected my integrity and understood my decision to be honest regarding the interpretation of the evening.

Again, I will stress, that this was a very uncomfortable situation because of my personal integrity and my loyalty to my manager.

Jody Graham 5/6/05

Jody Graham

PLAINTIFF'S EXHIBIT Barker ID 1-4-08

Vasconcellos-600032

KELLY HART & HALLMAN LLP
201 MAIN STREET, SUITE 2500
FORT WORTH, TEXAS 76102

Telephone: (817) 332-2500
Telecopy: (817) 878-9280
Writer's Direct Dial: (817) 878-3562
Email Address: russell.cawyer@khh.com

301 Congress, Suite 2000
Austin, Texas 78701
1000 Louisiana, Suite 4700
Houston, Texas 77002

January 7, 2008

**VIA CERTIFIED MAIL NO.**
**7006 2760 0005 4664 295, RRR and**
**VIA FACSIMILE (401) 722-9919**

Mr. Bruce P. Gladstein
750 East Avenue
Pawtucket, RI 02860

**Re: *Vasconcellos v. Pier 1 Imports (U.S.), Inc.*; Civil Action No. 06-4016**

Dear Mr. Gladstein:

Pursuant to Judge Torres' Scheduling Order filed June 28, 2007, this letter constitutes the initiation of Pier 1 Imports (U.S.), Inc. conference requirements that are prerequisites to a filing of a Motion for Summary Judgment. The anticipated Motion shall move on all claims asserted by Vasconcellos.

The undisputed facts on which Pier 1 will based its motion include the following:

1. Vasconcellos was employed as a Store Manager at Pier 1's retail store located in Newport, Rhode Island.

2. Vasconcellos was at all relevant times an at-will employee.

3. In December 2004, Vasconcellos learned that her new Regional Manager would be Cindy Baldwin.

4. Pier 1 Regional Managers oversee approximately 10-15 Pier 1 retail stores.

5. Vasconcellos first met Baldwin in January 2005. At all times prior to April 19, 2005, Vasconcellos concedes that Baldwin treated her professionally and as business acquaintances.

6. In February 2005, Vasconcellos experienced a break-up with her boyfriend.

7. She was so upset by this breakup that Baldwin noticed Vasconcellos was upset and asked her why she was upset.

8. Vasconcellos informed Baldwin that she was going through a tough break-up; Vasconcellos was so upset over the break-up that she left the store for the day.

9. On February 18, 2005, Vasconcellos was given a Written Corrective Action.

10. A Written Corrective Action is a written counseling advising an associate that her performance is deficient in some respect and encouraging improved performance.

11. The Written Corrective Action described a several areas where Vasconcellos' store was performing in a substandard manner related to inventory irregularities connected with incomplete or inaccurate paperwork; discounts on damaged merchandise; and failure to follow company shipping policies.

12. These issues were identified during a company internal audit of Vasconcellos' store on February 10, 2005.

13. This was the second internal audit where many of these deficiencies had been identified in Vasconcellos' store.

14. On April 19, 2005, Baldwin and Vasconcellos met to go over Vasconcellos' annual performance review.

15. The review rated Vasconcellos overall performance a "Good" with several areas where Vasconcellos was rated as "Needs Development."

16. Vasconcellos was rated as needing development in training her staff, developing taking more ownership of her store, listening to her team, and providing clear and timely direction to her team.

17. To assist Vasconcellos in improving her performance in the deficient areas identified in the recent audit, Baldwin also advised Vasconcellos that she wanted her to partake in all the shipments coming into the store.

18. Vasconcellos told Baldwin that she had no problem being present for every truck day during the week but that she would have limitations when it comes to the heavy furniture.

19. Baldwin asked Vasconcellos why and Vasconcellos told her that she was pregnant.

20. Vasconcellos further told Baldwin that she was due in December and that her assistant manager was capable of running the store in her absence.

21. Baldwin told Vasconcellos that they would deal with the running of the store during her anticipated absence when the time came for Vasconcellos to take a leave of absence.

22. Baldwin asked her how she felt about the pregnancy.

23. Vasconcellos explained that she was happy with the pregnancy, that the father was not the same person she had broken up with in February, and that the pregnancy was "a good thing."

24. Baldwin never said any negative about her pregnancy, her alleged work restrictions, or that she would need to take a leave of absence after the birth of her child during the April 19, 2005 meeting.

