been dishonest in the past?
A. Like what do you mean?
Q. Well, you said that she was terminated for dishonesty, correct?
A. Right.
Q. Had she been -- ever been -- ever been warned in the past for being dishonest while an employee of Pier 1?
A. I don't know.
Q. You didn't check that out?
A. Not that I remember. She was -- At this point, she was being dishonest now and we were focusing on that.
Q. Okay. How long had Crystal worked for Pier 1 at that point?
A. I don't remember.
Q. Does four and a half years sound correct?
A. It may be. I really don't know at this point.
Q. And even though there was only one -- as far as you know, one incident of dishonesty, you thought that was enough to dismiss or terminate Crystal?
A. I feel like dishonesty in this particular instance definitely required termination. Yes.
Q. Why?
A. Because in her role as a store manager, she is



responsible for leading her team, she is responsible for managing that store. And her team needs to feel like they can trust her, as do her bosses, her regional manager and her divisional director and on up, need to know that they can trust her in what she's doing. So she needs to be honest, and that's very important.
Q. Did her team members know that Crystal was dishonest?
A. In this -- I don't know.
Q. Okay. So you don't whether -- Strike that.
When you made the decision to terminate -- or when the decision to terminate Crystal was made, you don't know what her team members knew or didn't know; is that correct?
A. About this situation?
Q. Correct.
A. I know that Cindy talked to other people involved in the situation, who -- she interviewed other people, but, no, I don't know that others knew anything about it, to my knowledge.
Q. Okay. Do you know who Cindy interviewed?
A. She spoke with Jody, she spoke with Crystal, of course, she spoke with Teresa. I can't think of anybody else.
Q. And how do you know Cindy spoke with Teresa?



A. Because she told me.
Q. Is there a statement from Teresa anywhere?
A. No.
Q. Why is there no statement from Teresa?
A. What she spoke with Teresa about was actually specifically involving Teresa that came up as a result of this investigation.
Q. And no one thought that it was prudent to get a written statement from Teresa?
A. Like I said, it wasn't -- it came up as a result of the investigation, but it was not specifically related to Crystal. It was about Teresa.
Q. Well, would you -- would you agree that dishonesty is a serious offense?
A. I think in this particular case it was serious enough to require termination of employment.
Q. And even though Teresa was questioned regarding this incident, no one took a written statement from her; is that correct?
A. Like I said, she was questioned about nothing particularly specifically having to do with Crystal. It was about her own actions, and she was not being dishonest or lying. It was about -- It was not related to Crystal, so there was no statement needed. It didn't have to do with Crystal.



Q. Well, didn't you just say that she spoke to Crystal -- I'm sorry. Didn't you just say that she spoke to Teresa regarding the incident with Crystal on April -- that occurred on April 29th, 2005?
A. The way I understood your question was who did she talk to in the investigation. This was -- This was during the investigation, information came out in the investigation about Teresa and about Crystal. She spoke with both of them.
Q. And what -- I'm sorry. Go ahead.
A. Does that -- Is that clear?
Q. I think so.
A. Okay.
Q. And what did Teresa tell Cindy regarding Crystal?
A. Regarding Crystal?
Q. Yes. Or the incident.
A. I don't recall her -- I don't recall her being asked -- or I don't recall her providing any specific information about Crystal. It was about herself.
Q. And what did she provide about herself?
A. Cindy had looked at timecards in the store and found that in addition to Crystal, Teresa's timecards also had some -- what is the word I'm looking for -- adjustments or changes to them that were irregular. And

EXHIBIT 5
tabbies


692fc97d-7918-4ee0-9307-f1381bfd1980

Cindy had looked at both sets of timecards, and had talked to Teresa about why her timecards had irregular adjustments or changes.
Q. What did she -- What did Cindy find out?
A. She found out essentially that she had been making changes to the timecards and --
Q. She being who?
A. Oh, excuse me. Teresa had been changing -- making changes to her timecards, but was unable to find that there was any wrongdoing in that. They're allowed to make changes to their timecards, and Cindy was making sure that everything was appropriately done.
Q. Now, do you remember when you were first contacted regarding the April 29th, '05 incident?
A. The first communication I remember was May 2nd.
Q. And what kind of communication was that?
A. It was an e-mail.
Q. From?
A. From Cindy.
(Exhibit Number 1 was marked.)
Q. (BY MR. GLADSTEIN) I'm going to show you what's been marked as Plaintiff's 1. Is that the e-mail that you're talking about?
A. Yes.



Q. Okay. And it's from Cynthia Baldwin to yourself with a cc to Susan Dubois?
A. Correct.
Q. Okay. And under importance or for importance it's high?
A. Yes.
Q. Okay. Was any information sent to you or were you contacted at all on the 29th?
A. Not that I recall.
Q. Okay. And were you contacted over the weekend regarding Crystal?
A. Not that I can remember. No.
Q. And I notice that it's -- it's 11:58 a.m; is that correct?
A. The time on the e-mail?
Q. Yes.
A. Yes.
Q. And did Cynthia say anything to you regarding Crystal falsifying her timecard?
A. When?
Q. At any point.
A. At any point. She told me that there was some irregularities in -- that she needed to look into.
Q. Okay. And was this before or after -- Strike that.



