A. She didn't give me a date of conception.
Q. Well, she gave you a date you were first pregnant, a range, right?
A. A range, yes.
Q. Other than that, what I said was correct?
A. Yes.
Q. Was this a planned pregnancy?
A. No.
Q. When did you first start telling people you were pregnant?
A. The day I found out.
Q. Who did you tell?
A. My friends.
Q. Who are your three closest friends?
A. Jen Xavier, Jen Corey, C-O-R-E-Y, and John, obviously.
Q. Where does Jen Xavier live?
A. Fall River, Massachusetts.
Q. Do you have her address?
A. 116 Renney, R-E-N-N-E-Y, I believe, Street.
Q. What's Ms. Xavier's phone number?
A. 508-674-4711.
Q. What about Jen Corey, what is her address and telephone number?
A. She just moved. I don't know her exact



address. She's in Middleboro, Massachusetts. Her phone number I have to get out of my phone. I don't remember.
Q. Do you have your phone with you today?
A. Yes. 774-263-8437.
Q. When did you first start telling any employee of Pier 1 that you were pregnant?
A. Two weeks after I found out, about the same time I told Cindy.
Q. What employees at Pier 1 did you tell you were pregnant before your employment ended in May of 2005?
A. My assistant managers, Theresa Butala,` B-U-T-A-L-A, Rachel Brown, Jody Graham.
Q. What was Theresa Butala's position with Pier 1 in April and May 2005?
A. Assistant manager.
Q. What about Rachel Brown?
A. Assistant manager.
Q. Jody Graham?
A. Assistant manager.
Q. Did you tell any of your sales associates?
A. I don't recall directly.
Q. What was Ms. Butala's reaction when you told her you were pregnant?
A. "Oh, my God. Are you happy? I can't wait to



throw a baby shower."
Q. These were all positive reactions that you observed?
A. Yes.
Q. Is that accurate?
A. Yes.
Q. Did she wish you congratulations?
A. Theresa, yes.
Q. What was Rachel Brown's reaction?
A. I don't remember exact wording, but congratulations.
Q. Fair to say it wasn't a negative reaction?
A. Yes.
Q. What about Jody Graham?
A. Same.
Q. Tell me about the first time you told Cindy Baldwin you were pregnant.
A. It was during my review.
Q. When was that?
A. April 19.
Q. I'm going to ask you some questions about the conversation you had with Ms. Baldwin.
A. Sure.
Q. I would like you, to the best of your ability, to tell me the exact words that were used, not



paraphrase, don't fill in the blanks, but tell me the exact words that were used so I can get a fair understanding of what was said to you and what was said to Ms. Baldwin.
A. Okay.
Q. Tell me what you recall about the April 19, 2005 meeting where you went over your performance review with Ms. Baldwin and you told her you were pregnant.
A. In that, do you want me to tell you about when we went over the review or go right into what I said to her?
Q. Let's start at the beginning of the meeting and walk me through everything you can recall.
A. Okay. We spoke about the performance review, what she analyzed my performance with, a good she gave me. We talked about what successes my store had in the past few months as well as the prior year. After we talked about the successes, we talked about, we began speaking about the opportunities, and one of the opportunities in my store was the stockroom. My stockroom was very small. Shipment often was processed in a messy way, because we could not categorize it. So we started talking about how to fix that problem and different strategies we could use. Cindy requested that I partake in all the shipments

coming into the store, which was just doing a truck.
Q. What did you say in response?
A. I said that I had no problem being present at every truck, on every truck day during the week, but I will have limitations when it comes to the heavy furniture.
Q. What did she say, if anything, in response?
A. She asked why.
Q. What did you say?
A. I told her that I was pregnant.
Q. What did she say?
A. "Oh, is that a good thing?" I'm trying to think of her exact words for you. At that point I believe she just said okay, oh, okay.
Q. What did you say in response, if anything?
A. I went into conversation about how I was very happy about this and it was a good thing.
Q. So you volunteered to Ms. Baldwin that you were happy about the pregnancy and it was a good thing?
A. I'm having a problem with -- you said you wanted exact words. I'm having a problem with exact words for you.
Q. I just want to know the best of your recollection. I don't want to hear something new for the first time at trial. To the best of your ability,



