Page 36

13 sections that preceded the examples of violations?
A. No, I did not.
Q. Was there a reason why you didn't read the entire Associate Code of Conduct section?
A. I read it many times. I didn't read it at that moment.
Q. Okay. Based upon on your past readings, you determined that Crystal's action fell under Subsection 1 and Subsection 10; is that correct?
A. No.
MR. CAWYER: Objection, form.
Q. I'm sorry, no?
A. No.
Q. Well, you testified earlier that there were other actions you could have taken besides terminating Crystal; is that correct?
A. Yes.
Q. You could have given her a warning for what you stated as dishonesty; is that correct?
A. There are other -- no. I guess I need you to explain the question.
Q. Well, instead of terminating Crystal, another option would have been to give her, I believe you called it a corrective action, which I'm calling a warning?

Page 37

A. You asked me that, and generally that's for, not specifically for Crystal.
Q. Well, then let me ask you specifically for Crystal. Another option would have been to provide Crystal with a warning rather than separation; isn't that true?
A. No.
Q. That was never a possibility?
A. No.
Q. Had Crystal ever been warned of dishonesty in the past?
A. I don't know.
Q. Well, in your investigation as to whether to separate Crystal or not, you did not bother to see whether she had been warned regarding dishonesty in the past?
MR. CAWYER: Objection, form.
A. No.
Q. Is there a reason why you didn't bother to, is there a reason why you did not investigate whether Crystal had been warned regarding dishonesty in the past?
A. She lied and she admitted to lying, so it was based upon that situation.
Q. At that point Crystal had been with the company

Page 38

for four years; is that correct?
A. I'm not sure.
Q. Well, did you know how long Crystal had been with the company when you decided to separate her?
A. I probably did. I don't remember at the moment right now, though.
Q. Are you testifying here today that one situation of dishonesty in four years -- strike that. Are you testifying here today that one dishonest, one action of dishonesty -- strike that. Are you testifying here today that in four years of working for Pier One one dishonest action was not worth or was not, there was no availability other than separation?
MR. CAWYER: Objection, form.
A. I'm not sure of your question.
Q. Well, when you decided to separate Crystal, as far as you knew, that was the only situation where she was dishonest or you claim she was dishonest; is that correct?
A. That I knew of, yes.
Q. If that was the only situation where it was alleged that Crystal was dishonest in four years, you're testifying that there was no other option other than separation; is that correct?
A. No, I didn't, no.

Page 39

Q. Well, didn't you testify earlier that you did not even consider a corrective action?
A. I don't know if she was dishonest in any other time in her four years.
Q. But it would have been a good idea to check to see if she had been, wouldn't it have?
MR. CAWYER: Objection, form.
A. I don't know.
Q. What do you mean you don't know?
A. She lied. She admitted to lying, and she could not be trusted. It's critical that you're trusted as a store manager for this company. It was an example of the violation of the code of conduct. It was misconduct.
Q. Well, when someone violates the code of conduct, there are other options other than separation, correct?
A. Yes, depending upon what it is and who it is and the situation.
Q. All right. Crystal had never been warned -- strike that. I have a couple of questions about job descriptions. I just want to clarify for my own understanding, store manager would be the person in charge of the store; is that correct?
A. Yes.

Q. The
to be e
senior a
A.
Q. Ok
A.
Q. Ok
A.
Q. Di
for Pie
A.
Q. Is
differe
A.
Q. W
A.
positi
assis
Q.
A
Q.
A
Q.
A
Q.

Q.

Q.

