Page 14

but give her a second chance since it was a small amount and her first offense; B, follow the company policy, fire her; C, talk to your manager or loss prevention to see if they can bend the rules?"
A. This was also -- it's very old. At the time of this, I know exactly how I would answer. It would be a little different today.
Q. How would you have answered it?
A. Follow the company policy and fire her.
Q. How would you answer that today?
A. Contact my supervisor. In any case, before we fire someone, we contact a supervisor.
Q. Now, when you became divisional director, did you review any of the performance reviews of your store managers?
A. Primarily I reviewed the regional managers. When I started on with the company?
Q. Correct.
A. I read the regional managers.
Q. Performance reviews, but not for the store managers?
A. Not at that time.
Q. Did you ever read the store manager reviews?
A. When they were submitted to me before they were given --

Page 15

Q. Did you ever have any discussions with Cindy regarding the performance of Crystal as a store manager prior to the April 29 incident?
A. Yes.
Q. Do you remember how often you would speak with her?
THE WITNESS: Speak with her about Crystal?
MR. GLADSTEIN: Yes.
A. Well, I know of two occasions right off the bat. One was the time of the audit. We discussed the audit, what should be done about it.
Q. Do you make recommendations as to what should be done when there are issues with store managers?
A. Sometimes.
Q. Did you make a recommendation to Cindy as to what should be done with Crystal regarding the audit?
A. Not alone, no.
Q. What do you mean "not alone"?
A. The audit was primarily done with, in conjunction with the loss prevention department. So that would have included Ms. Miller Nemmeth, N-E-M-M-E-T-H, Maureen.
Q. Okay. Anybody else?
A. At that time, no.

Page 16

Q. Just to go off the subject for a second. I'm going to show you what has been marked as Plaintiff's 1 in the Barker deposition which is a Store Associate Handbook checklist. Does this document look familiar to you at all?
A. I don't know. It feels old to me. I don't know if I saw this exact same one or not. It's a familiar form, but I don't know. It looks like this is the one we have right now.
Q. Okay. Now, the date of the audit was on 2/10/05; does that sound familiar?
A. Yes.
MR. GLADSTEIN: I'm going to now show you what has been marked as Plaintiff's 3 in the Barker deposition.
MR. CAWYER: Did you say the date of the audit or the date of the written corrective action?
MR. GLADSTEIN: I said the audit, but the date of the written corrective action.
Q. Does that document look familiar to you?
A. Yes. Maybe I should read it.
Q. Sure, okay.
A. Yes.
Q. Now, when you received the information as to the things that were not being done, per Pier One

Page 17

standards, did you recommend to Cindy that she write a written corrective action?
A. I remember talking with Maureen first.
Q. That's Maureen --
A. Miller Nemmeth.
Q. Who is Maureen?
A. She was the loss prevention manager for the area. I don't know if that was first. I remember basically talking about this with her and then Cindy, and the suggestion from Maureen based on how things, how we do things with these audits was that do it in a corrective.
Q. Did you have an opinion one way or another whether a written corrective action should be drafted?
A. I believe that a written had to be drafted.
Q. Now, you said that there are two examples that you could think of regarding Crystal's performance as store manager. One was the audit, which was the 2/18/05 document. What was the second?
A. Actually, there's three, now that I'm thinking about it. The second was that, was at that time of the meeting that we had in Newport, Rhode Island, and we used her store for a workshop. I came even for a day to help out. I knew that the store, once they got in there and really looked at it, was in

Page 18

tough shape, cleanliness, back room organization, and Crystal was not really participating really well. They had to bring in managers from other stores and even myself to get the store in what would be good standard to show her managers, because that's what we were going to do.
Q. What do you mean Crystal wasn't participating really well?
A. She wasn't managing the floor while we were there, as far as her sales associates, or taking the initiative to accomplish things or get them done without being told exactly what to do.
Q. It sounds like, from what you're saying, that you were pretty, or you were disappointed in her effort; is that fair to say?
A. Yes.
Q. Did you have a discussion with Cindy regarding this incident?
A. Yes.
Q. Do you remember what the discussion consisted of?
A. There were two times. One, at the time of it, just the frustration of getting through it and what we had to do, more about what to accomplish to get the store in position. At the same time, her review was being written. So the discussion was that,

