UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

CRYSTAL VASONCELLOS
plaintiff

CA No. 06-484 T

v

PROVIDENCE, RI
APRIL 16, 2008

PIER 1 IMPORTS (U.S.), INC.
defendant

BEFORE MAGISTRATE JUDGE LINCOLN D. ALMOND

APPEARANCES:

FOR THE PLAINTIFF:

BRUCE P. GLADSTEIN, ESQ.
750 East Avenue
Pawtucket, RI 02860
401-722-9900

FOR THE DEFENDANT:

RUSSELL D. CAWYER, ESQ.
Kelly Hart & Hallman LLP
201 Main Street
Suite 2500
Fort Worth, TX 76102
817-332-2500

JAIME J. LaPORTE, ESQ.
Adler Pollock & Sheehan P.C.
One Citizens Plaza
8th Floor
Providence, RI 02903
401-274-7200

APRIL 16, 2008 - MORNING SESSION

THE COURT: You may be seated. Good morning. We're here today in the matter of Crystal Vasconcellos vs Pier 1 Imports, Inc., Civil Action No. 06-484 T. It's here for argument on defendant's motion for summary judgment. Will counsel please identify themselves for the record?

MR. CAWYER: Your Honor. Russell Cawyer on behalf of Pier 1 Imports, Inc.

MS. LA PORTE: Jaime LaPorte for defendant.

MR. GLADSTEIN: Bruce Gladstein for plaintiff.

THE COURT: Also referred to me is a motion to strike filed by the plaintiff seeking to strike defendant's reply, that is document number 39. It raises a timeliness issue. I'm going to deny that motion and consider all the papers that have been filed. All right.

VOICE: Your Honor, there are two issues. Not only timeliness but a page limit issue, also.

THE COURT: All right. I'm going to deny it on both counts. I'll deal with the matter. All right, Mr. Cawyer, are you going to argue?

MR. CAWYER: Yes, sir.

THE COURT: Just to focus in your arguments, it seems to me that I know you've raised several issues in your motion. In particular, in the prima facie case you've raised the issue about whether plaintiff has presented enough

evidence to meet the second prong as to whether she was qualified or otherwise performing her job satisfactorily. I find that there's a fact issue as to that prong, and I think it would be just unproductive for you to address that issue. It seems to me the primary issues are what is the proper criteria for the fourth prong in the prima facie case. As I read the case law in this area, it is a fairly flexible prong, and then (b), has the plaintiff presented sufficient evidence to meet whatever that prong is on the fourth prong of the prima facie case, and then also whether the plaintiff has presented enough evidence to present a fact issue as to pretext.

MR. CAWYER: Thank you, your Honor. I agree with the Court that based on the record as a whole, and the plaintiff's responsive briefing, that there likely is a fact issue with respect to the plaintiff's qualifications, and I had not intended to address that in any depth. However, with respect to whether the plaintiff was replaced by somebody that had comparable qualifications to the plaintiff, regardless of what that standard is in the First Circuit, the plaintiff offered no evidence of either who the plaintiff was replaced by or that person's qualifications. I certainly would concede to the Court that there is no need for the plaintiff to show that she was replaced by somebody that was not pregnant. I think the law in the First Circuit is clear

on that. The First Circuit has spoken to that. But there is still a requirement that she show that she was replaced by somebody who was comparably qualified as her, and there is no evidence in the summary judgment record that she was replaced at all, by whom she was replaced, or the qualifications of the replacement. I reviewed the record very carefully and I find not only not a scintilla of evidence, absolutely no evidence as to that particular element.

With respect to the pretext argument --

THE COURT: That's if I accept that that's how the fourth prong should be construed in this particular case (inaudible) cases where it has somebody, a similar situated person who is not in a protected class has been treated more favorably. I've seen the fourth prong stated that way. I've seen the fourth prong stated that the employer can have the duties of that position performed by somebody who was comparably qualified, which I think is along the lines you've just stated. I've seen it stated more generally that whether the employment action at issue occurred under circumstances giving rise to an inference of discrimination when you look at the totality of the circumstances. The cases I've seen have said it's not a very onerous burden. I've seen it described as a minimal burden, and I've seen it described as a flexible prong in the past. So why should I focus in simply on the fact that plaintiff hasn't identified to me

that Jane or John Doe was the person who became the store manager?

MR. CAWYER: Because I think under any of those tests, the plaintiff has offered absolutely no evidence of any of them. For example, if you accept that the test is that the employer continued to have that job and it continued to require the same duties and responsibilities, there's an absolute absence of evidence in the summary judgment record of that.

THE COURT: So once she was terminated, Pier 1 ceased having store managers in its retail operation?

MR. CAWYER: I will tell you that the summary judgment record is absent on that regard. I would not suggest to the Court that there was not a replacement or that a store manager did not occupy that, but confined to the summary judgment record at issue, I will tell the Court there is no evidence, that I would not suggest that there necessarily was not a replacement, but --

THE COURT: But aren't I required at the stage of summary judgment to draw all reasonable inferences in favor of plaintiff and view all the evidence in the light most favorable to plaintiff? So couldn't a reasonable juror draw an inference that a retail operation would continue to need store managers?

MR. CAWYER: If, if the test in the First Circuit

were that the only burden that the plaintiff had to show under the law for a prima facie case was that the employer continued to have the position, and it continued to require the same duties and responsibilities, I believe that would be a reasonable inference that the Court could make. If, however, the prima facie case standard is that they have to show that they were replaced by somebody comparably qualified, then I don't believe that's a reasonable inference. I don't believe that the Court from this summary judgment record could make the reasonable inference that plaintiff was replaced by someone that had comparable qualifications.