25. On April 26, 2005, Vasconcellos emailed Baldwin to inform her that she was working at the Dartmouth Store because her car needed work done.

26. Upon receiving the email, Baldwin told Vasconcellos that working out of another store seemed to be more of a personal decision rather than a business decision because it was important that Vasconcellos work at her assigned store. She also told Vasconcellos that there were other options if she needed time off to take care of personal matters such as vacation time.

27. On April 29, 2005, Vasconcellos was scheduled to work from 9:00 a.m. to 5:30 p.m.

28. During the day, Vasconcellos claims that she was not feeling well and at 4:15 p.m. decided to leave early.

29. Prior to leaving, Vasconcellos covered the responsibilities she wanted completed during the remainder of the day with her assistant manager, Jody Graham ("Graham"), and then gathered her personal belongings; clocked out from work; told Graham good-bye and exited the store intending to go home.

30. Vasconcellos never told Graham that she was going to the bank.

31. Shortly thereafter, Baldwin called the store for Vasconcellos. Baldwin was told that Vasconcellos was gone for the day.

32. The assistant manager then called Vasconcellos' cell phone to advise her that the Regional Manager, Baldwin called looking for Vasconcellos.

33. Vasconcellos asked the assistant manager if Baldwin wanted anything in particular and the assistant manager said she did not know because she did not take the call.

34. Vasconcellos returned to the store. She did not immediately return Baldwin's call.

35. Before returning Baldwin's call, Vasconcellos decided that she would get some money and go to the bank next door to get change for the weekend.

36. Vasconcellos obtained the cash she wanted to have changed to smaller bills from the store safe and then walked next door to the bank.

37. Vasconcellos never advised Jody Graham she was going to the bank.

38. Vasconcellos never entered the bank or obtained the change because she was not feeling well and the bank was busy.

39. Instead, Vasconcellos decided to get change later and returned to the Pier 1 store to return Baldwin's call.

40. Upon returning to the Pier 1 store, Vasconcellos returned Baldwin's call.

41. Baldwin told Vasconcellos that her associate told her she had left for the day.

42. Vasconcellos responded, "I ran over to the bank."

43. Baldwin responded "Oh."

44. The two then discussed certain activities that needed to be handled for a scheduled sidewalk sale at Pier 1's Seekonk store.

45. Vasconcellos' pregnancy was never mentioned during this April 29th call nor did Vasconcellos tell Baldwin that she was sick, feeling ill, or that she had vomited that day.

46. After the call, Vasconcellos clocked back in and completed the tasks she and Baldwin discussed.

47. Vasconcellos clocked out at 5:30 p.m. and left for the day.

48. Vasconcellos never returned to the bank to obtain the change the store supposedly needed for the weekend nor did she ask any other Pier 1 manager or employee to obtain the change.

49. On April 29th, Baldwin stopped by the Newport store on her way home. She reviewed Vasconcellos' time card to see whether it reflected that she had merely stepped over to the bank or had clocked out for the day.

50. Making bank deposits is working time and Pier 1 associates do not clock out when taking deposits to the bank.

51. Baldwin also asked Graham whether Vasconcellos had told her she was going to the bank when she left on April 29, 2005. Graham advised Baldwin that when Vasconcellos originally left she told Graham that she was leaving for the day.

52. Vasconcellos did not tell Graham she was going to the bank.

53. Believing that Vasconcellos had been dishonest in her explanation that she had been at the bank when Baldwin originally called, Baldwin concluded she needed to investigate this potential integrity issue further.

54. On May 4, 2005, Baldwin visited Vasconcellos' store to follow-up on Vasconcellos' report that she had been at the bank when Baldwin initially called the store looking for her.

55. During the interview, Vasconcellos falsely told Baldwin that she had informed Graham she was merely going to the bank when she had in fact left for the day.

56. Vasconcellos inaccurately told Baldwin that she had advised Graham that she was going to the bank before leaving the store.

57. Vasconcellos did not advise Graham that she was going to the bank.

58. Vasconcellos apologized to Baldwin for not telling her that her intent had been to leave for the day.

60. As part of her investigation Baldwin asked Vasconcellos to write out a statement on how she thought the conversation went.

61. Vasconcellos was free to write anything she wanted in the statement and was not told to exclude anything.

62. In her handwritten statement, Vasconcellos admitted that she had not been truthful with Baldwin when she told Baldwin she let her assistant manger know she would be at the bank.