When did she tell you about the irregularities that she had to look into?
A. It doesn't appear it was in this conversation, it must have been after this conversation, which was on the 2nd or after this e-mail. Sometime between the 2nd and prior to Crystal's termination.
Q. Okay. Did -- When was the first time that you spoke with Cynthia after you received this e-mail?
A. I believe it was the conversation for which there are notes at the bottom of this page. I don't know exactly what day that would be. These notes are not dated.
Q. Okay. Do you know if it was the same day that you received this e-mail?
A. I'm not positive.
Q. Well, I'm -- I'm assuming that when you received this e-mail you were concerned about the information you were receiving; is that correct?
A. Right. I wanted to talk to -- to Cindy about it.
Q. Okay. Go ahead.
A. I would have to make an assumption. I don't know for a fact.
Q. Okay. Well, after reading this, this would be something that you would want to talk to Ms. Baldwin as



soon as possible; is that correct?
A. Yes. It was something I would want to talk to her about.
Q. As soon as possible?
A. Well, depending on what else I had -- priorities that day, which I don't remember, but it was absolutely something I would want to speak with her about.
Q. And these are your notes on the bottom?
A. Yes.
Q. Okay. So let's go through these notes.
A. Okay.
Q. "WCA for recent audit." What does that mean?
A. WCA it stands for written corrective action.
Q. Okay. And is that a WCA for audits, is that a common practice for managers?
A. It -- It depends. I don't recall exactly what came of the audit or what was in the corrective action, but written corrective actions can be given for a multitude of reasons, so I can't really answer your question as to whether that was a normal practice.
Q. Well, how often would a manager on average get a WCA for an audit?
A. I don't know. I have no idea. I don't know. I don't even -- I don't know.



692fc97d-7918-4ee0-9307-f1381bfd1980

A. I would -- I would write down the essence of what I heard in the conversation.
Q. Okay. And shake slash teary is pretty specific, wouldn't you agree? Yes?
A. Yes.
Q. Okay. And you wouldn't make up those words unless those are the words that were told to you, is that fair?
MR. CAWYER: Objection; form.
THE WITNESS: Like I said, I don't remember -- I can't -- I can't specifically tell you yes Cindy told me this, because I don't remember hearing those words come out of her mouth. This is what I wrote down. I can make some assumptions or conjectures, but I can't be sure that would be accurate.
Q. (BY MR. GLADSTEIN) Okay. And then -- And then you go on with, "Felt bad, back in the middle between the two of you. Cindy, hope not me. I'm trying to do my job and maintain company's integrity." Can you explain what -- what you meant by that?
A. Uh-huh. Jody felt bad and that's because -- that my -- Jody felt bad because she felt like she was in the middle of Cindy and Crystal.
Q. And again, that's based on what Cindy told you, because you never spoke with Jody?



A. That's correct. I never spoke with Jody.
Q. And then Cindy told you -- Strike that.
And then it says, "Jody said that Crystal came back to the office very flustered." Again, that's based on what Cindy told you that Jody said?
A. Yes.
Q. And then later on it says, "No reason to go to bank, Teresa went to bank" -- "bank two times." Is that what Cindy -- Is that what Cindy knew or what Jody told Cindy or what Teresa told Cindy? Do you know?
A. I don't know. No, I don't know.
Q. And going back to the -- to the top part about falsifying -- about the statement that Crystal is and has been falsifying her timecard. That was -- That allegation was proven incorrect, correct?
MR. CAWYER: Objection; form.
THE WITNESS: About the timecard?
Q. (BY MR. GLADSTEIN) Yes.
MR. CAWYER: Objection; form.
THE WITNESS: Yes. It was not conclusive as to whether or not she had been falsifying the timecard.
Q. (BY MR. GLADSTEIN) And is that one of the reason why, if you know, is that one of the reasons why Cindy had that discussion with Teresa regarding her



timecard?
A. Well, it didn't have anything to do with Crystal. Why she talked to Teresa didn't have anything to do with Crystal falsifying her timecard or allegedly falsifying her timecard.
(Exhibit Number 2 was marked.)
Q. (BY MR. GLADSTEIN) Okay. I'm going to show you what's been marked as Plaintiff's 2, which is a statement from Jody Graham. Have you seen this statement before?
A. Yes, I have.
Q. Did you have this statement when you made the decision or when the decision to terminate Crystal was made?
A. Her written statement, no.
Q. Was there a reason why you didn't have a written statement from Jody before the decision to terminate Crystal was made?
A. Crystal wrote a statement of her own in which she admits to lying, she also admitted to Cindy that she lied, we also had Jody's verbal statement, if you will. So we felt at that time that based on the information that we had collected that we had -- we had enough information to make a solid decision.
Q. Now, when you say you had Jody's verbal



statement, isn't it really Cindy telling you what Jody said?
A. Well, Cindy talked with Jody and -- and asked her the questions that were relevant. And -- yes, Cindy related that to me.
Q. So you were relying on what Cindy stated Jody told her; is that correct?
A. Uh-huh, yes.
Q. And you didn't know whether that was accurate or inaccurate when Cindy told you what Jody told her?
A. I had no reason to believe it was inaccurate.
Q. Okay. Now let's look at the -- let's look at your notes and the statement by Jody Graham.
A. Okay.
Q. Can you point out anywhere where it says that Jody began to shake and was teary?
A. Point it out where?
Q. In Jody's -- In Jody's statement.
A. In Jody's statement. And you had asked me if I saw in Jody's statement the words shake or teary?
Q. Where it says that Jody began to shake slash teary or anything similar to those words?
A. I didn't see those words. She says -- She says, "I became flustered and upset," which I think are similar.