tell me the exact words that people used.
A. She asked me how I felt about it. Almost like she was unsure if I was happy.
Q. Did she ask you whether you were okay with it, or how did you feel about it, how did you feel?
A. About it. She did not ask me how I was feeling at the time.
Q. She asked you how do you feel about it, and what response, if anything, did you make?
A. I said, "It's a good thing." I said, "Don't worry. It's a good thing." I talked, it was myself talking for a good couple of minutes about, that I was happy.
Q. What else did Ms. Baldwin say, if anything, after you described how you were happy and this pregnancy was a good thing?
A. She said, "Can I ask you a personal question?"
Q. What did you say, if anything?
A. I said okay.
Q. What happened next?
A. She said, "I know in February you were just going through a break-up." That was her posed question. She said it with a -- I went into how it wasn't the same person and how this was a good thing



and how long I've known this person. I was very, I wanted to convey to her that I was happy about this.
Q. Had you gone through a bad break-up in February 2005?
A. Yes.
Q. With whom?
A. It wasn't, let me say, not a bad break-up. It was a short-term break-up that for a week I was upset about it.
Q. Who was it you were broken up with?
A. His name was Jason.
Q. What was his last name?
A. I don't remember right now.
Q. How long did you date Jason?
A. Three months, two months.
Q. So in February, for a week period of time when you were broken up, you were upset about that?
A. Yes.
Q. You had shared that with Cindy Baldwin, hadn't you?
A. She noticed I was upset in February. She asked me why. I said, "I'm just going through a break-up," and I went home.
Q. Did you appreciate the fact that Ms. Baldwin was concerned about you?



A. No.
Q. You would have preferred her to be unconcerned about you?
A. No, not necessarily.
Q. After you say that Ms. Baldwin asked you about going through the break-up in February, what did you say your response was, if anything?
A. I said that I was happy now, and I started describing my relationship now is a good thing, justifying myself, honest.
Q. What else, if anything, was said during this conversation between you and Ms. Baldwin after you explained that you were in a happy relationship now?
A. I told her when I was due.
Q. Tell me exactly what you told her.
A. I said I'd be due around Christmas. December 17 was my due date. I let her know that that shouldn't be a problem because Theresa, my assistant manager, was comfortable handling the store in my absence. I'd make sure that she would be completely set up and everything.
Q. What else, if anything, was said?
A. She said, "We'll deal with that then."
Q. Anything else?
A. Not that I recall, other than, in the body of

the conversation talking about the review, like I said before.
Q. Is it accurate to say at no time during this April 19, 2005 conversation you had with Cindy Baldwin did she ever make any negative statements about your pregnancy?
A. Yes.
Q. Is it accurate to say that during the April 19, 2005 conversation that Ms. Baldwin never said anything negative about the fact that you need to take time off because of your pregnancy?
A. Yes.
Q. Is it also accurate to say that Ms. Baldwin never said anything negative to you about your pregnancy, correct?
A. Yes.
Q. Ms. Baldwin never said anything negative to you about the fact that you need to take time off for your pregnancy, correct?
A. Yes.
Q. Ms. Baldwin never said anything negative to you about any work limitations that might be imposed upon you during the tenure of your pregnancy, correct?
A. Correct.
Q. After the April 19 conversation with Ms. Baldwin



going over your performance review and where you told her for the first time you were pregnant, when was the next time you spoke with Ms. Baldwin?
A. The next time she called my store or I called her for something. It might have been a couple of days.
Q. How many times did you talk with Ms. Baldwin between April 19 and April 29, best of your recollection?
A. I could not make a guess.
Q. As many as ten times?
A. I don't think so, no.
Q. What is your best estimate today?
A. If I had to say an answer, I would say between, maybe about two to three.
Q. How many times did she stop by your store between April 19 and April 29, 2005?
A. I don't recall any.
Q. Did you and Ms. Baldwin ever socialize outside of work?
A. No.
Q. Even before you told her you were pregnant, would it be fair to best describe your relationship with Ms. Baldwin as one of supervisor-subordinate?
A. Yes.