Q.
ma

Q.
wa
an
"S
ca
Sh
w
ha
pa
ca
d

Q. The first part of it was Crystal e-mailing you to let you know that she was in the Dartmouth store?
A. Yes.
Q. That was at 10:25 a.m.?
A. Correct.
Q. She stated that she was in the Dartmouth store, because her car needed to be fixed; is that correct?
A. Yes.
Q. Was that the story that she gave you, or was that the explanation that she gave you when you spoke with her on the phone?
A. Yes.
Q. Did you have any reason to believe that what she stated as her reason was untrue?
A. No.
Q. Now, in your response to her, which was at 11:15, you write, "I am only concerned with your schedule this week on the (S) drive. Is it current or correct?" What does that refer to?
A. The store managers posted their schedule on a shared drive. S stands for shared.
Q. What was your concern, do you remember?
A. Not exactly. No, I don't remember. I think it probably wasn't within the guidelines of the store manager, which is why I have, "Is it current or



correct," because we have guidelines that the managers were supposed to work.
Q. Responding to this e-mail, there isn't any language, or you haven't written anything that says that she should not be in the Dartmouth store; is that correct?
A. No. I discussed that with her when she called me.
Q. But you didn't put it in the e-mail?
A. No.
Q. If you knew she was in the Dartmouth store, was there reason why you didn't call her?
A. No.
Q. In fact, you were waiting for her to call you regarding this information, correct?
A. I responded to her e-mail, then asked her to call me.
Q. So you were waiting for her to call you?
A. Yes.
Q. Would it be fair to say that there was no urgency in discussing this situation?
A. I don't know if that would be fair to say, no.
Q. Well, if it was urgent, you could have called her in Dartmouth, correct?



A. I guess so.
Q. This was after the review that you had with Crystal, the yearly review, correct?
A. Yes, it was.
Q. So other than that one, getting back to what we were talking about earlier, other than the one written corrective action, were there any other issues that you had with Crystal's performance as a store manager up to April 18, 2005?
A. Yes.
Q. What was that?
A. We had a divisional meeting in March in Newport. The store was going to be the walk-through store. It required quite a bit of work from other store managers and the divisional team to fix the store, because it wasn't satisfactory. It wasn't clean. It wasn't merchandised well. It needed a lot of work. Crystal wasn't able to do that on her own and hadn't been able to do that. I had given her that feedback back in March, back when that was over, and that was in March.
Q. Did you give her a corrective warning?
A. No.
Q. Any feedback?
A. No.



Q. Correct me if I'm wrong, that sounds like a serious oversight on Crystal's part; would you agree?
A. No. I don't know what you mean by that. I don't know for her what -- I guess if you could rephrase the question.
Q. Well, you were concerned that the store wasn't in the condition you expected it to be; is that correct?
A. Yes.
Q. You did not draft or put anything in her file regarding any type of corrective action; is that correct?
A. Yes.
Q. That's before the April 19, 2005 review?
A. Yes.
Q. Anything else?
A. No.
Q. Up to April 18, 2005, were you having any thoughts or opinions as to whether Crystal should continue as the manager of the Newport store?
A. No.
Q. So it would be safe to say you were satisfied with her performance up to April 18, 2005?
A. I guess so. I'm not, I don't know what you mean by satisfied. So I guess I can't really answer that question.

Q. Were you happy with her performance?
A. No.
Q. Up to April 18, 2005, no?
A. No.
Q. Other than those two examples that you gave me, being the walk-through store and the -- strike that. Other than the walk-through store and the corrective action that you drafted, what else were you dissatisfied with, if anything?
A. Well, her performance was, to be on a corrective action, it's not good, obviously, for a store manager. So she wasn't, she needed to improve and to change in order for her to be more successful in her position. That was the discussion that we had when we did her review. Does that answer your question?
Q. Just so I'm clear, on February 18 you drafted a corrective action; is that correct?
A. Yes.
Q. That was regarding her performance in the purchase of her store?
A. That was regarding her audit.
Q. Well, did you draft any type of written corrective action regarding her performance between the time you started at Pier One and April 18, 2005?