Page 19

you know, this was a new year. It wasn't what her review was from the prior year, because it was in March and the fiscal year ends at the end of February. So the discussion, because, I believe, Cindy wanted to include it in her review, was that, "Well, this isn't the year she's being reviewed on. You're just going to have to have that discussion with her and talk about expectations and going forward in her review."
Q. Was there a reason why, if you were so disappointed with her effort, that there wasn't any type of either written or verbal corrective action?
A. Again, it was very close to the time that her review was being written. In that review, I think, there is a reflection of some conversations that were being had.
Q. Now, did you review a copy of the review written by Cindy for Crystal?
A. Yes.
Q. Do you review it before it's given to Crystal or after it's given to Crystal?
A. Before.
Q. I'm assuming, please correct me if I'm wrong, that you can make any changes that you feel are necessary?
A. I personally don't make changes on them. I

Page 20

would discuss, if I disagreed, or if I thought there was anything wrong, or that it could be done differently, I would, but I wouldn't rewrite anything.
Q. You would make suggestions if you thought that there were items missing?
A. Yes.
Q. I'm going to show you what has been marked as Plaintiff's 9 in the Barker deposition. If you can look at that and tell me if you recognize the document.
A. Yes.
Q. Do you remember reviewing that document before it was provided to Crystal?
A. Yes.
Q. Can you show me anywhere in that document where it reflects the discussion we just had regarding Crystal's performance at the walk-through?
A. She received and needs development, and D in both people development and communication. To elaborate, because a lot of what was going on in the store is she wasn't holding her people accountable to get the results. I think the opportunities here, you greatly benefit from focussing on developing your people by providing regular feedback, if not successfully train development management team in

Page 21

roles, and you need to hold yourself accountable and your team accountable to hold your goals. That all was part of that, too.
Q. Show me in the document where it specifically refers to the issues that you felt Crystal had at the walk through.
A. Those are the issues, some of the issues we felt she had.
Q. Let me ask it a different way. Show me in the document where it refers specifically to the walk-through.
A. No, we wouldn't normally do that in this. We wouldn't normally do that in a review, give an absolute specific, or not usually. I haven't, I don't think.
Q. I believe that you testified that you were, you didn't take any corrective action because it was going to be addressed at the review; is that correct?
A. Yes.
Q. Yet at the review you don't specifically talk about that situation at the walk-through; is that correct?
A. I don't speak of the word, the actual walk-through, no. The behaviors that we, that were cause to it is what we're talking to. You know, what

Ms. Barker's deposition?

MR. GLADSTEIN: Yes.

Q. Now, at some point Crystal told Cindy that she was pregnant; is that correct?

A. Yes.

Q. Do you know when Cindy told you that Crystal was pregnant?

A. Only that it was sometime after she had done her review.

Q. Do you remember how soon after?

A. I don't.

Q. Do you remember whether it was closer to the time she did a review or the time when the separation incident occurred?

A. Again, I'd be guessing if I were to say.

Q. Do you know if she told you before the April 29, 2005 incident occurred?

A. Yes.

Q. It was before that?

A. Yes, before the 5th.

Q. Before the 29th?

A. Yes.

Q. Do you remember the conversation in which Cindy told you that Crystal was pregnant?

A. Not specifically, no.



Q. Do you know how Crystal's pregnancy came up?

A. Kind of like an update. She updates me. All of my regionals update me on, like, what's going on.

Q. Was that something that you wanted to know regarding Crystal?

A. It would be something I wanted to know regarding any store manager.

Q. Why?

A. We always know where we are, what people are doing. Eventually look at the bench.

Q. Go ahead. Look at the bench?

A. That's it.

Q. What is the bench?

A. Down the road who will fill positions, that type of thing. That is why people update you early. We don't do anything.

Q. Did Cindy tell you the due date?

A. No.

Q. Did Cindy tell you when Crystal would be out of the store regarding her pregnancy?

A. No.

Q. Is that something you asked Cindy about?

A. Maybe eventually, but not then, no.

Q. Why not?

A. I don't know. I don't.



Q. You don't know whether Crystal was going to be out next week or in six weeks or six months, correct, when Cindy told you?