THE COURT: All right. You can continue.

MR. CAWYER: With respect to the final prong, and just to address it briefly, I think even the plaintiff concedes that the articulated reason for plaintiff's separation of employment dishonestly is a legitimate nondiscriminatory reason, and that there is evidence in the summary judgment record to support that legitimate nondiscriminatory reason. Therefore, the burden falls on the plaintiff, as the Court knows, to demonstrate that the stated reason is pretextual and that the real reason is pregnancy discrimination.

And in the context of a dishonesty case, a case where an employee is terminated for dishonesty, the Court need not

conclude that the dishonesty actually occurred. The Court's proffer should be on the state of mind of the decision-maker. Did the decision-maker not believe the stated reason. In this particular case, there's ample summary judgment evidence from both the decision-maker and the plaintiff that she was less than forthright and was, in fact, dishonest. In fact, I think the Court could conclude from the plaintiff's own deposition testimony that she has admitted that she made inaccurate misleading statements to the decision-maker. An investigation was conducted by Cindy Baldwin, who was the plaintiff's manager, she interviewed a woman by the name of Jodi Graham. Miss Graham told

Miss Baldwin that she was uncomfortable about the situation she was being put in, and when questioned further about why she was uncomfortable, she said I'm afraid I'm going to get my store manager in trouble. And the reason she said was because she thought that this store manager had been less than forthright about her reason for leaving the store early on April 29, 2005. When Miss Baldwin asked the plaintiff what her intentions were on that day, she said that she had just run to the bank. Even Miss Vasconcellos in her written statement says: When I was first asked about my intention about leaving that day, she said, "I ran to the bank. Upon further questioning, I conceded that my true intent was to leave early for the day."

THE COURT: I read it. I mean, I'll grant you that she, in both her written statement that she provided to Miss Baldwin in connection with the investigation in her deposition, concedes that she wasn't fully forthcoming, and apologizes for that. I'll grant you that. I guess the issue then is -- the issues are, (a) whether if she had not been pregnant, would that have led to her being terminated? If I assume what plaintiff's counsel will argue is they found out she was pregnant, they found out she was likely going to be out of work during what is traditionally the busiest time in retail, and when this issue was put in their lap, they used it as a reason to terminate her while in other circumstances, if it was a non-pregnant employee, they might have taken some lesser disciplinary action other than firing her. That's an issue as to the degree of punishment. And then (b) I assume the issue he will also argue is whether she would have been punished at all because she had the discretion to leave. It wasn't as if she was committing some sin by leaving because she didn't feel well.

MR. CAWYER: But she did not commit some sin by leaving because she did not feel well. She did violate Pier 1's rules and policies by not being forthright and candid to her manager, and in fact misleading her manager when Miss Baldwin asked her where she had been and she said, "I ran to the bank." And then goes on to concede with further

questioning that her real intent had been to leave for the day. There is no evidence in the summary judgment record that any other employee, a store manager, any other position for Pier 1, has been accused of lying, and upon the conclusion of an investigation, it had been concluded that they lied who was not terminated. There is an absence of any evidence in the record that it would not be a reasonable inference to conclude that had she not been pregnant and had the company believed she lied, that she would not have been terminated. This is a store manager, the highest ranking management official of a Pier 1 store. They have all day-to-day control of the store. They supervise the store, its property and its employees. These store managers are the eyes and ears of Pier 1 at the stores. They are in control of millions of dollars of Pier 1 property and merchandise, and because they're the highest ranking manager in the store, trust is paramount. And I know Miss Vasconcellos argues in her papers that, well, she'd never been previously warned about being dishonest. There are some things that are just fundamental in the workplace that people don't need to have prior warning before having their employment separated. And, in fact, Miss Vasconcellos was at all times an at-will employ. She was free to resign her employment at anytime, and her employment could be separated by Pier 1 at anytime. There was just absolutely no

summary judgment evidence that the same discipline would not have been meted out to her had she not been pregnant.

THE COURT: All right.

MR. CAWYER: Your Honor, I think the case that is most closely on point with what we have here is the Strawn vs Delta Airlines case, 2001, First Circuit Court of Appeals case.

THE COURT: What's the cite on that one?

MR. CAWYER: 250 F.3rd 23. In that particular case, the plaintiff was terminated from her employment at Delta Airlines because she had been dishonest about whether she'd received worker's compensation while she was on a leave of absence. She gave some different ambiguous statements about whether she had or not. She denied receiving worker's comp benefits but conceded that she did get some reimbursement for meals and travel expenses. The employer investigated the misconduct and concluded that she had been dishonest about her receipt of worker's comp benefits. And what's important in that case, as in the Strawn case, the plaintiff raised a number of similar arguments that Miss Vasconcellos raises in this case such as the technical accuracy of her statement, whether the investigator was distorting her comments, and the First Circuit in that case, based on the evidence, rejected all of those, and the Court made clear that in a case like the case before the Court

today, that when you're looking at whether an employee has proven on summary judgment, that the employer's stated reasons, dishonesty, are pretextual. You don't look at the actual violation itself, you look at whether the decision-maker believed the stated reason, and in this particular case, Miss Baldwin has testified both in deposition and in an affidavit before the Court that she believed she lied, that Miss Vasconcellos lied, that pregnancy was not a basis in any way for the separation, and I think that the record evidence, both Miss Vasconcellos' statement where she concedes that she didn't tell her whether -- in her deposition testimony where she was asked, "Did you tell your assistant manager Jodi Graham that you were going to the bank?" And she says, "Yes." She admits in her deposition in two separate places that, "Yes, I told my manager that but I didn't tell Jodi Graham that, so yes, that was inaccurate." She admitted twice that she lied during the course of the investigation.