63. Vasconcellos' written statement also stated, "Cindy questioned what my intention was for that Friday evening and I explained I was going to the bank. With more questions I hesitantly let her know my true intention was to leave for the day."

64. Vasconcellos' true intention at the time Baldwin called looking for her was to go home for the day and not to go to the bank.

65. Following Baldwin's meeting with Vasconcellos, she next partnered with her Divisional Director and Human Resources department.

66. On May 4, 2005, Vasconcellos complained that she left early because she was pregnant and had been sick earlier in the day. This was the first time Vasconcellos communicated that the reason she was leaving early was because she was sick.

67. On May 5, 2005, Baldwin advised Vasconcellos that her employment was being discontinued due to dishonesty.

68. Vasconcellos concedes that the only reason ever provided to her for her termination of employment was dishonesty and therefore no evidence of inconsistent or shifting explanation for her termination exists.

69. It is also undisputed that no Pier 1 employee ever made any negative or derogatory remarks about Vasconcellos' pregnancy; the possibility she might need to take a future leave of absence for her pregnancy; or that she might eventually have work restrictions resulting from her pregnancy.

70. Moreover, Vasconcellos can identify no non-pregnant Pier 1 store manager who lied to her Regional Manager and was permitted to remain employed.

71. There is no evidence of any similarly-situated non-pregnant store managers who were treated more favorably than was Vasconcellos.

Please let me know within seven (7) days from the date of this letter whether any of these facts are disputed or not. As they come primarily from Ms. Vasconcellos' deposition, I do not anticipate that there will many, if any, disputes with the facts stated above. At the expiration of the seven (7) day period, Pier 1 will contact the Court to schedule a conference to discuss the filing of this Motion for Summary Judgment.

I look forward to hearing from you soon.

Very truly yours,

Russell D. Cawyer

RDC/ml

Enclosure

cc: Jaime J. La Porte (via email)

# LAW OFFICES OF
# BRUCE P. GLADSTEIN

750 EAST AVENUE
PAWTUCKET, RHODE ISLAND 02880
ALSO ADMITTED IN CONNECTICUT AND PENNSYLVANIA

TELEPHONE (401) 722-9900
FACSIMILE: (401) 722-9919

**SENT VIA FACSIMILE ONLY**

January 18, 2008

Russell Cawyer Esq.
Kelly Hart & Hallman LLP
Fort Worth TX 76102

RE: Crystal Vasconcellos vs Pier 1 Imports (US) Inc., and Cindy Baldwin
CA No; 06-484T

Dear Attorney Cawyer:

This letter is in response to your January 7, 2008 letter in which you list your opinion of undisputed facts. At this point I am not able to accurately respond to said undisputed facts, in that I do not have a transcript of the deposition of the defendants Cindy Baldwin and Susan Dubois. For example in undisputed fact number 20 you state that Plaintiff told Ms. Baldwin her due date, my client did state this. However during her deposition your client Ms. Baldwin, said the due date was never discussed.

At this point it would be unfair to my client to guess at what your clients stated at their depositions. Therefore at this point I can not respond to your letter as sections of the undisputed facts can not be responded to clearly and precisely. I will inform you that currently that we agree with undisputed facts numbers 1, 2, 14, 35, and 60. We disagree with undisputed facts numbers 15, 16, 17, and 20.

Thank you for your attention to this matter. Should you have any questions or concerns, I can be reached at (401) 722-9900.

Sincerely,

Bruce P. Gladstein, Esq.

BPG/kvh
cc: Crystal Vasconcellos

**LAW OFFICES OF**
**BRUCE P. GLADSTEIN**

750 EAST AVENUE
PAWTUCKET, RHODE ISLAND 02860
TELEPHONE (401) 722-9900
FACSIMILE: (401) 722-9919
ALSO ADMITTED IN CONNECTICUT AND PENNSYLVANIA

**SENT VIA FACSIMILE ONLY**

January 25, 2008

Russell Cawyer Esq.
Kelly Hart & Hallman LLP
Fort Worth TX 76102

RE: Crystal Vasconcellos vs Pier 1 Imports (US) Inc., and Cindy Baldwin
CA No; 06-484T

Dear Attorney Cawyer:

This letter is to follow up my assistant's conversation with Mary from your office on January 24, 2008. I need the full name and address of Pier 1's former HR person and dates that you will be available for a deposition of said HR person at your office.