Q. You wouldn't characterize your relationship with Ms. Baldwin at any time as being friends, right?
A. No.
Q. That's not right?
A. No, we were not friends.
Q. Business acquaintances?
A. Yes.
Q. Do you recall April 29, 2005?
A. No. April 29, yes, I'm sorry.
Q. If you didn't recall it, I guess we could all go home.
A. I'm sorry. The day, I was thinking May when you said that.
Q. What time did you get to work on April 29, 2005?
A. 9 a.m.
Q. Who worked with you on April 29, 2005?
A. I don't remember my associate during the day, but I believe Theresa worked in the morning. I don't remember the morning. I believe Theresa opened at seven.
Q. Who else did you work with during the course of the day?
A. Jody came in at three. Two more associates, Heather and Kris, they were both fairly new; Kris being very new. There was another associate on,



another person with me during the day earlier. I'm not sure which associate.
Q. The only people you can remember by name are Theresa, Jody, Heather and Kris?
A. Yes. Rachel might have been on in the morning as well. Again, I'm not sure.
Q. When were you scheduled to work April 29, 2005?
A. 9 to 5:30.
Q. When did you decide to leave for the day on April 29, 2005?
A. I believe it was around 4:15.
Q. So around 4:15 p.m. you decided you were going to leave for the day?
A. Yes.
Q. Did you clock out?
A. Yes.
Q. Did you talk to anyone to tell them you were leaving for the day?
A. I told, I said good-bye to Jody.
Q. Tell me exactly what you told Jody before you left.
A. I told her that I hadn't been feeling well and that I was going to leave. We had actually gone over the responsibilities for the night.
Q. So you went over the responsibilities of the

Page 78

A. Not that I recall.
Q. Did you have any other conversations with any Pier 1 employee between April 29 and May 4, other than this one conversation with Theresa, if it was Theresa, and one conversation with Jody about Cindy Baldwin coming to your store, looking at time cards, you leaving early, anything relating to the allegations you're making in this lawsuit?
A. Not that I recall.
Q. Tell me what happened on May 4, 2005.
A. It was a truck day. I got there at 7 a.m. We processed the shipment. Cindy came to the store, I believe, around 10:30 or 9:30, 9:30, between 9:30 and 10:30. She asked if she could speak to me in the office. I said okay. We went and spoke in the office. I sat down at my desk. She sat down opposite me. She asked me, "I'd like to ask you about Friday, last Friday." I said okay. She said, "What happened?" I started talking about the furniture I gathered for her and for the Seekonk sale, and she goes, "No, I'm talking about when we spoke on the phone." I said okay. She goes, "Why would your associate tell me you left and you told me you just ran to the bank?" I said, "I don't know. I had ran to the bank." She said okay. She rephrased the same

Page 79

question and asked me again. I told her that I had to get ones. Then she pulled out my time cards and said, "If you were just going to the bank, why did you punch out?" I informed her that, you know, it was my intention to have left for the day, but when I heard that she called, I figured she might need something, speaking to Cindy, and I wanted to call her back to see what, what she needed. She asked me why I intended to leave for the day. I told her I was not feeling well at all.
We went over the happenings about when I went to the bank and what that looked like and why, why didn't any of my associates know that I had gone to the bank. I said, "I didn't tell the associates. I don't have to tell the associates when I leave." She spoke to an associate. She started talking about time cards and questioned why I had adjustments on my time card. I informed her that my computer is very slow and sometimes I forget to punch in and out, and we make adjustments for them. She excused me out of the office and told me that she had to partner with human resources, and I was on the sales floor for the rest of the day. She only came out maybe once to take a lunch break. She left the store. At the end of the day I left with her saying she would talk to me

Page 80

tomorrow.
Q. Did she say, between the conversation you had with her at 9:00 or 10:00 in the morning and you leaving for the day when she said, "I'll talk to you in the morning," did you have any other conversations with her, with Cindy Baldwin?
THE WITNESS: With Cindy?
MR. CAWYER: Yes.
A. I had asked her right before I left, before she left for lunch, she said she still didn't hear anything. Then before I left for the day I asked her if she was trying to fire me.
Q. What made you think you might be getting fired?
A. Because of the way she was reacting to me.
Q. What do you mean the way she was reacting to you, she was in the office, you said?
A. On the phone trying to partner with human resources. That's usually what they say.
Q. The only reason you thought that you might be getting fired was because Ms. Baldwin had spent the majority of the day in your office supposedly talking to human resources, correct?
A. She had said she needed to partner with human resources to figure out what to do with me or the situation. So I got the impression, and that's why I