A. Other than that, no.
Q. Other than the February 18?
A. Yes.
Q. I thought you just stated that was because of her audit?
A. Well, her performance is included in that. It was based upon her performance and her needing to correct her behavior, things she wasn't doing in reference to an audit that was done to find out these things.
Q. You did not provide her with any other written corrective action up through her review on April 19, 2005; is that correct?
A. Yes.
Q. Now, when you met with her on April 19, 2005, did you have the review already drafted and ready to give to her?
A. I'm not sure. I believe I probably did.
Q. Now, when you signed the, when you signed the review, that is dated 4/19/05 --
A. Okay.
(PLAINTIFF'S EXHIBIT 9 MARKED FOR ID)
Q. What has been marked as Plaintiff's 9, is that, I think we discussed this, you said this was the review that you gave Crystal on 4/19?



A. Yes.
Q. If you look at the last page, it's dated 4/19 with your signature?
A. Yes.
Q. You wouldn't have dated this document -- strike that. The day you signed this would have been the day you dated it; is that correct?
A. Yes.
Q. Crystal also signed it on 4/19?
A. Yes.
Q. Would you have given this document to Crystal to sign before you signed it?
A. At that moment, possibly, where she might have signed it or I signed it, or we might have signed it at the same time.
Q. Does this refresh your memory as to when you had prepared this document, whether it was before the 19th or after the 19th?
A. It would have been before the 19th or on the day of the 19th. It would not have been after.
Q. It would have been before you met with Crystal you would have prepared this document?
A. Yes.
Q. You would have given the grades, comments, everything else before you met with Crystal on the



19th?
A. Yes.
Q. Okay. Now, when you gave her the corrective action on February 18, could one of the options have been to terminate her rather than to give her a corrective action?
A. Possibly. I don't know.
Q. But that would have been a possible disciplinary action, and you chose to not terminate her but to provide her with a corrective action; is that correct?
A. Yes.
Q. Then you stated that there were no other corrective actions until, between the time period of February 18 and the review, there were no other corrective actions?
A. Yes.
Q. Then on February 19 you met with Crystal; you discussed her performance; is that correct?
A. No.
Q. You didn't discuss her performance?
A. No, I did not meet with her on February 19.
Q. I'm sorry. April 19, you met with Crystal?
A. Yes.
Q. You discussed her performance?
A. Yes.

Q. You gave her your review, and even though you weren't happy with her, even though her performance wasn't up to your expectations, you still gave her a good for her -- yes, a good for her review; is that correct?
A. Yes.
Q. Now, on April 19, do you remember what you discussed with Crystal?
A. Yes.
Q. What did you discuss?
A. We discussed her review, and we discussed her opportunities and what she needed to improve. We discussed the audit as well, again, because of the issues with the truck.
Q. Did you discuss with her the loading and unloading of bulk merchandise?
A. Loading and unloading of bulk merchandise, I'm not sure what you mean by that.
Q. Well, does bulk merchandise arrive at the store on a truck?
A. What do you mean by bulk merchandise?
Q. Let me ask it a different way. Does bulk merchandise arrive to the store on a truck?
A. Yes.
Q. That would be under the shipment area; is that



fair to say?
A. Yes.
Q. Did you discuss with Crystal her requirements in the future regarding shipments?
A. Yes.
Q. What did you say to her regarding shipments?
A. She needed to supervise her truck deliveries because of her audit results, her corrective action and the state of her stockroom.
Q. Did you tell her that she needed to personally participate in all shipments?
A. I told her that she needed to be present, that she needed to supervise them.
Q. Did you tell her that she needed to be involved personally with the loading and unloading, or the unloading of shipments?
A. No.
Q. Is that a requirement for a manager, store manager to be personally involved in the unloading of shipments?
A. I don't know what you mean by personally involved.
Q. Well, let me ask it a different way. What are the requirements of the store manager when it comes to, or as it relates to the unloading of merchandise



off trucks at Pier One?
A. I don't know what you mean by requirements.
Q. Well, are there requirements of a store manager, a job description?
A. I don't know if truck is necessarily in the job description.
Q. Have you ever looked at the job requirements for the store manager?
A. Yes.
Q. You don't remember whether the loading or unloading of trucks is a requirement of the store manager?
A. I don't know if that exact wording is, no. They have to ensure that it gets done. I don't know if they physically have to, personally have to do it themselves.
Q. Anything else that you spoke to Crystal about that day regarding her job performance, either past, present or future?
A. No.
Q. At some point did Crystal tell you she was pregnant?
A. Yes.
Q. At what point in the conversation did Crystal tell you she was pregnant?