A. I don't know how to answer that.

Q. Well, let me ask it a different way. When Cindy told you that Crystal was pregnant, did you know whether Crystal would be out, pregnant for the b... in six days, six weeks, or six months?

A. No.

Q. You did not, didn't you say you do this because want to know the bench?

A. Yes.

Q. Wouldn't it be important to find out the due date, so you can decide the bench?

A. I can only assume why I didn't ask.

Q. Well, are you guessing why you didn't ask, or do you know why you didn't ask?

A. I'd be guessing right now.

Q. Okay. So Cindy tells you that Crystal is pregnant. You didn't ask any further information about Crystal's pregnancy, correct?

A. Correct.

Q. Now, getting back to the -- strike that. Within two weeks after Crystal informed Pier One that she w pregnant -- strike that. Within a month after Crystal



informed Pier One she was pregnant she was separate is that correct?

A. Yes.

Q. Up to the date of April 28, 2005, had you had an opinion as to whether Crystal should remain as store manager of the Newport store?

A. No.

Q. No opinion one way or another?

THE WITNESS: Whether she should be in position?

MR. GLADSTEIN: Whether she should be the manager of the Newport store.

A. No.

Q. Well, as of April 28, 2005 were you satisfied with Crystal as the store manager of Newport?

A. There had been no changes since her review at that point, but that was only, how many days?

Q. That's not my question. My question is, were you satisfied with Crystal's performance as store manager of Newport as of April 28, 2005?

A. She had areas of development.

Q. Were you satisfied with her performance?

A. I don't know how to say what is satisfied.

Q. Was she meeting the standards of Pier One?

A. In some areas, yes. In some areas, no.

had been at that point?
MR. CAWYER: At what point, when?
MR. GLADSTEIN: On Monday when you spoke to HR.
A. Okay. The only other thing I remember is that she did talk to Jody on Saturday morning to talk about confidentiality and that kind of stuff.
Q. At what point did Cindy tell you that she believed Crystal had lied to her?
A. In the very beginning. When she went to go check it, she thought that she could be being lied to.
Q. Okay. At what point was she confident, or at what point was she confident that Crystal had lied to her?
A. Confident is a strong word. I think confident was when Crystal admitted to it.
Q. Now, when you say Crystal admitted to it, you're talking about in a conversation with Cindy that no one witnessed; is that correct?
A. And in her statement.
Q. I'm going to show what you has been marked as Plaintiff's 12. Can you show me where Crystal admits that she lied to Cindy?
THE WITNESS: Can I stop when I see one, and we'll go on?



MR. GLADSTEIN: Please. Whatever is easier for you.
A. She says here -- well, it's kind of all the way. She says, "When she questioned me about where I was, I let her know that I had went to the bank. I did not mention that my intent was to leave the store."
Q. Okay. To you, that is Crystal admitting that she lied?
A. Yes.
Q. In what way?
A. In that she told her one thing that wasn't the truth when she was doing something else.
Q. What line are you on?
A. I started here. "When she questioned me about where I was, I let her know I had went to the bank. I did not mention that my intent had been to leave the store."
Q. Okay. Where would the next one be?
A. Down here, "Cindy questioned what my intention was for that Friday evening. I explained I was going to the bank. With more questions I hesitantly let her know my true intention was to leave for the day."
Q. Okay. Next?



A. And then after the asterisk.
Q. Can you read the statement where Crystal admits she was lying?
A. She doesn't say those exact words.
Q. That's what I'm trying to figure out in this document, where Crystal admits that she lied.
A. Do you want those exact words? Those exact words aren't in the document.
Q. So you are assuming from what she wrote that she was not being truthful?
MR. CAWYER: Objection, form.
Q. Is that correct?
MR. CAWYER: Same objection.
A. She's saying that she did one thing and told her another. That, to me, is untruthful.
Q. Okay. Now, Crystal gave an explanation as to why she did not tell Cindy exactly what occurred, is that correct, in her statement?
A. I have to read it again, but I believe so. Yes, she says here that she's uncomfortable communicating to Cindy that I was experiencing morning sickness and I had to leave early.
Q. Did you question anybody, by anybody, Cindy, Crystal, Jody, Michelle, anybody as to whether, as to why Crystal would say she was hesitant to talk to