THE COURT: I understand that and I've granted you that. I guess at some level the pregnancy discrimination case has become a bit more complicated than, for instance, a race or national origin or a non-pregnancy gender discrimination case because pregnancy involves issues, as in this case, as been raised by plaintiff, issues about availability to work, leave issues. As I understand the

record, the issue of pregnancy came up in the first place in connection with a conversation about plaintiff's performance evaluation for the year and she feeling she needed to disclose that she might be limited, physically limited, at some point as her pregnancy progressed in terms of moving furniture, et cetera.

So she says, I'm not here to argue Mr. Gladstone's case, but she says in her papers that she was uncomfortable because she felt she got a cold reception to her pregnancy by her manager. So she was uncomfortable saying, "I was sick and needed to leave." How does that factor in? Is that something I should just ignore? What probative value does that evidence have?

MR. CAWYER: I would not say categorically that in every case the Court's ignore cold shoulders or tone of voice or inflection, but I think in this particular case the Court should, and must, ignore that because in her deposition the only thing that the plaintiff could testify to was at this one meeting where they were going over the performance review and talking about her opportunities for improvement, particularly with respect to the stock room ad the receiving of merchandise, the plaintiff said, "I don't mind being present for those but I can't do it. Well, why can't you do it? Well, I've got restrictions because I'm pregnant." Well, at the time she didn't have restrictions because of

pregnancy and, in fact, she'd never got restrictions because of that pregnancy. But, of course, that wasn't one of the lies on which the company based the decision.

THE COURT: Well, hold on a second. She's saying -- she's pregnant. You're right, if she stood there that day she might not have had a restriction but this was an evaluation talking about her performance going forward, and isn't the issue whether she reasonably believed that she might be restricted at some point in the future?

MR. CAWYER: I think that at some point in the future most pregnant women will get some restrictions. I don't believe that on this record Miss Vasconcellos reasonably believed she would get restrictions, and the reason why, which is in the summary judgment evidence, Miss Vasconcellos had previously been pregnant and given birth to a child, and she testified she was never given any work restrictions or any physical restrictions. Now, a reasonable inference for the Court could be that at some point, perhaps in the third trimester of pregnancy, a woman will likely get some work restrictions. That might be a reasonable inference. But on this record, she testified that even with her prior pregnancy, she never was given any physical work restriction, or any work restriction whatsoever.

THE COURT: What about, you refer to this, this is brought up at this one single meeting, at this one

meeting, in addition to that discussion about the potential lifting restrictions, plaintiff also brings up the issue of these personal questions asked by the manager about her feelings about being pregnant, et cetera, and plaintiff also points to the fact that there was a ten day span or a two week span between the decision to terminate and this meeting where the pregnancy was disclosed, did that short period of time, the timing of that, play any place in looking at whether or not there's a fact issue?

MR. CAWYER: Absolutely not. First of all, at the pretext stage, timing alone is never sufficient. I think even if the Court were to look at this close period of time, along with the other evidence that the plaintiff attempts to present to the Court, it's still insufficient. This timing alone is entitled to even less deference by the Court because you had the intervening act of the misconduct. You have the dishonesty. You have the lie, which is amply supported by the evidence, and I think the Court has conceded that, granted that, that may be a reasonable outcome for the decision-maker to make.

With respect to the tone of voice evidence, had the plaintiff been able to offer anything more than just give us her tone of voice, then the Court might be able to give that some credence. But she was pressed repeatedly, what was it about the tone of voice? It's all subjective. It's

speculative. It's conclusory at best. And we cited a couple of cases for the Court, but all the cases that I've seen that talk about tone of voice, where all the plaintiff can say, and all the specifics she can give about the tone of voice, unless her tone of voice changed, they can't give any other credible or concrete specifics, that they're not entitled to any deference at the summary judgment stage. I think we've cited at least two of those cases in our reply brief. One was an Eleventh Circuit Court of Appeals decision and another one was --

THE COURT: But the problem I have in the analysis of some of those cases is in those cases that was the single or one of two factors. Here, I suspect plaintiff will tie together a number of pieces of circumstantial evidence which may in and of themselves may be weak and inconclusive and say these five pieces of circumstantial evidence all tied together are sufficient to create a fact issue to bring this case forward to trial. Now, I believe the record reflects that the key people involved in the termination decision, Miss Baldwin, Miss Dubois, Miss Trotter, all three had knowledge of the pregnancy at the time they made the decision to terminate.

MR. CAWYER: That would be accurate because the plaintiff interjected the pregnancy into a written statement which was reviewed by all three, you know, as they're making

a decision about the misconduct. Importantly, Miss Vasconcellos conceded that on the day she originally told Miss Baldwin that she had been at the bank when her true intent was to go home, she never mentioned her pregnancy. She never mentioned that she'd been sick all day. She never mentioned her morning sickness. It was only when she's being questioned by her manager about the belief that she might have been dishonest that she then for the first time say, well, you know, I wasn't feeling well all day and I was reluctant to tell you that. I think what the Court, given that --

THE COURT: Don't I have to believe that at this stage? Don't I have to believe that that's true, for purposes of this, I have to accept that as true that the reason she wasn't forthcoming was that she was uncomfortable about disclosing that she had a pregnancy related illness?