In addition, I wanted to respond further to your undisputed facts. We agree that the following number's are undisputed 1 through 6,9 through 12,14,22 through 25, 27,28,30,32, through 34,36,37,39 though 48,50, 52,56,57,58,63,67. The following number's are disputed7,8,13,15 through 17, 29,38,53,55,61,62,64,66,68 though 71. The following number's we neither confirm as to dispute or undisputed 31,49 though 54,65, and the following numbers can not be answered until a copy of the transcript is received.

Please get back to me as soon as possible with information with regard to deponents address and possible deposition dates.

Thank you for your attention to this matter. Should you have any questions or concerns, I can be reached at (401) 722-9900.

Sincerely,

Bruce P. Gladstein, Esq.

BPG/kvh
cc: Crystal Vasconcellos

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| CRYSTAL VASCONCELLOS | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. 06-00484-T-LDA |
| v. | § | |
| | § | |
| PIER 1 IMPORTS (U.S.), INC., AND | § | |
| CINDY BALDWIN | § | |

**DECLARATION OF CINDY BALDWIN-BARKER**

1. "My name is Cindy Baldwin-Barker, I have personal knowledge of the facts stated in this declaration, have never been convicted of a felony, am fully capable of making this declaration and if called upon to do so, I could and would testify competently thereto."

2. "I was hired as a Regional Manager for Pier 1 Imports (U.S.) Inc. ("Pier 1") in November of 2005. As a Pier 1 Regional Manager, I oversee approximately ten to fifteen Pier 1 retail stores. The Pier 1 store in Newport, Rhode Island was within my region."

3. "During March of 2005, I spent a lot of time at the Newport Store getting the store ready for a Pier 1 divisional meeting. The Newport Store was to be the walk-thru store that was to be modeled during the divisional meeting. Because the store was not up to standards, I spent a significant amount of time actively bringing it up to standards for the divisional meeting. In April of 2005, after the March Pier 1 Divisional Meeting, I began conducting on-site performance reviews of the store managers throughout my district. This required me to spend a great deal of time traveling throughout the region visiting various Pier 1 stores."

4. "On or about February 18, 2005, Crystal Vasconcellos was given a Written Corrective Action. A Written Corrective action is a written counseling advising an associate that his or her performance is deficient in some respect and encouraging improved performance. The

Written Corrective Action given to Ms. Vasconcellos described several areas where her store was performing in a substandard manner. Attached to this declaration is a true and correct copy of the Written Corrective Action."

5. "On April 26, 2005, Vasconcellos emailed me that she was working at the Dartmouth store because her car needed work done. Pier 1 Store Managers are required to contact their Regional Managers is they are not going to be in their assigned store as scheduled. Upon receiving the email, I informed Vasconcellos that working out of the Dartmouth store seemed to be more of a personal decision rather than a business decision because it was important for her to be at her assigned store. I also counseled her that there were other options if she needed time off to take care of personal matters such as vacation time or sick leave. Pier 1 managers have unlimited sick time."

6. "On April 29, 2005, I called the Newport Store and asked to speak with Vasconcellos. I was told that Vasconcellos had left for the day. Shortly thereafter, I received a phone call from Vasconcellos. I told her that an Associate at the Newport store had informed me that Vasconcellos had left for the day. Vasconcellos informed me that she had gone to the bank. We then discussed certain activities that needed to be handled for a scheduled sidewalk sale at Pier1's Seekonk store."

7. "Because this was not the first time that Plaintiff was not where she was scheduled to be and because I lived near the Newport Store at the time, I stopped by the Newport Store on my way home to see why Vasconcellos had left. Upon arriving at the Newport Store, I reviewed Vasconcellos's time card to see whether it reflected that Vasconcellos had stepped out to the bank or had clocked out for the day. I also asked Jody Graham, an Assistant Manger, whether Vasconcellos had told she was going to the bank when she left. Graham advised me that when Vasconcellos left, she told Graham that she was leaving for the day. I decided to

investigate the situation further. During the course of the investigation I discovered irregularities regarding Vasconcellos' timecard. It appeared to me that there were an unusual number of manual overrides to the timecard. Unrelated to Vasconcellos' situation, another employee's timecard also showed irregularities –Teresa Butala. I investigated her time entries as well."