Page 81

asked her the question.
Q. You said Ms. Baldwin asked you why would your associate tell me you had gone for the day; is that accurate; she asked you that question?
A. Yes.
Q. Your response was, "I don't know, because I had just run to the bank"?
A. Not because I had just run to the bank. That's not my exact words.
Q. What were your exact words?
A. I said, I said, "I don't know." She questioned me again. I said, "I ran to the bank." That's when she pulled out -- I didn't say that I only ran to the bank.
Q. When you left, when you left at 4:15, you hadn't gone to the bank, had you?
A. No.
Q. You hadn't intended on going to the bank, had you?
A. Not at that point.
Q. Were you intending to mislead Ms. Baldwin when you told her that you had gone to the bank and didn't disclose that you had been intending to leave for the day?
A. That wasn't my intention.

Page 86

Ms. Baldwin on May 4, 2005 that you thought she thought you had been dishonest with her?
A. At the beginning.
Q. At any time during the May 4, 2005 interview?
A. After several questions, yes.
Q. So it was your impression that you thought Ms. Baldwin thought you lied to her?
A. Yes.
Q. What was it exactly you apologized for?
A. That she felt -- I don't remember my exact apology to her. I said I'm sorry if she felt that I was dishonest with her. It wasn't my intention to be dishonest with her.
Q. Did you tell Cindy that you had told Jody, your assistant manager, that you would be at the bank?
A. In quick response, yes.
Q. So during this May 4, 2005 interview, you did tell Ms. Baldwin that you told Jody you would be at the bank, correct?
A. Yes.
Q. But in actuality you had never told Jody that you had been at the bank, correct?
A. Correct.
Q. That was inaccurate, right?
A. Yes.

Page 87

(DEFENDANTS' EXHIBIT 4 MARKED FOR ID)
Q. I'm going to hand you a document I've marked as Defendants' Exhibit 4. Is Defendants' Exhibit 4 a true and correct copy of the statement that you wrote out on May 4, 2005 at Ms. Baldwin's request?
A. Yes.
Q. Again, this is the statement where she asks you to document what had occurred on Friday, April 29 through May 4, 2005, correct?
A. Yes.
Q. This was the statement where she didn't tell you to leave anything out, right?
A. Right.
Q. She didn't tell you that you needed to be sure you included anything, correct?
A. No.
Q. What's inaccurate about that?
A. After I had written it to this point, she faxed it into human resources and then asked me to include this last part.
Q. Is there anything in this last part --
MR. GLADSTEIN: Just for the record, when she said this part, it was everything up to the asterisk on Page --
Q. When you say this part, you included at LR, or at

Page 88

Cindy's request, was the portion that is next to the asterisk on Bates label 600030?
A. Correct.
Q. Is there anything about what you added and wrote in the asterisk that is inaccurate?
A. No.
Q. So you had, in fact, told Cindy that you had told your assistant manager that you had been at the bank, right?
A. Yes.
Q. You had not, in fact, told your assistant manager that you had been at the bank, right?
A. Correct.
Q. So that was inaccurate?
A. It was inaccurate.
Q. You wrote out Defendants' Exhibit 4, did you intend to write it out truthfully?
A. Yes.
Q. Accurately?
A. Yes.
Q. Would you have expected a manager like Cindy Baldwin to rely on the information you included in Defendants' Exhibit 4 in making her decisions about your employment?
A. I wouldn't assume anything.

Page 89

Q. How long had you been a manager for Pier 1 as of May 2005?
A. Store manager or associate manager?
Q. How long have you been a manager?
A. For Pier 1, the whole time I worked there.
Q. Four years?
A. Almost.
Q. Have you ever had any opportunities to formally or informally investigate allegations of employee misconduct?
THE WITNESS: My own associates?
MR. CAWYER: Any associate.
A. Yes.
Q. When you were investigating allegations of associate misconduct, what did you do to investigate those allegations?
A. I spoke to other associates and questioned them.
Q. So you interviewed relevant witnesses, right?
A. Yes.
Q. You interviewed the person who was accused of misconduct, right?
A. Yes.
Q. Did you review any documents?
A. The rules and regulations that pertain to