A. At the end of the conversation.
Q. Was it just, "Oh, by the way, I'm pregnant," or was it in response to something that you said?
A. It wasn't either.
Q. Well, didn't she tell you she was pregnant after you told her that she needed to supervise -- didn't she tell you that she was pregnant after you told her that she needed to participate in the unloading of trucks?
A. I told her that she needed to supervise them and yes, that's when she told me.
Q. Okay. When she said that you were pregnant, what was your reaction?
A. She didn't tell me I was pregnant.
Q. I'm sorry. When she told you she was pregnant, what was your reaction?
A. I asked her if she was happy about that, and she told me that she was. That it was a different man, the father was a different man than she had a bad breakup with the month before. I told her, I said, "Congratulations."
Q. Did you ask her who the father was?
A. No.
Q. Did you ask her about the bad breakup she had?
A. No.

Q. So she just volunteered on her own that it was a different person than the, it was a different person than the person she had the bad breakup with?
A. Yes.
Q. Did you act surprised that she said she was pregnant?
A. I don't know if I did or not.
Q. Well, were you surprised that she said she was pregnant?
A. I don't know if I was, either way.
Q. Were you concerned in any way that she was pregnant?
THE WITNESS: Concerned?
MR. GLADSTEIN: Yes.
A. No.
Q. Were you concerned about the store -- strike that. Were you concerned about her managing the store during her pregnancy?
A. No.
Q. No concerns at all?
A. No.
Q. Did you ask her, did you ask Crystal anything about her being able to perform any portions of her duties as store manager during the pregnancy?
A. No.



Q. Not one?
A. No.
Q. Did Crystal say anything to you regarding her ability to perform the duties of store manager during a pregnancy?
A. No.
Q. Did Crystal tell you her due date?
A. No.
Q. Did you ask Crystal when she was due?
A. No.
Q. Did you ever ask Crystal when she was due?
A. No.
Q. You had no concern about when she would be out of the store for giving birth?
A. We didn't discuss it, no.
Q. That was never a concern of yours, as to when Crystal would be out of the store due to the birth of her child?
A. No.
Q. Now, after that conversation -- strike that. After you had your review with Crystal, did you call the Newport store more often, less often, or the same up to the point of April 29?
A. The same.
Q. Up to, after the review on April 19, did you go



to the store or visit the store more often, the same or less up to April 29?
A. Probably less.
Q. Was there a reason why you went less?
A. I had been there quite often preparing the store for that big walk-through in the month of March, daily, in fact. Then I had to do all my other regional reviews, my store manager reviews. So I had to go to each of the other 13 stores.
Q. Up to the April 29 date -- strike that. Between the review of April 19 and up to the April 29 date of 2005, were you still concerned regarding Crystal's performance that you spoke about earlier?
A. I don't know what you mean by concerned.
Q. Well, you said there were issues regarding Crystal's performance that occurred with the February 18 written notice. You said you discussed it at her review?
A. Yes.
Q. Did you still have a concern regarding Crystal's, did you still have the same concern regarding Crystal's performance between the April 19 review and the April 29 date?
A. Yes.
Q. Now, let's go back to the e-mail from Crystal to