Cindy about having morning sickness?
A. No.
Q. That wasn't important to you?
A. We were really looking at the lying and her admitting to lying.
Q. That's not my question. My question is, that wasn't important to you?
A. I don't think I could answer that.
Q. That didn't make a difference to you as to why she gave the explanation to Cindy that she did?
MR. CAWYER: Objection, form.
A. She had given other explanations, too, in a conversation.
Q. What other explanations did she give?
A. I believe at one time she said that she kind of felt sorry for Cindy, because she was working so hard, and she didn't want to tell her she was leaving early.
Q. Where did she give that statement?
A. It's not in this written statement.
Q. Who did she give that statement to?
A. Cindy.
Q. Well, let's look at Cindy's statement. I'm going to show you Plaintiff's 13 from the Barker deposition. Do you recognize this document?

and they came to me --
Q. If someone told their supervisor that they were weary of telling them that they were sick because of their pregnancy, would you want to know more about that as a supervisor or as a manager?
A. It depends. I don't know.
Q. Depends on what?
A. I'm not sure. I mean, taken separate from everything else, it sounds like yes.
Q. Yes, you would want to know more?
A. Separate from all the information that I have here, possibly. I don't even know definitely.
Q. Okay. It seems like you're across the board?
A. Maybe I need a break.
MR. GLADSTEIN: That's fine.
(BRIEF RECESS)
(PREVIOUS QUESTION AND ANSWER READ BACK)
Q. Let's go back to that question and see if we can focus a little better. If an employee was weary of telling their supervisor that they suffered from morning sickness, as a manager wouldn't you want to know more information as to why that employee was weary of telling their supervisor?
A. That's very general. Again, if that was the case, it wasn't exactly like that in this case.



Q. That is not what I'm asking. I'm asking in general. Wouldn't you want to know more?
MR. CAWYER: Objection, form.
A. I still would want to know more specifics.
Q. What type of specifics would you want to know?
A. What the circumstances were, when was this being given, why this person was telling me now. I don't know. I can't think of everything that I would want to know, but more specifics than just that one question.
Q. When you say "why are you telling me now," what do you mean by that?
A. Well, I guess I'm thinking about this case right now. That information was offered up after she admitted to lying. That wasn't, we weren't worried about why she wasn't in the building. We weren't questioning why she was going home. We were questioning why she was lying.
Q. I'm not asking about in this case. I'm asking in general, wouldn't you want to know why an employee was, didn't want to tell their supervisor that they left early because of morning sickness?
MR. CAWYER: Objection, form.
A. This general question, I feel like I don't know how to answer that specifically.



Q. Well, let me ask it this way. Would you want to know more information as to why the employee was weary of telling their supervisor that they suffered from morning sickness?
A. In general, again, is it the same question? I mean, you're asking me in general would I want more information. Again, I would probably want more specifics around that to answer it and give you an honest answer. There could be times where I may not.
Q. If you found out that an employee, if an employee came up to you and said, "I'm afraid to tell my supervisor that I suffer from morning sickness" --
A. If an employee came up to me and said that to me, yes.
Q. What would you do?
A. I would look into it.
Q. Okay. You didn't look into it in this situation with Crystal, did you?
A. Crystal never came to me and told me that.
Q. But you read her statement, that she was afraid to tell Cindy that she suffered from morning sickness, correct?
A. Which was not what we were really looking into. We were looking into her lying. That seemed to be an excuse that she gave, but we weren't wondering



about where she was at that time or why, but why she lied to Cindy.
Q. So you were focussing on Crystal's responses rather than why Crystal gave the response she did; is that fair to say?
THE WITNESS: I was thinking something else. I'm sorry. Can you ask that again?
(QUESTION READ BACK)
A. She had talked to Cindy about it before, and Cindy had asked her why she didn't come to her and she said she didn't know.
Q. Can you state that again?
A. She talked to Cindy about it before and said to Cindy, you know, when Cindy asked her why she didn't come to her, she said she didn't know.
Q. How do you know that?
A. That was in that and also talking to Cindy and the feedback that she gave.
Q. But you never asked Crystal yourself why she felt she couldn't talk to Cindy, did you?
A. No.
Q. Now, you stated that you got e-mail from Cindy regarding the recap of her conversation, you got the statement from Crystal and the statement from Jody?
A. Yes.