MR. CAWYER: I think the Court can accept that as true but for purposes of the summary judgment I don't think her reason for being dishonest is not probative. The First Circuit in the Strawn vs Delta Airlines case, in fact, considered that exact argument. The plaintiff had a number of excuses for why she was dishonest about her receiving worker's comp benefits. For example, she said, well, one of my lawyers told me that I shouldn't disclose that to Delta. And the First Circuit in that case seemed to place very

little import on the reasons for the dishonesty. It was whether or not the decision-maker believes she was dishonest, and so I think that the reasons for why she lied are not probative to the pretext analysis.

What I think is also very very important for the Court to recall, or note, is that at no time at anytime were there any negative statements about the plaintiff's pregnancy, the fact that she might have restrictions, the fact that she might need to take a leave of absence. Miss Vasconcellos couldn't identify any policy that Pier 1 violated in either investigating her misconduct or separating her employment. She couldn't identify anything in the investigation that she thought Pier 1 should have done and didn't. She couldn't identify no other employees that engaged in the same misconduct or who didn't get the same discipline she got. In fact, when she was asked if she could identify any facts that led her to believe that Miss Baldwin, the decision-maker, didn't truly believe the reason that she gave her, dishonesty. She couldn't identify any facts. That is overwhelming summary judgment evidence that shows an absolute absence of pretext, and for those reasons we think that the U.S. Magistrate's report and recommendation should recommend that the summary judgment motion be granted.

THE COURT: All right. Mr. Gladstein.

MR. GLADSTEIN: I'll be brief, especially

considering that many of the points that I was going to raise your Honor has discussed.

Regarding prong 4, Attorney Cawyer has stated that there's no evidence that my client's position was taken over by another person, and I think that that's totally inaccurate. In response to plaintiff's summary interrogatory 17 --

THE COURT: Yeah. Actually, I'm glad that you brought that up because I think there's a typographical error in your brief because you do refer to that and then there's a, it looks like there's missing text from your brief. I wish I'd -- I was looking at this over the weekend and I frankly didn't note the exact page down, but you referenced those interrogatory responses, and it looked like you intended to cut and paste them, and they are not. Interrogatory 17?

MR. GLADSTEIN: Correct.

THE COURT: Do you have your brief with you?

MR. GLADSTEIN: Yes.

THE COURT: Page 8 going into page 9, as for the notion that there is no proof that the position remained open and was ultimately filled by someone with roughly equivalent qualifications, et cetera, this is also incorrect. In response to plaintiff's supplemental interrogatory 17 and 17f, and then it states what the interrogatory was.

Defendant submitted the following answers: Blank. Therefore, plaintiff has established a prima facie case of pregnancy discrimination.

MR. GLADSTEIN: It must not have come out when we transferred it to a PDF file.

THE COURT: You have it in the version you have?

MR. GLADSTEIN: Yes.

THE COURT: Did it get into the version that went to the defendant? Did you get a version just electronically or did you get one served on you?

MR. CAWYER: I recall the only one received was electronically.

THE COURT: All right. I'm going to permit you to supplement with the interrogatory responses in the interest of having a full record, so after we get off the record today, if you could, just so it's clear, submit a supplemental submission to the Court that just includes those interrogatory responses.

MR. GLADSTEIN: Your Honor, can I do that as an exhibit only because I'm afraid that if I do -- if I resubmit my paper the same problem is going to come out.

THE COURT: Yes, all right. Submit it as a supplemental exhibit and just put the answer in there. What is the response, for my benefit now?

MR. GLADSTEIN: Part (e), Elizabeth Jarvis

temporarily replaced plaintiff as manager from approximately June and July of 2005. Charlene Demello, D-E-M-E-L-L-O, was hired to replace plaintiff as manager around August of 2005. And then in Part (f), it says, Elizabeth Jarvis, Pier 1 Imports, 100 Franklin Street.

THE COURT: All right. Submit that to the Court.

MR. GLADSTEIN: Thank you, your Honor.

THE COURT: What evidence do you have, if any, of comparables that others, non-pregnant employees, were treated more favorably under comparable circumstances?

MR. GLADSTEIN: I'm sorry, can you repeat that one more time?

THE COURT: Sure. What evidence do you have that non-pregnant employees were treated more favorably under comparable circumstances?

MR. GLADSTEIN: Well, your Honor, in a pregnancy case, the Court has ruled, and I believe it's the Supreme Court, has ruled that pregnancy is prima facie evidence of sex discrimination, which I've referred to in my brief, and the fact that men cannot get pregnant, I believe that's also prima facie evidence that a pregnant woman would be treated differently if she's discriminated against because of her pregnancy. So I don't think that we need to show that non-pregnant women are treated differently but that it's a sex discrimination issue and therefore women are treated

differently than men, and again, since men cannot get pregnant, if it's treatment because of the pregnancy, then that's a sex discrimination issue.

THE COURT: But if I accepted that, then anytime an employee is disciplined or discharged, they would automatically have a prima facie case of discrimination.

MR. GLADSTEIN: Then you have to look at the circumstantial evidence.

THE COURT: Let's get back to, do you have any evidence that -- the ultimate issue in the case is whether she was discharged because she was pregnant.

MR. GLADSTEIN: Correct.

THE COURT: Okay. And that you bear the burden of proof that she was discharged because of her pregnancy, i.e., that that was a motivating factor in the decision to discharge her.

MR. GLADSTEIN: Correct.

THE COURT: Do you have evidence that other people were dishonest or engaged in a similar misconduct, non-pregnant employees, who were not terminated?

MR. GLADSTEIN: No, I don't but I don't believe that's needed.

THE COURT: Okay.