8. "On May 4, 2005, I met with Vasconcellos regarding the differences in what I had been told about her whereabouts when I called on April 29, 2005. During the interview, Vasconcellos falsely told me that she had informed Graham that she was going to the bank rather than leaving for the day. She later admitted that what she told me was false and that she had not told her Assistant Manager that she had gone to the bank. Following our conversation, I next partnered with my Divisional Director and Human Resources regarding my investigation and determine what consequence, if any, should result from Plaintiff's dishonesty and misconduct."

9. "I called Susan Dubois and Michele Trotter to inform them of Plaintiff's misconduct. I inquired as to what Pier 1's practice was in this type of situation. We discussed my belief that Vasconcellos, and another employee, were inaccurately recording their time entries using manual overrides. Since both Vasconcellos and Butala denied doing so we determined that the proof on this issue was inconclusive. However, in light of Vasconcellos' admission that she had made inaccurate statements about the events occurring on April 29, 2005, Ms. Dubois, Ms. Trotter and I reached a consensus that Plaintiff's employment should be terminated for violation of company policy—i.e. dishonesty. Plaintiff's dishonesty was the only reason we decided to terminate her employment."

10. "Attached to this Declaration are true and correct copies of business records from Pier 1 which I kept in the regular course of business, and it is my regular course of business as someone with knowledge of the act, event or condition recorded, to make the record or to

transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter."

11. "Vasconcellos' pregnancy played no part in the decision to terminate her employment for dishonesty. I am not aware of another non-pregnant store manager who I believed lied to me that was not treated the same as Vasconcellos."

12. "Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct."

Executed on Feb 7, 2008.

C. Baldwin Barker
CINDY BALDWIN-BARKER

*Confidential / Salary*

# Written Corrective Action

**Pier 1 imports**

NOTE: When using the online version of this form, you must first save it to your hard drive or a network drive. Instructions

| Associate's Last Name: Vasconcellos | First: Crystal | Date: 2.18.2005 |
|---|---|---|
| Job Title: Store Manager | | Associate Identification Number: 185872 |
| Store #: 589 | Store Location: Newport, RI | Date of Hire: 09/17/2001 |

Has Associate Previously Received Corrective Action for Same Reason?

☐ Yes ☒ No

List Prior Corrective Action Taken:

Date ____ Verbal ☐ Written ☐
Date ____ Verbal ☐ Written ☐
Date ____ Verbal ☐ Written ☐

Briefly Describe Substandard Performance Including Dates/Times as Appropriate:

Your store was audited on 2.10.2005, by your Zone Asset Protection Manager and your Regional Manager. (See attached audit.) Following are items that are not consistently being done according to Pier 1's standards.

**Backroom & Office:**

1. The amount you claim on your manifest for damage is not the same as the amount you tag the damaged item on the sales floor. It is against company policy to claim 50% on your manifest, and tag the same merchandise on the sales floor at a 25-30% discount. It is your responsibility to initial the damage percent claimed. You are providing associates with higher damage discounts than regular customers. These violations are unacceptable, and must be remedied immediately.
2. Your monthly billing summary continues to have errors. It is your responsibility to review it, and ensure accuracy. This was discussed with your during an audit on March 12, 2004.
3. DETAIL CHECK IN FURNITURE. THIS WAS NOTATED ON MY PRIOR AUDIT OF 9/17/03 AND KB'S OF 3/12/04.
4. You have not keyed inventory adjustment logs on a weekly basis, as required by the company. This was also discussed with you during prior audits on 09/17/03 and 03/12/04.
5. You are checking in dropships to receivers, not packing slips. This was discussed with you during an audit on 09/17/03.
6. You are not handling inter-store transfers appropriately. Inter-store transfers must be detail checked in, the quantity of merchandise must be circled, and you must sign and date the transfer. This was discussed with you during a prior audit on 09/17/03.

**Asset Protection:**

1. You have not taken deposits to the bank on a daily basis, and you have not maintained an accurate deposit log. Validated deposit slips have not been picked up twice a week. You are not using the deposit bags in numerical order.
2. You must keep Quick Credit Applications in the safe, and mail weekly. This is for the protection of all of our customers who are applying for Quick Credits.

**Communication:**

1. You have not reviewed the bank deposit log during every shift. Errors are not being caught by Crystal's validation. It is your responsibility to ensure that your management team is reviewing the deposit log, and that it is accurate. This was discussed with you during a prior audit on 09/17/03.