that investigation, I'm assuming.
Q. You mean the Pier 1 policies?
A. Yes.
Q. Anything else that you would do when you were investigating allegations of associate misconduct?
A. I never had to review an extreme misconduct.
Q. You mean extreme misconduct like lying?
A. No. That's not what I meant.
Q. What did you mean?
A. Stealing.
Q. Do you think lying is an extreme misconduct?
A. It depends on the situation.
Q. What does it depend on? When is lying okay?
A. When the intention wasn't to lie, but somebody takes it as a lie.
Q. You mean like when you tell your manager that you told your assistant manager you were going to the bank when, in fact, you didn't tell your assistant manager you were going to the bank?
A. It wasn't a specific yes or no. It wasn't a specific, direct question.
Q. But it was inaccurate nonetheless?
A. Sure.
Q. Do you equate misconduct of lying as similar to stealing?



A. Depends on the situation.
Q. I mean, they're both serious, aren't they?
A. It depends on the situation.
Q. When is it okay to lie? It's never okay to lie, is it?
MR. GLADSTEIN: Objection. You can answer it.
A. When somebody takes your words and your intent and assumes what they mean as not what they mean.
Q. In that situation it's okay to lie, right?
A. I don't know how to answer that.
(LUNCH BREAK)
Q. Ms. Vasconcellos, we're on the record after a break. You understand you're still under oath?
A. Yes.
Q. When we last broke I recall we were talking about the events of May 4, 2005; is that accurate?
A. Yes.
Q. I want to be clear, on May 4, 2005 when you talked to Cindy Baldwin, you told her that you told your assistant manager, Jody, that you had gone to the bank; is that correct?
A. No.
Q. You never told her that on April 29, 2005?



A. On April 29, no.
Q. At some other point did you tell Ms. Baldwin that you told your assistant manager, Jody, that you had gone to the bank?
A. On May 4 she asked me what the procedure was before I left. I said I usually tell my assistant managers. She goes, "So you told Jody?" I said yes.
Q. When you said yes, you referred to telling Jody that you had gone to the bank on April 29, 2005, correct?
A. Yes.
Q. In fact, you had not told Jody on April 29, 2005 that you had gone to the bank?
A. No, and I did amend that with her.
Q. Where did you amend it?
A. I had told her afterwards that no, I don't remember telling her, in fact, that I went to the bank, and then I wrote that.
Q. Show me on Defendants' Exhibit 4 where you wrote that you were mistaken about telling Jody that you had gone to the bank?
A. I didn't write that I was mistaken. That was part of the conversation.
Q. So nowhere on Defendants' Exhibit 4 did you correct the inaccurate statement you made to



Ms. Baldwin that you had told Jody, your assistant manager, that you had gone to the bank, correct?
A. Correct.
Q. So on May 4, 2005 you left for the day and Ms. Baldwin told you that they didn't have a decision, she'd talk to you tomorrow, correct?
A. Yes.
Q. When was the next time you talked with Ms. Baldwin?
A. The next morning.
Q. What time?
A. When I first got to my store, 8:40 in the morning.
Q. She was already there?
A. Yes.
Q. Tell me what happened.
A. I walked into my store. I went into my office and began morning paperwork. I completed most of my morning paperwork and left my office for the sales floor. She asked if she could speak with me. So I went in the office. So I went back to the office and we sat down. She said, "The company has decided to separate your employment due to dishonesty."
Q. This was in your office?
A. In my office.

Q. Was your door opened or closed?
A. Closed.
Q. What else did she say, if anything?
A. I asked her if that was in the handbook. She replied yes, under the code of conduct, under integrity.
Q. Anything else?
A. She asked me if I was okay. I said fine, and I left.
Q. Was anything else said?
A. Nothing.
Q. So what was the reason she gave you for your separation of employment?
A. Dishonesty.
Q. Now, has anyone from Pier 1 ever given you any reason, other than dishonesty, for the reason that you were separated?
A. No.
Q. You ever file any complaint with Pier 1 with Ms. Baldwin or her treatment of you?
A. Other than this, the complaint that I filed with human resources?
Q. Other than your lawsuit and other than your charge of discrimination, did you ever file any complaint with Pier 1, human resource department or



any department of Pier 1 about Ms. Baldwin or her treatment of you?
A. No.
Q. Do you attend church regularly?
A. No.
Q. Have you ever?
A. When I was young.
Q. In your handwritten statement you wrote on, I believe, Page 1, "I felt uncomfortable communicating to Cindy that I was experiencing morning sickness and wanted to leave early." Do you see where you wrote that?
A. Yes.
Q. Why did you feel uncomfortable communicating that to Ms. Baldwin?
A. It was my impression that she was put off by outside, by anything to do not with the business.
Q. What do you mean? I don't understand.
A. She had made it clear to me, or my impression, in the review by her mannerisms that she was put off by what I had told her.
Q. Okay. Tell me what she did that formed your impression that she was put off by you.
A. The tone in her voice, also the questions that she asked as far as --