yourself and yourself back that was dated April 26. I believe that's Exhibit 8; is that correct?
A. Yes.
Q. This was after you were told that Crystal was pregnant; is that correct?
A. Yes.
Q. Did you state to Crystal that she needed to take the day she went to the Dartmouth store as a sick day?
A. No.
Q. Did you state to Crystal that she needed to take the day she went to the Dartmouth store as a vacation day?
A. No.
Q. Those could have been options, also, correct?
A. Yes.
Q. Now, I asked you earlier about the S drive; did you ever find out whether it was current or correct?
A. I believe that she told me it was not, and she fixed it.
Q. Okay. So now let's go to April 29. Do you remember that day?
A. Yes.
Q. Tell me, as best as you can, the events of that day starting from when you first went to work.
A. Okay. I went to the Seekonk location and

saying that she told Jody she was leaving for the bank?
A. It states that she apologizes for not being direct.
Q. Which we discussed earlier?
A. Yes.
Q. I want to know where it says she apologized for lying about anything.
A. I'm sorry. Why don't you explain the question better?
Q. Well, I want to know where it says that she apologizes for lying. Apologizing for not being direct could have many meanings. I want to know where, where in the statement that she apologizes for lying.
A. It doesn't say that in the statement, but she told me that.
Q. Once you received this statement from Crystal, did you go over the statement with her?
A. No.
Q. Did you talk to her further about this?
A. No.
Q. Did you have her, did you have any questions as to what certain parts of the statement meant?
A. No.



Q. So you didn't ask her what she meant by that, she was not direct?
A. No.
Q. Did you ask her why she was uncomfortable telling you that she was experiencing morning sickness?
A. After I read her statement, no, no.
Q. At any point did you ask her why she was uncomfortable letting you know that she was experiencing morning sickness?
A. Yes.
Q. When was that?
A. When we were speaking before she wrote the statement.
Q. What did she say?
A. She said that she didn't know why, but she did not tell me.
Q. Now, who made the decision to terminate Crystal?
A. The decision was made when I discussed it with Michelle Trotter and Susan Dubois.
Q. Was there one person who made the final decision?
A. No. It was a collective discussion based upon the information that I had gathered.
Q. Do you know if Susan Dubois spoke with anybody, other than you, regarding the situation?
A. Other than Michelle, no, I don't know that.



Q. Do you know whether Michelle spoke with anybody, other than the two of you, regarding this situation?
A. Yes.
Q. Who did she speak with?
A. I don't know who it was, but she told us in the conversation that she would need to partner with legal, to run the decision by legal.
Q. But it wasn't, it wasn't anybody in the store?
A. No.
Q. So would it be fair to say that the only investigation into this, into the April 29 incident with Crystal was your investigation?
A. That I know of.
Q. Now, after you discussed all this information with Susan and -- what was the other person's name?
A. Michelle.
Q. Michelle, did you take a vote? I mean, how did that process work? Step me through it.
A. I let them know what had happened, what information I had gotten. I had let them know our conversation. I told them that she had lied, and she admitted to lying. We discussed that that is a violation of the code of conduct. We discussed what the options would be and the severity of this as a store manager, that she could not be trusted and what



the outcome would be. That conversation, it was discussed that separation would be the most likely outcome because of the severity of it. She, Michelle, said that she just needed to partner with legal, and that she would get back to me.
Q. What were your conversations with Michelle? Tell me about them.
A. I just let Michelle know what had happened and faxed over the statement. I faxed over Crystal's statement and just let her know what the conversation was.
Q. Did you fax over Jody's statement?
A. After I received it, yes.
Q. When was the decision finally made to separate Crystal; do you remember what date?
A. It was either the night of the 4th or the morning of the 5th.
Q. Okay. What else did you discuss with Michelle regarding Crystal?
A. I don't know. Other than what we discussed, what Crystal and I discussed, nothing.
Q. Anything else?
A. I don't think so, no.
Q. Did you give an opinion as to whether you thought Crystal should be separated or not?

Q.
Q.
Cr
Q.
yo
Q.
tim
cal
Q.
an
lied
Q.
Q.
fro
un
Q.
Pie
ma
the
Q.
Wh
no
wa
Q.
It d
tha
Q.
it d
be
tha
of s
Q.
lies
she
bec