MR. GLADSTEIN: And the reason why it's not needed is that we're showing that this person was treated

differently. For example, if a person, if a manager asks for sexual favors of a subordinate, in order to get a promotion, you don't have to show that every, or that any other female subordinate was asked for sexual favors for that promotion. The fact that it happened to this one person would be enough.

THE COURT: But that's a hostile environment claim. Here your claim is a disparate treatment, pregnancy discrimination claim.

MR. GLADSTEIN: Correct.

THE COURT: She was treated differently because she was pregnant.

MR. GLADSTEIN: Correct.

THE COURT: She was treated more harshly because she was pregnant.

MR. GLADSTEIN: Correct.

THE COURT: So what evidence do you have that would support a finding that, reasonably support a jury finding that her termination was motivated by her pregnancy?

MR. GLADSTEIN: Well, I was limited in pregnancy situations regarding Miss Baldwin. I know that there have been other pregnancy issues. For example, in Chicago, there's a current case right now regarding pregnancy issues, and if my memory serves me, I believe that up to the point that Miss -- between the time period that Miss Baldwin started at Pier 1, and Miss Vasconcellos was terminated,

there were no other pregnant store managers, so it would be impossible to show that other store managers were treated -- other pregnant store managers were treated inappropriately or in a discriminatory factor.

THE COURT: All right. You have no, I assume, unless you tell me I'm wrong, I haven't seen in your papers any direct evidence of pregnancy discrimination or negative comments related to her pregnancy. Am I missing anything?

MR. GLADSTEIN: Other than the fact that she called the store less often, she came -- she didn't visit the store at all once she was -- once Miss Baldwin was told of the pregnancy, Miss Baldwin is someone who lived a couple of streets over and came to the store once or twice a week, from the time that she was told about the pregnancy, until her termination, she didn't come to the store once.

THE COURT: Well, that's a ten day period, or 12 day period. So how is that a relevant fact? And also, if your theory of the case is that she was searching for a reason to terminate a pregnant employee who she knew she was going to have to replace during the holiday season, why wouldn't she show up at the store more often to try to uncover some work performance deficiency?

MR. GLADSTEIN: Your Honor, I think that if there was just the cold shoulder or the attitude of not showing up, I think defendant's argument would be much stronger, but you

have more evidence. You have the short time period. You have the plaintiff giving a reason why she wasn't completely honest. And all three defendants stated in their testimony they didn't care what the reason was, they didn't look into the reason, they didn't talk to her about the reason. You know, the fact that an employee states that they're uncomfortable talking about pregnancy to their manager should be a --

THE COURT: License to lie?

MR. GLADSTEIN: Not a license to lie but it should be a significant enough issue that there should be someone talking to the employee and determining why they felt this way. The investigation was very shoddy. Once they found out that this pregnant person had not been completely truthful, they didn't care what her reasons were, they didn't care what her excuses were, they didn't check to see if she had been dishonest or stretched the truth in the past. This is a person who worked for the company for 4 years in either a management or assistant management position, who had keys to the place, who was responsible for the merchandise.

THE COURT: I indicated to Mr. Cawyer I really wasn't interested in hearing about the issue of qualifications in terms of the second prong of the prima facie case analysis but at the time she was terminated, your

client had a February warning that dealt with some deficiencies she had. She had some issues about a walk through in March of the store where things weren't in great condition, and she had an overall good but not glowing performance review that outlined some deficiencies, so I don't think you could say she was employee of the year.

MR. GLADSTEIN: And I'm not even saying this in terms of the second prong. I'm stating this is the pretextual issue because I think these all go to -- you know, before the pregnancy, there were issues regarding the walk through. Before the pregnancy, there were issues regarding the deficiency notice in February. Before the pregnancy, there were other issues. The only issue that came up at the performance review was the notice, the February notice, which my client stated wasn't accurate. There was no written warnings regarding the walk through that was done, and the way the defendants state this walk through and how awful she was, I mean, I find it hard to believe that she wasn't given a warning. Nothing was in the file. Nothing was in a review. No mention was made of that until my client stated that she was pregnant. Now all of a sudden issues before the pregnancy that were non-issues are now huge issues after the pregnancy.

THE COURT: Hold on. The march walk through, I brought that up in the context of you were suggesting she was

a great employee, and I pointed out some of the issues. Show me in the record where the March walk through became an issue between the time she disclosed her pregnancy and when she was terminated?

MR. GLADSTEIN: It's --

THE COURT: It's not.

MR. GLADSTEIN: No, but now, after the fact, the defendants are now stating that she wasn't a great employee, she was deficient in all these areas, and --

THE COURT: They were raising that in the context of litigation, in the context of trying to establish that there's no genuine issue of material fact as to whether she met the qualifications prong of the prima facie case.

MR. GLADSTEIN: And I understand that, but I think that goes back to, you know, would a pregnant person, or a non-pregnant person be treated the way that Miss Vasconcellos was treated because of the issue of whether she went to the bank or leaving for the day, and my point that I'm trying to make is that here is a performance issue that is being made into a big issue by the defendants, but when it occurred, she wasn't --

THE COURT: As the store manager, isn't she in charge of the money, accounting for the money?

MR. GLADSTEIN: Correct.

THE COURT: The deposits?

MR. GLADSTEIN: Correct.

THE COURT: She's responsible for supervising other employees who have time keeping, payroll issues, she turns, looks the other way, people leave early. She was salaried but I'm assuming the people that worked for her were paid by the hour.

MR. GLADSTEIN: Correct.

THE COURT: But she was responsible for the integrity of that payroll system for the people who were working for her, she had responsibility for, I'm guessing, tens of thousands of dollars of store inventory.