Crystal, many of the above-mentioned items have been discussed with you during previous audits. It is your responsibility to ensure that you are following asset protection guidelines in relation to the back room and Office, and communication with your management team. It is your responsibility to ensure the accuracy and integrity of company assets and customer information. Your performance is not meeting standards in the area of asset protection.

Expectations:

Clearly and concisely state your expectations of the associate. Use the links in the References box below to access policies and resources online. You may refer to them in your statement of expectations, and in many cases you can copy and paste directly from the policy or resource.

I am here to support you and help you to succeed. However, the final accountability for your performance and success rest with you. You must meet the above mentioned levels of performance immediately and be able to maintain those levels going forward. Failure to do so will result in further corrective action, up to and including the termination of your employment. My expectation is that you immediately correct all infractions found on the audit and that you adhere to all policies in order to meet Pier 1's standards. It is the minimum expectation of myself & Pier 1 that you follow company policies, and that you uphold these policies in your store. You must immediately secure andprotect all company and customer assets, and ensure that your team does the same. You must ensure that all damage discounts are applied consistent with the Damage Discount POlicy. You must comply with policies relating to bank deposits, and hold your management team accountable for doing the same.

## REFERENCES

**Job Descriptions**

- Sales Associate
- Stockroom Coordinator
- Assistant Manager
- Manager in Training
- Sales Manager
- Senior Assistant Store Manager
- Store Manager

**Policies**

- Code of Conduct
- EEO Policy
- Anti-Harassment
- Open Door Policy
- Absence, Tardiness & Leaving Early
- Work Hours, Overtime & Time Sheets
- Work Attire
- Asset Protection
- Associate Discount
- Bank Deposits

**Resources**

- Store Associate Handbook
- People Management Manual
- Policies & Procedures Manual
- AP Quick Reference

**Search**

If you can't find what you need in the links above, click here, then type a keyword into the Search box.

**Failure to meet and sustain the expectations set forth in this corrective action may result in further corrective action up to and including termination of your employment.**

Sign below to indicate that you have read this corrective action.

[signature] 2/18/08 — Associate Signature / Date

Cynthia Baldwin (signature) 2.18.05 — Supervisor Signature / Date

Cynthia Baldwin — Print Supervisor Name

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| CRYSTAL VASCONCELLOS<br><br>Plaintiff,<br><br>v.<br><br>PIER 1 IMPORTS (U.S.), INC., AND<br>CINDY BALDWIN-BARKER | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 06-00484-T-LDA |

DECLARATION OF MICHELE TROTTER

1. "My name is Michele Trotter, I have personal knowledge of the facts stated in this declaration, have never been convicted of a felony, am fully capable of making this declaration and if called upon to do so, I could and would testify competently thereto."

2. "I am employed as an Associate Human Resources Manager. I was employed by Pier 1 Imports (U.S.), Inc. during 2005 in the Human Resources Department.

3. "During May 2005, I was involved in an investigation regarding Crystal Vasconcellos' conduct. During the investigation Vasconcellos' honesty regarding her whereabouts on April 29, 2005 when her Regional Manager called looking for her; irregularities regarding her time card and issues related to her judgment in working from another store on a day she was scheduled to work at her Newport store were examined. At the conclusion of the investigation, Cindy Baldwin-Barker, Susan Dubois and I discussed the three issues that came up during the investigation. We determined that the issue regarding the irregularities in her time cards was inconclusive about whether Plaintiff falsified her timecard and therefore no discipline would be imposed for that issue. We also concluded that the issue related to her judgment in working from a different store did not warrant termination. However, Plaintiff's dishonesty with Ms. Baldwin-Barker regarding her whereabouts when Ms. Baldwin-Barker called the store on

April 29, 2005 and her false statements regarding whether she told her assistant manager that she had gone to the bank were substantiated and warranted separation of employment.

4. "During the investigation, Vasconcellos injected her pregnancy into the investigation when she offered her morning sickness as an excuse as to why she was dishonest with Ms. Baldwin-Barker about her leaving early and her whereabouts on April 29, 2005.

5. "Plaintiff's dishonesty was the only reason she was terminated. After considering all of the information that came to light during the investigation I believe that Ms. Vasconcellos had not been honest with Ms. Baldwin-Barker about her whereabouts when Ms. Baldwin-Barker called on April 29, 2005 and about whether Vasconcellos told her Assistant Manager that she was going to the bank when she left the store with the intent to go home for the day.

6. "Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct."

Executed on February 8, 2008.

Michele Trotter

MICHELE TROTTER