Q. You mean the question where she asked you if you were okay? That gave you the impression she was put off by you?
A. How I felt about the pregnancy.
Q. Because she asked you how you were and how you felt about the pregnancy, that gave you the impression that she was put off with you?
A. The tone, and how I felt about it and not how I was, yes.
Q. You mean it, the pregnancy?
A. Yes.
Q. Of course, in April 2005 you didn't know if you were having a boy or girl, correct?
A. No.
Q. That's not correct?
A. That is correct. I did not know the gender.
Q. You could understand that some people might not be happy about finding out they're pregnant, right?
A. I guess so.
Q. Have you ever known anybody that wasn't happy about an unexpected, unplanned pregnancy?
A. Personally, no.
Q. You never have?
A. I've never known anyone not to be happy.
Q. You can certainly understand how not everyone



would be happy about that, right?
A. That's their own --
Q. That's true, correct?
A. Sure.
Q. So it's not completely out of bounds when Ms. Baldwin asks you if you're okay with your pregnancy?
MS. GLADSTEIN: Objection. You can answer.
A. I feel that it is.
Q. You do?
A. Yes.
Q. So she shouldn't have any non-work conversation with you at all, shouldn't express any interest in how you're doing, how you're feeling?
A. I didn't say that.
Q. Is that how you are as a manager?
A. No.
Q. Did you express interest in your employees?
A. Yes.
Q. Did you express interest in your employees' personal lives?
A. At times.
Q. How their kids were doing or how their spouses were doing?

stress you continue to suffer?
A. No.
Q. Fair to say that regardless of whatever you contend you suffered as a result of your termination, it's been something that you've been able to handle and deal with on your own?
A. I'm alive.
Q. Well, but you've been able to handle it and cope with it on your own?
A. We can cope with lots of things.
Q. Is that a yes or no?
A. So far, yes.
Q. Well, you've never attempted suicide, have you?
A. No.
Q. Never had any thoughts that you wanted to kill yourself because you lost your job at Pier 1?
A. No.
(DEFENDANTS' EXHIBIT 22 MARKED FOR ID)
MR. CAWYER: I'm going to mark your summary of damages that you were kind enough to do for me as Exhibit 22. With that, let's take a comfort break.
(BRIEF RECESS)
Q. Back on the record after a break. Do you understand you're still under oath?



A. Yes.
Q. We've gone for a long time today. You've had an opportunity to take several breaks and have a lunch break. Are there any of your answers that you feel like you need to change now?
A. Not that I can think of right now.
Q. Can you identify any non-pregnant store manager who lied to their regional manager and who wasn't terminated?
A. No.
Q. Can you identify any facts for me that lead you to believe that Pier 1's stated reason for your termination of employment was untrue?
A. I'm sorry. Can you repeat that one more time?
Q. Can you identify any facts that lead you to believe that Pier 1's stated reason for your termination of employment was untrue?
A. Just my impression.
Q. But facts, correct?
A. If you consider a fact her not calling the store as much or not, or changing her tone, but you do not consider that a fact.
Q. I just want to know what you consider. Other than the fact that you believe Ms. Baldwin changed her



tone and didn't call your store as often, can you identify any facts that lead you to believe that Pier 1's stated reason for your termination of employment was untrue?
MR. GLADSTEIN: Just for the record, I'm not telling her how to testify. Don't worry about what he considers facts. Worry about what you consider facts.
A. Okay. Yes, I believe that -- I'm sorry. Once more, rephrase the question so I can --
Q. Sure. Other than the fact that you believe Ms. Baldwin's tone and frequency with which she called your store changed after you told her that you were pregnant, can you identify any facts that lead you to believe that Pier 1's stated reason for your termination of employment was untrue?
A. Yes.
Q. What?
A. That I feel that she treated me differently. She acted different towards me. Those are facts to me.
Q. Anything else, other than your subjective belief that she treated you differently, that leads you to believe that Pier 1's stated reason for its termination of your employment is untrue?