MR. GLADSTEIN: Correct.

THE COURT: Were within her custody and control, and were subject to both loss from members of the public and loss from employees, so wasn't she charged with quite a bit of trust as the store manager?

MR. GLADSTEIN: And I agree, and I think there are two points I'd like to make regarding that. The first one is, if there's a concern about her dealing with money and hours and loss of time, money, whatever the case may be, to the defendants, then they should have checked to see whether there were other issues of her being dishonest.

THE COURT: So she should get a pass. They, as a legitimate business reason, they can't say once a store manager lies, we have a lack of trust, that in and of itself

is a reason to terminate her?

MR. GLADSTEIN: Well, I think it depends on the reason, and if the reason was, you know, she was on Vicodin, and wasn't aware of what was going on, then yes, that would be a concern. But the reason that she gave, and you talked about whether the reasons should be probative, I think the reason that she gave is very probative. She gave a reason that she was not comfortable about telling the employer why she wasn't at work.

THE COURT: What if she just simply made a serious mistake? What if she said, all right, I'm uncomfortable, she didn't have grounds to be uncomfortable because there is nothing you can point to directly in the record, nothing objective that they were coming down on her because of her pregnancy, what if she made just a misjudgment and lied for a reason that she shouldn't have lied for?

MR. GLADSTEIN: But we don't have that situation here, your Honor. We have a pregnant woman who is concerned about talking about her pregnancy who -- and I wouldn't even agree that she lied. What I would say is that she wasn't forthright, and I know that there's a fine line here, but it's not as though she said I'm --

THE COURT: Whether she was forthright at that initial point, didn't she concede later that she lied about telling her assistant manager the reason for leaving. I'm

not articulating this well. Didn't she tell Miss Baldwin that -- she told her assistant manager that she was going to the bank and then later told Miss Baldwin, no, that wasn't true, I told the assistant manager I was leaving for the day?

MR. GLADSTEIN: She testified --

THE COURT: That she lied during the investigation and she lied, or was not fully forthcoming on the afternoon of the 29th when she called Miss Baldwin back and then lied during the investigation about what she told her assistant manager?

MR. GLADSTEIN: Well, she testified that she was mistaken. She thought she had told Jodi but then she realized that she did not.

Your Honor, I stated that there were two points that I wanted to make. The other point that I'd like to address to the Court is that originally when Miss Baldwin investigated the plaintiff, she also wrote an e-mail stating that she thought that Miss Vasconcellos was falsifying her time cards, so you could make the inference that she was looking for any reason to get rid of Miss Vasconellos, the falsifying the time cards didn't stick, so she relied on the so-called lying incidents. You know, my client had worked for Pier 1 for 4 years. I'm not going to say she was the best employee in the world but she was a good employee. There was no discipline notice or no warnings, nothing in her file about being

dishonest. She told at the company that she was pregnant. Within twelve days after telling she was -- telling the company she was pregnant, she was terminated, and I think the reasons why she was terminated, and the reasons that she gave for not being truthful, are all statements of fact that are disputed.

THE COURT: All right, you pointed to the fact that she said she was pregnant and then twelve days later she's terminated.

MR. GLADSTEIN: Correct.

THE COURT: Another way to look at it is she said she was pregnant and twelve days later she lied to her boss.

MR. GLADSTEIN: Well --

THE COURT: Miss Baldwin didn't make her lie. I mean, I look at the statement. She says in her statement, she has the addendum with the asterisk, "I had told Cindy that I did not let Jodi, my assistant manager, know I would be at the bank. I did not inform Jodi I was leaving for the bank. I said good-bye to her and I was clocked out for the day." Then she's referring to her conversation with Miss Baldwin, "I hesitantly let her know that my true intention was to leave for the day." So she wasn't truthful to Miss Baldwin. I'm not really sure how you can get around that.

MR. GLADSTEIN: Well, when she says that, that

she was at the bank, that was a true statement. She didn't say, "I was at the bank when you called." Miss Baldwin said, "Where were you?" And she said, "I was at the bank." Which is a true statement. Regarding the statement to Jodi, I'm not going to stand here and say that my client was perfect and didn't make some mistakes in what she did, but she testified that it was a mistake that she thought she'd talked to Jodi and in reality she didn't, and the question comes down to, would a pregnant person --

THE COURT: Whether or not, you can agree or disagree about it, whether or not the statement was a lie. Then when Miss Baldwin was investigating, unless you can point to me something in the record to suggest I'm wrong, during the investigation, she lied to cover a lie by telling Miss Baldwin that she told her assistant manager she would be at the bank. Then she later said, "I didn't tell her that. I told her I was leaving for the day." She tried to lie to cover her tracks, and then on reconsideration, whether she didn't want to get the assistant manager in trouble or she just had no choice but to tell the truth at that point, she confided in Miss Baldwin that she lied.

MR. GLADSTEIN: Well, I think there's also a third option, your Honor, and this is what my client testified to, that when she was asked about it, she thought she had told Jodi that she was going to the bank, and then

when she had some time to think about it, and spoke to Jodi about it, she realized that she didn't and it was just an honest mistake.

THE COURT: How would that be credible, if she says, according to your client, the end version, the end version is that she clocked out, was leaving for the day, said good night, walked out the door, and then was called on the cell phone by Ms. Graham, I believe it is, called on the cell phone and said, "Miss Baldwin is looking for you." Came back in and then jumped right over to the back, but then jumped back, then did some additional work before she left, how would it be credible that she would mistakenly believe that she told Miss Graham that she was leaving to go to the bank?