A. I don't think so.
Q. So nothing else?
A. I don't believe that their reason for terminating me is correct.
Q. Right. My question is simple. Other than your subjective belief, do you have any facts that lead you to believe that Pier 1's stated reason is untrue?
A. I guess not.
Q. Okay. What was your last rate of pay with Pier 1?
A. It was $39,000 per year plus change, I'm not sure, with the ability to bonus.
Q. Did you actually participate in any benefit plans with Pier 1?
A. Yes.
Q. Which ones?
A. Medical.
Q. What was the amount of your premium per month?
A. I don't remember. They just deducted it out of the check.
Q. Were you given an opportunity to participate in Cobra?
A. Yes. It was too expensive.
Q. Do you remember how much it was?
A. $900 a month.

Q. Shaking?
A. No, she just was like, "I didn't know what to say." She kind of hunched her shoulders.
Q. Did you take that as her feeling like she might have gotten you into trouble?
A. No.
Q. What did you, what was your impression based on her shrugging her shoulders?
A. Jody spoke like that a lot. She was, if she did a project that she was unsure she did correctly or she did something that she wanted you to like, she would speak in the same tone.
Q. I'm trying to figure out your impression that you took away from Jody's actions or mannerisms when she shrugged her shoulders.
A. That she did not know why Cindy was there. That's basically it. I didn't really think too much about it.
Q. She never really apologized to you and --
A. I don't recall. Jody -- no, I don't recall an apology.
Q. Do you recall anything that Jody said or did that gave you the impression that Jody might have thought she got you in trouble?
A. It's hard for me to answer, because Jody



always talked like, "I didn't really know what to do." She didn't say anything, no.
Q. Did Jody ever say or do anything that gave you the impression that she felt she was in a difficult spot being pitted between you and Cindy Baldwin?
MR. GLADSTEIN: Objection. You can answer.
A. No.
(DEFENDANTS' EXHIBIT 25 MARKED FOR ID)
Q. Handing you a document that's been marked Defendants' 25, have you ever seen Defendants' 25 before?
A. Yes.
Q. What is it?
A. It's a written corrective action.
Q. What manager gave you the written corrective action?
A. Cindy.
Q. What were you being written up for in Defendants' Exhibit 25?
A. An audit to my store.
Q. Tell me what, tell me why you were written up.
A. When an audit was performed on my store, they found things that they felt were unsatisfactory.
Q. What were the things that were described to you



that were unsatisfactory on it?
A. They were upset that I didn't check in furniture in their manner, keying things, damages, what you see.
Q. You ever write out any disagreement with the written corrective action that you were given and that is reflected in Defendants' 25?
A. I did not appeal the corrective action. I followed up with some of the things that they said.
Q. When you say followed up with some of the things they wanted, you mean you made efforts to improve on those areas?
A. And I also checked into the areas. There was a, something that they put on here that was the home office that handled it. I contested to Cindy, number one, because I was taught a different way. Number three, because their detailed check-in of furniture, that was noted on my prior audit, was different. I had checked in furniture. I just didn't pen mark the check. There was also something that was in reference to number four with the inventory adjustment logs that they saw a whole adjustment in the computer that they said I had no paperwork on when, in fact, it was a home office adjustment that I would not have paperwork on.



Q. Anything else?
A. Not I can see.
Q. Did you ever write out any disagreement with any of the items that were described on Defendants' Exhibit 25?
A. I spoke to Cindy. I wrote out and forwarded to the asset protection manager, the home office, a response to why the keys were different or why the paperwork --
Q. Who did you direct that written response to in the asset protection department?
A. Maureen McMiller-Menos. I don't know if I have that completely correct.
Q. Did you keep a copy for your file of what you supposedly wrote?
A. I don't remember.
(DEFENDANTS' EXHIBIT 26 MARKED FOR ID)
Q. Handing you what you has been marked as Defendants' Exhibit 26, have you seen Defendants' 26 before?
A. Verbal document, yes.
Q. Were you given a copy of the verbal counselling documentation by Carol Pruitt?
A. I did not get this from Carol, no.
Q. Did you ever see Defendants' 26 before?