MR. GLADSTEIN: Because she did go to the bank. And that's when she mistakenly believed that she told Miss Graham that she was going to the bank.

THE COURT: But again, if she was telling Miss Baldwin, "I told Miss Graham I was going to the bank," that's again not being forthcoming because she's only disclosing part of it. She's not saying that, "Two minutes earlier I told her I was leaving for the day."

MR. GLADSTEIN: And was my client completely forthright in her statement in what she told Miss Baldwin? No. And I'm not going to stand here and say that everything

she said was completely true without any items left out. The question is, was this enough to terminate my client without finding out why she felt she had to leave information out about her being pregnant, about her having morning sickness and leaving for the day, and the fact that no one asked Miss Vasconcellos why she felt that she couldn't talk to her manager, why she felt she needed to cover the real reason why she left for the day, the fact that it occurred twelve days after everybody found out that she was pregnant, the fact that when the investigation was done --

THE COURT: What was the big secret if she didn't feel well? She told her boss. She volunteered to her supervisor that she was pregnant and she openly discussed her pregnancy and the circumstances about her pregnancy, personal things about her pregnancy with her supervisor. She was comfortable doing that. It's not -- morning sickness in the beginning portion of a pregnancy is not unusual. Why would she feel compelled to hide that, that she was leaving an hour and fifteen minutes early because she didn't feel well?

MR. GLADSTEIN: With all due respect, your Honor, I think that that is incorrect. I think that she was very uncomfortable talking about personal issues. All she really wanted to tell her boss about was she was pregnant, that she would be due in December, and that she would be unable to lift heavy furniture at some point. That's all she wanted to

tell her boss. When her boss started asking her personal questions, and started making comments, and started showing up at the store less, and started calling her, or not showing up at the store at all, calling her less, not being cheery and friendly as she always was, at that point my client realized that there's something wrong with me being pregnant in the eyes of Miss Baldwin, and when it came down -- when a pregnancy issue came up, she was scared to tell her because who knows what she was going to do, and I think that the evidence will show --

THE COURT: Well, you would have a much easier case if she told her that she was leaving because she was sick, and the woman said, well, I'm firing you for that reason.

MR. GLADSTEIN: You're right, I would. And there are a lot of cases that would be easier if my clients would get my advice before they would say things, but as you know, that doesn't occur. You know, this is a client who, you know, that being pregnant was a concern to the company and that's why they terminated her, and I think that there are numerous --

THE COURT: A concern in her mind or a concern based on objective evidence that you can point to me?

MR. GLADSTEIN: Well, I think there was a concern in her mind whether the --

THE COURT: You can't point to anything other than your client's subjective belief that she got the cold shoulder, you can't point to anything in that record to show me that Pier 1 supervisors, or Pier 1 HR, believed that this was a negative, and a problem, and what are we going to do when she's out Thanksgiving to Christmas?

MR. GLADSTEIN: No, I think I can. I think the fact that this occurred shortly after the Pier 1 was notified of her pregnancy, the fact that there were other performance issues that weren't even put in any type of warning or memo in her file that they say were so horrendous, the fact that when the investigation was done, it was done on the basis of one person relaying all the information.

THE COURT: You identified the investigation as being shoddy and you say, well, only one person, and that one person relayed the information. Whether you agree or not with the outcome, or the decision to terminate, the investigation was pretty thorough, wasn't it? The only people involved were interviewed. They gave written statements. Your client gave a written statement. She admitted she wasn't forthcoming. What's shoddy about that investigation?

MR. GLADSTEIN: Well, one of the things that I asked of Miss Dubois, which was Miss Baldwin's boss, is that when you are investigating a situation, do you want to give

leading questions and --

THE COURT: That's a red herring here because your issue is with the decision not with the investigation.

MR. GLADSTEIN: Correct.

THE COURT: You concede. You know, you say she has reasons for it. All that's in the investigation, the fact that she said during the investigation, "I was uncomfortable because there was morning sickness." Who said what, all that ultimately came out in the investigation. This isn't a case where I look at the investigation and it doesn't match to what the record shows actually happened. The investigation reviewed the truth.

MR. GLADSTEIN: Well, and --

THE COURT: You disagree with the decision. You believe it was a discriminatory decision to fire her but the information obtained during the investigation seems to be fairly accurate.

MR. GLADSTEIN: And I would disagree with that, also. There were statements that Miss Baldwin stated that the plaintiff told her that what was not in the statement that Miss Vasconcellos wrote out that was given to everybody.

THE COURT: The one I have in front of me.

MR. GLADSTEIN: Correct.

THE COURT: The three page handwritten statement?

MR. GLADSTEIN: Correct.

THE COURT: All right.

MR. GLADSTEIN: For example, Miss Baldwin stated that Miss Vasconcellos admitted three times that she lied to her, but that doesn't say that in the statement. What she --

THE COURT: That's her conclusion based on, whether you call it lying or not being forthcoming, her conclusion that she was dishonest on three occasions during that process.

MR. GLADSTEIN: But that's not what she said. It wasn't her conclusion. She testified that Miss Baldwin -- I'm sorry, Miss Baldwin testified that Miss Vasconcellos told her three times that she lied and she was sorry for lying. And now we're sent in the e-mail to Miss Dubeau and --

THE COURT: Where is this e-mail? Where is it in the papers in front of me? It's not, unless you can point me to an exhibit that's on file.

MR. GLADSTEIN: If I may have one second, your Honor.

THE COURT: You may. I have the e-mail regarding going to the Dartmouth store. I don't think I have any e-mails in the exhibits that were entered.

MR. GLADSTEIN: It was not attached, your Honor. There was a reference to it, but it was not attached.

THE COURT: All right. So it's not part of the

record in front of me?

MR. GLADSTEIN: That's correct.

THE COURT: Anything further?

MR. GLADSTEIN: The only thing I would say in closing, your Honor, the question as to whether Miss Vasconcellos lied, and the question as to whether the lie was the reason for the termination, or the pregnancy was the reason for the termination, those are facts that are clearly in dispute, and at this point in the summary judgment proceeding --

THE COURT: The concern I have, if I let this case go forward, and Judge Torres impanels a jury, and that jury is presented with the evidence in the case, the evidence that's been put forward in this record should be all the evidence that is available and would be presented to a jury. What evidence do I have that would allow a reasonable jury to find that you've met your burden of proving intentional discrimination because of pregnancy?

MR. GLADSTEIN; Well, again, I think it's all the circumstantial -- in a discrimination case, very rarely you're going to have a smoking gun variety of evidence. Very rarely are you going to have the smoking gun variety of evidence, and what it depends on is circumstantial, and I think there's numerous examples of circumstantial evidence, the temporal proximity, the difference in the attitude before

and after the pregnancy, the fact that supposedly my client had performance issues in the past that were never documented, and now she has the performance issue, that is, not to terminate her. The fact that there was no questioning as to the reasons why my client felt that she couldn't be completely forthright in talking about her pregnancy for the morning sickness caused by the pregnancy, with Miss Baldwin. The fact that my client states that she told Miss Baldwin that she was pregnant, and the due date, and Miss Baldwin stating that she didn't know when her due date was. The fact that Miss Baldwin testified that she told Ms. Dubeau --

THE COURT: Isn't that also a red herring? I mean, anybody can do the math. Somebody comes to you and they look the same as they always looked, and they say, "I'm pregnant," and with the other facts that were given to Miss Baldwin, couldn't she take a calendar out and do the math and have a pretty good idea of what her due date was?

MR. GLADSTEIN: Well, I think, first of all, in today's age of skinny is best, which I'm not saying I agree with, because I don't, as you can tell, but that skinny is best, and let's be in shape, no one really knows today how long anybody is. And, in fact, I think it can go the other way, even if she said that she didn't know when she was due, if you count out, she's still going to be out during the Christmas holiday, which is the busiest time of the season.

I think what also is important is that Miss Dubeau says that she wants to know if people are pregnant because she needs to do, I forget the words she used, but it was basically scheduling --

THE COURT: Take care of the bench.

MR. GLADSTEIN: Right. The scheduling issues and --

THE COURT: Isn't that a legitimate business concern?

MR. GLADSTEIN: It is, but if that's a legitimate business concern, then she stated that she didn't know whether my client was six weeks pregnant or six months pregnant, so if it's a concern that she's going to do the scheduling, she -- how can she not ask Miss Baldwin when Miss Vasconcellos is pregnant. And then you look at the notes taken by Miss Trotter, and it clearly states in the notes --

THE COURT: Doesn't that fact that she was concerned about the bench, doesn't that almost cut against your argument that they have an adverse position towards pregnancy? Wouldn't that suggest that they are willing to plan and have people on the bench to substitute, to cover, when people are out for maternity leave?

MR. GLADSTEIN: I would make the following inference, the fact that she says she does it for her bench,

but she didn't do it in this case, shows that it is a pregnancy issue.

THE COURT: Maybe she was going to get around to it. It was only twelve days, as you've point out over and over again. Twelve days prior she found out that this employee was in early stages of pregnancy.

MR. GLADSTEIN: Well, she didn't find out that the employee was in the early stages. She found out she was pregnant, and I think that's important because she could have been 8 and 1/2 months pregnant. She says she finds out these issues so she --

THE COURT: Well, wouldn't she expect -- wouldn't Miss Dubeau say to Miss Baldwin, isn't it Miss Baldwin's job to let her know if she was going to lose the store manager in two weeks?

MR. GLADSTEIN: She could say that but Miss Dubeau says she wants to know about pregnancy because of bench issues, not because she wants to know when her employees are pregnant, not because she wants to send them a muffin basket for being pregnant, she wants it for bench issues, so when she found out she was pregnant, and then didn't ask the follow up question, very simple, you know, three words -- four word question, when is she due, I mean, I think that, you know, it shows that she knew she was due, she knew she was due in the busiest time of year, she knew it was

going to be tough to have a manager out at the busiest time of the year, and she decided, you know what, the best way to get rid of this -- to resolve this issue is to find a reason to fire her and then they found a reason.

THE COURT: All right.

MR. GLADSTEIN: Thank you, your Honor.

THE COURT: You're welcome.

MR. GLADSTEIN: I guess I wasn't as brief as I thought I would be.

THE COURT: I didn't let you be brief. All right. I will take the matter under advisement and I will issue a report and recommendation to Senior Judge Torres advising him of my recommendation, as I'm required to within the report and recommendation. I will advise the parties of their appeal rights, to object to my report and recommendation. If they're unhappy, there is a fairly specific deadline for filing those objections, and also requirements in the local rules, I believe Local Rule 72, if you don't follow those rules in filing an objection, your objection can be denied as non-compliant. All right.

MR. GLADSTEIN: And, your Honor, I'll get you that supplemental exhibit by the end of the day.

THE COURT: All right. Actually, I am going away for a long weekend, so if you can get that to me anytime next week is fine. You don't need to jump right on it because I'm

not going to look at it, anyway. I'll be out of state. The Court will be in recess.

(RECESS)

C E R T I F I C A T I O N

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

/s/Joseph A. Fontes Date: May 21, 2008